1    XAVIER BECERRA
     Attorney General of California
2    ANTHONY R. HAKL
     Acting Supervising Deputy Attorney General
3    JOHN W. KILLEEN
     Deputy Attorney General (attorney for notice)
4    State Bar No. 258395
      1300 I Street, Suite 125
5    P.O. Box 944255
      Sacramento, CA 94244-2550
6    Telephone: (916) 210-6045
     Fax: (916) 324-8835
7    E-mail: John.Killeen@doj.ca.gov
     *Attorneys for Defendant California Labor*
8    *Commissioner Julie Su*

9                IN THE UNITED STATES DISTRICT COURT

10              FOR THE CENTRAL DISTRICT OF CALIFORNIA

11                        WESTERN DIVISION

12

13

14   **RICK SIEGEL,**                    Case No. 2:17-cv-07203 CAS (SSx)

15                  Plaintiff,           **REQUEST FOR JUDICIAL
                                         NOTICE IN SUPPORT OF**
16          v.                           **CALIFORNIA LABOR
                                         COMMISSIONER JULIE SU'S**
17                                       **MOTION FOR JUDGMENT ON
     **JULIE SU,** in her official capacity as   THE PLEADINGS (FED. R. CIV. P.**
18   the California Labor Commissioner,   **12(C))**

19                  Defendant.           Date:        February 12, 2018
                                         Time:        10:00 a.m.
20                                       Courtroom:   8D
                                         Judge:       Hon. Christina A. Snyder
21                                       Trial Date:  None Set
                                         Action Filed: September 29, 2017
22

23

24

25

26

27

28

1          Pursuant to Federal Rule of Evidence 201, California Labor Commissioner

2    Julie Su respectfully requests that the Court take judicial notice of the following

3    documents in support of her motion for judgment on the pleadings:

4          (1) The April 15, 2008, complaint in *Siegel v. Brown*, No. 08-2480 CAS

5    (SSx).  A true and correct copy of this document (excluding attachments) is

6    attached hereto as Exhibit A.

7          (2) The Court's July 14, 2008, minute order granting the Labor

8    Commissioner's motion to dismiss the complaint in *Siegel v. Brown*.  A true and

9    correct copy of this document is attached hereto as Exhibit B.

10         (3) The July 25, 2008, first amended complaint in *Siegel v. Bradstreet*, No.

11   08-2480 CAS (SSx).  A true and correct copy of this document (excluding

12   attachments) is attached hereto as Exhibit C.

13         (4) The Court's September 8, 2008, order granting the Labor Commissioner's

14   motion to dismiss the first amended complaint in *Siegel v. Bradstreet*.  A true and

15   correct copy of this document is attached hereto as Exhibit D.  Exhibit D is also

16   available in Westlaw at 2008 WL 4195949.

17         (5) Labor Commissioner Determination of Controversy *Blanks v. Riccio*, Case

18   No. TAC 7163 (Jan. 9, 2009).  A true and correct copy of this document is attached

19   hereto as Exhibit E.  Exhibit E is also available in Westlaw at 2009 WL 9081071.

20         (6) Labor Commissioner Determination of Controversy *Brooks v. Ax*, Case

21   No. TAC 43-04 (Nov. 7, 2006).  A true and correct copy of this document is

22   attached hereto as Exhibit F.  Exhibit F is also available in Westlaw at 2006 WL

23   4449696.

24         (7) Labor Commissioner Determination of Controversy *Tyler v. Laugh

25   Factory*, Case No. TAC 31-01 (Feb. 3, 2006).  A true and correct copy of this

26   document is attached hereto as Exhibit G.  Exhibit G is also available in Westlaw at

27   2006 WL 7089514.

28   / / /

1       (8)  Labor Commissioner Determination of Controversy *Miravalles v. Artists,*

2 *Inc.*, Case No. TAC 33-99 (Oct. 11, 2000).  A true and correct copy of this

3 document is attached hereto as Exhibit H.  Exhibit H is also available in Westlaw at

4 2000 WL 35316019.

5       (9)  Labor Commissioner Determination of Controversy *Solis v. Blancarte*,

6 Case No. TAC 27089 (Sept. 30, 2013).  A true and correct copy of this document is

7 attached hereto as Exhibit I.

8       (10)  True and correct copies of search results on the Labor Commissioner's

9 "Talent agency license database," published on the Internet at

10 https://www.dir.ca.gov/databases/dlselr/talag.html.  The pages attached collectively

11 as Exhibit J are the results of searches executed by counsel for the Labor

12 Commissioner on November 21, 2017, by searching on the "state" field for

13 Arizona, Florida, Massachusetts, New York, Tennessee, and Texas respectively.

14       (11)  A "Talent Agency License Application," downloaded from the Labor

15 Commissioner's website at

16 https://www.dir.ca.gov/dlse/Talent/Talent_application.pdf.  A true and correct copy

17 of the application is attached hereto as Exhibit K.  Counsel for the Labor

18 Commissioner downloaded this document on November 21, 2017.  An online

19 version of the application can be found at

20 https://www.dir.ca.gov/dlse/Talent%20Agency_License_and_Fee-

21 Related_Talent_Services.htm.

22       (12)  Labor Commissioner Determination of Controversy *James v. Thompson*

23 *Management*, Case No. TAC 17-03 (Apr. 25, 2006).  A true and correct copy of this

24 document is attached hereto as Exhibit L.  Exhibit L is also available in Westlaw at

25 2006 WL 7089512.

26       (13)  Labor Commissioner Determination of Controversy *Breuer v. Top Draw*

27 *Entertainment, Inc.*, Case No. TAC 18-95 (July 18, 1996).  A true and correct copy

28 of this document is attached hereto as Exhibit M.

1    (14)  Labor Commissioner Determination of Controversy *Baker v. Bash*, Case

2  No. TAC 12-96 (Dec. 27, 1996).  A true and correct copy of this document is

3  attached hereto as Exhibit N.

4    (15)  Labor Commissioner Determination of Controversy *Robi v. Wolf*, Case

5  No. TAC 29-00 (Mar. 21, 2002).  A true and correct copy of this document is

6  attached hereto as Exhibit O.  Exhibit O is also available in Westlaw at 2002 WL

7  34940567.

8    The Court may take judicial notice of any fact that is "not subject to

9  reasonable dispute in that it is either (1) generally known within the territorial

10  jurisdiction of the trial court or (2) capable of accurate and ready determination by

11  resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.

12  201(b).  A court shall take judicial notice if requested by a party and supplied with

13  the necessary information.  Fed. R. Evid. 201(d).  "A trial court may presume that

14  public records are authentic and trustworthy."  *Gilbrook v. City of Westminster*, 177

15  F.3d 839, 858 (9th Cir. 1999).

16    The Court may take judicial notice of its own records.  *See, e.g.*, *United States*

17  *v. Brugnara*, 856 F.3d 1198, 1209 (9th Cir. 2017). The Court may take judicial

18  notice of administrative agency orders and decisions.  *See, e.g.*, *W. Radio Services*

19  *Co. v. Qwest Corp.*, 530 F.3d 1186, 1192 n.4 (9th Cir 2008) (taking judicial notice

20  of state public utility commission order).  And the Court may take judicial notice of

21  public records obtained from government websites, the authenticity of which is not

22  disputed.  *See, e.g.*, *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th

23  Cir. 2010).  The accuracy of these public records consisting of court records,

24  agency decisions, and publicly available information from government websites

25  and databases cannot reasonably be questioned.  Judicial notice of these records is

26  therefore appropriate.  Fed. R. Evid. 201(b).

27  / / /

28  / / /

1

2    Dated:  November 30, 2017                    Respectfully submitted,

3                                                 XAVIER BECERRA
                                                  Attorney General of California
4                                                 ANTHONY R. HAKL
                                                  Acting Supervising Deputy Attorney
5                                                 General

6
                                                  /s/ John W. Killeen
7                                                 JOHN W. KILLEEN
                                                  Deputy Attorney General
8                                                 *Attorneys for Defendant California
                                                  Labor Commissioner Julie Su*
9
      SA2017109057
10    12889791.docx

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# Exhibit A

FILED

1  Rick Siegel
   3379 Tareco Drive
2  Los Angeles, CA 90068
   Acting Pro Per
3  323.512.2600
   ricks@marathonent.com

2008 APR 15  PH 3: 53

4                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
5                           WESTERN DIVISION

6

7  Rick Siegel, an individual,              )
                                            )
8              Plaintiff,                    )
                                            )
9       vs.                                  )
                                            )
10 EDMUND G. BROWN, in his official         )  **COMPLAINT FOR DECLARATIVE AND**
   capacity as the California Attorney General )  **INJUNCTIVE RELIEF FROM THE**
11 and ANGELA M. BRADSTREET, in her official )  **APPLICATION AND ENFORCEMENT OF**
   capacity as the Labor Commissioner for the )  ***CALIFORNIA LABOR CODE* § 1700.5**
12 State of California                       )
                                            )  CV 08 - 2480 - CAS (SSX)
13             Defendants.                    )
                                            )  CASE NO.
14 ─────────────────────────────            )
                                            )
15                                          )
                                            )
16

17

18                          **BACKGROUND**

19      1.      This is a civil action for declaratory and injunctive relief arising under the due

20 process and equal protection clauses of the Fourteenth Amendment to the United States

21 Constitution.

22      2.      In an effort to protect artists (as defined in *CA. Labor Code* § 1700.4 (b),

23 "actors, writers, directors, musicians and other persons who render professional services in

24 entertainment enterprises") who are looking for employment in their chosen fields, the

25 California Legislature created the Talent Agencies Act (hereinafter "TAA" or "the Act").

26      3.      Since its January 1, 1979 enactment, courts and the California Labor

27 Commission (hereinafter "CLC") have uniformly penalized found violators of the Act by

28 rendering the talent representative/artist contract *ab initio* and in doing so extinguish any

   contractual obligation the artist had to pay owed commissions.

                                    1

4.      This disgorgement has been done no matter how immaterial the infraction; for instance, in *Wilson v Sirens Model Management* (TAC 13-96), the CLC voided the parties' contract because the agency had failed to "post in a conspicuous place in the office" a copy of their schedule of fees (CA. *Labor Code* § 1700.24) and similarly failed to "post in a conspicuous place in the office" a copy of the TAA statutes (§ 1700.28).

5.      While a recent California Supreme Court decision has instructed the State's courts and Labor Commission to incorporate the doctrine of severability when considering a TAA dispute, the Jurists reinforced an artist's ability to utilize the TAA "as a defense against collection of commissions," despite characterizing this ability as "a blunt and unwieldy instrument." *Marathon Entertainment v. Rosa Blasi* (S145428 at 28).

6.      A statute is rendered unconstitutionally vague when there is uncertainty as to (1) what persons are affected by the law; (2) what conduct is considered to be unlawful; and (3) or if there is uncertainty as to what, if any, penalties should be imposed for those found to have violated the Act.

7.      As delineated below, the TAA's lack of clarity as to what persons are affected by its statutes and what conduct if any being regulated – specifically, who needs to be licensed before procuring employment for artists – offers persuasive rationale for rendering the application of *CA. Labor Code* § 1700.5 ("*No person shall engage in or carry on the occupation of a talent agency without first procuring a license therefor from the Labor Commissioner*") unconstitutional.

8.      Moreover, it is undeniable that the Talent Agencies' Act is devoid of any statute informing adjudicators of what penalties are to be imposed if or when a violation is found.  Therefore, as delineated herein, any assignation of a fine, penalty, or the disgorgement of a contract is done without legislative instruction and violative of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

9.      With these understandings, the Plaintiff hereby asks this Court to issue a permanent injunction to stop California's courts and Labor Commission from assigning any further penalties or withholding any fees due under contract for violations of the Talent Agencies' Act until or unless the California Legislature creates a stature providing guidance of what an appropriate penalty would be.

2

**JURISDICTION AND VENUE**

10.     This action arises under 28 U.S.C. 2201, 42 U.S.C 1983, and the First and Fourteenth Amendments to the United States Constitution.

11.     The court has subject matter jurisdiction to adjudicate both claims in this complaint under 28 U.S.C. 1331 and 1343(a).

12.     The Central District of California is the proper venue for this case under 28 U.S.C. §1391(b) since Defendants perform their official duties in California, and the facts that form the basis for this complaint are all based in this district.

13.     The Western Division is a proper location to hear this complaint as the Plaintiff is based in Los Angeles his three California Labor Commission (hereinafter "CLC") and two superior court and Court of Appeals controversies were all held in Los Angeles.

**PARTIES**

14.     Rick Siegel is a personal manager.  He is the president and sole shareholder of the management firm involved in the recent CA. Supreme Court decision, Marathon Entertainment, Inc.  That was just one of the three times a former client first withheld owed commissions and when faced with a breach of contract action, petitioned the CLC alleging a violation of § 1700.5 and asking for the disgorgement *ab initio* of their manager/client contracts and thereby freeing them of their otherwise owed financial obligations.

15.     Edmund G. Brown is the attorney general of California.  The attorney general's office of California oversees the State's judicial operations.

16.     Angela M. Bradstreet is the Labor Commissioner of the State of California.  The California Labor Commission has the original and exclusive jurisdiction over issues arising under the Talent Agencies Act (see *Styne v Stevens* (2001) 26 Cal.4th 42) and has the power, as per *CA Labor Code* § 1700.29, has the "power to adopt, amend, and repeal such rules and regulations as are reasonable necessary for the purpose of enforcing and administering the laws of the Act."

**STANDING**

17.     "The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged of the challenged official

3

conduct and the injury must be both real and immediate, not conjectural or hypothetical." *City of Los Angeles v Lyons*, 461 US 95, 101 (1983).

18.      "[By injury in fact] we mean an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 US 555, 560 (1992).  The monies lost after the CLC rendered Siegel's company unable to enforce its contract with one client (*Marathon v. Vardalos* (TAC: 02-03) and a jury's determination to disgorge its contract with another (*Marathon Entertainment v. Hayes* BC 275443) left the management firm unable to provide Siegel a salary.  Siegel and Marathon recently settled with Blasi for hundreds of thousands less than what was owed.  The rest is an actual loss.  Further, Siegel is currently owed money by another ex-client, Wendy Walsh, and concerned any effort to enforce his contractual rights will be similarly rebuffed.  Thus, Siegel's interest is concrete and actual, not conjectural or hypothetical, and therefore meets the required sustaining of injury as defined in *Lujan* and decreed in *City of Los Angeles*.

19.      The Rooker-Feldman doctrine bars lower federal courts "from ... considering issues actually presented to and decided by a state court..." *Allstate Ins. Co. v West Va. State Bar*, 233 F. 3d 813, 816 (4th Cir. 2000).  In its determination that the TAA regulates an activity and not an occupation, (see *Marathon Supra* at 15, Fn 8), that Court avoided the question as to whether such application, and in particular the enforcement of a penalty, is constitutional.  As the doctrine only bars the consideration of a Plaintiff's issue already "presented to *and decided* by a state court," Rick Siegel's standing in this matter is not affected by the Rooker-Feldman doctrine.

## FACTS

### There Is Uncertainty About The *Punishment* That Should Be Imposed

20.      As per *CA. Business & Professions Code* § 7031 (a), "*Except as provided in subdivision (e), no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract, regardless of*

4

*the merits of the cause of action brought by the person.*" This statute, part of the California State Contractors' Act, provides clear notice that those engaging in activities limited to licensees without the applicable contractor's license have no legal mechanism to enforce a contract.

21.     Similarly, *CA. Business & Professions Code* § 6980.15 provides clear notice that anyone who cannot prove they were duly licensed no legal recourse to collect monies for any locksmith work they did for others.

22.     California has parallel statutes in a litany of occupational licensing schemes leaving unlicensed persons unable to recover monies for work done that requires licensure. Notably however, no such statute exists inside the Talent Agencies Act.

23.     It is a basic rule of statutory construction that courts should avoid a construction that makes some words surplusage.  If one follows the construction of the TAA as currently enforced (whereby one has no mechanism to collect monies for procuring artistic employment without a talent agency license though there is no statute comparable to *BPC* §§ 7031 or 6980.15), the locksmith, contractors' and other like statutes that disgorges contractual rights are surplusage.  Conversely, if one follows the statutory construction tenet that avoids making those statutes subterfuge, that they were needed before a court could disgorge a contractor's, locksmith's or the like contractual rights, the lack of a statute providing for penalties in the Talent Agencies Act must be given meaning as well; in this case, the legal maxim, "that which does not appear to exist is to be regarded as if it did not exist." CA. *Civil Code* § 3530.

24.     Another basic legal tenet of relevance: one cannot be punished if there is no prescribed punishment, even when the purpose to proscribe the conduct is clear.  See *U.S v. Evans,* 333 U.S. 483 (1948).

25.     In *Evans* the Government argued, "because Congress intended to authorize punishment, but failed to do so, probably as a result of oversight, we should plug the hole in the statute." *Ibid at* 488.  Noting that devising statutory penalties "is essentially the sort of judgment legislatures rather that courts should make," (*Ibid* at 490) the Court ruled it "a task outside the bounds of Judicial interpretation.  It is better for Congress, and more in accord with its function, to revise the statute than for us to guess at the revision it would make.  That task it can do with precision.  We could do no more than make speculation law."

5

26.    "Engrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges.  Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed." *Lambert v. California*, 355 U.S. 225 (1957).  Yet California's courts and Labor Commission have continuously and consistently enforced a tortuous, speculative interpretation of legislative intention, disturbing property without the required notice.  No matter how slight the found violation, courts and the CLC has eviscerated the representative/ client contract and relieved the client of any otherwise owed fiscal obligations, despite there being absolutely no statutory guideline of what, if any, penalties should be imposed.  While the *Marathon* decision instructing courts to incorporate the doctrine of severability when adjudicating TAA disputes may give a broader disposition to future controversies, with no statutory guidelines the imposition of any penalty cannot pass constitutional muster.

27.    "Elementary notions of fairness enshrined in this Court's constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." *BMW of America v Gore*, 517 U.S. 559 (1995).  Without the same clear notice that all other licensing schemes provide to inform the public what penalties might be extracted if a violation is found, per *Lambert*, any extraction of a penalty relevant to a TAA violation must be found violative of the doctrines of equal protection and vagueness.

### The Void For Vagueness Doctrine Demands That The Current Enforcement Of The Talent Agencies Act Must End

28.    Undue vagueness in a statute will result in its being held unconstitutional whether the uncertainty goes to the persons within the scope of the statute (see *Lanzetta v. New Jersey*, 306 U.S. 451 (1939)); the conduct which is forbidden (see *Interstate Circuit, Inc. v City of Dallas*, 390 U.S. 676(1968)); or the punishment which may be imposed (See *United States v. Evans*, 333 U.S. 483 (1948).  *See Due Process Limitations on Occupational Licensing*, VA L. Rev. 59, No. 6 (Sep., 1973), pp. 1104, citing *The Void-for Vagueness Doctrine in the Supreme Court*, 109 U. PA. L. Rev. 67 (1960).

29.     As delineated above, the only certainty relevant to these three precepts of
vagueness is that the California Legislature has not empowered Courts or the Labor
Commission to impose any punishment.

30.     As detailed below, there are similar ambiguities relevant to how California's
courts and Labor Commission applies and enforces (1) what persons are within the scope of
the prohibitions of § 1700.5 and (2) what conduct is forbidden.

### There Is Uncertainty With Regard To Who Is Within The Scope Of The Act

31.     The Due Process Clause of the Fourteenth Amendment requires that a statute
be declared void when "men of common intelligence must necessarily guess at its meaning
and differ to its application." *Conally v General Construction Co.*, 269 U.S. 385, 391
(1926).   As written, California *Labor Code* § 1700.5 – "*No person shall engage in or carry
on the occupation of a talent agency without first procuring a license therefor from the Labor
Commissioner*" – is facially constitutional.   Anyone who wants to hold his or herself out as a
talent agent must first get a talent agency license.

32.     However, as applied by California, § 1700.5 does not regulate an occupation:
it "regulates *conduct*, not labels; it is that act of procuring (or soliciting), not the title of one's
business, that qualifies one as a talent agency and subject one to the Act's licensure and
related requirements." *Marathon Supra* at 10.   This interpretation, which wrongly accepts
the terms "occupation" and "conduct" as synonymous, renders such enforcement
unconstitutional.

33.     However, the regulation was created not by the Legislature but by the courts
and Labor Commission.   The Act does not call itself the Artists' Procurement Act, and the
statute that adjudicators point to states that one must first get a license before engaging in an
occupation, not an activity, and activity is not synonymous with occupation.   According to
Webster's Third New International Dictionary, p. 1560, col. 3, "occupation" is defined as
one's "principal" business endeavor; "a craft, trade, profession or other means of earning a
living."   "Occupation" is synonymous with "employment" (ibid.), which includes "temporary
or occasional work or service for pay" (id. at p. 743, col. 3).   No one of common
intelligence would ever guess that doing something once would be synonymous with one's
"craft," "trade," or "principal business endeavor."

7

34.     It is not good enough for a high school student to have "intended to hand in their homework," they actually had to do it and hand it in.  Similarly, if the Legislature intended that anyone who procured even once needed to first be licensed, they had to memorialize that intention through enacted law.  There is no TAA statute informing those in other occupations whom incidentally procure employment as part of their overall responsibilities – producers, personal managers, attorneys, talent consultants and publicists – that they must first get a license for another occupation before fulfilling their fiduciary duties.  Just the opposite, California courts recognize, "No separate analogous licensing or regulatory scheme extends to personal managers." *Ibid* citing *Waisbren v. Peppercorn Productions Inc.* (1997) 41 Cal.App.4th at 252.  As one of common intelligence would never believe that doing something once changes their occupation, there is uncertainty as to whether persons who are not talent agents, and in particular personal managers, should be enveloped inside the scope of the statute.  As such, per *Lanzetta*, applying § 1700.5 to those who hold themselves out as being in an occupation other than a talent agent, either licensed or unlicensed, cannot pass constitutional muster.

## There Is Uncertainty With Regard To What Conduct Is Prohibited

35.     In *Marathon*, the most recent TAA dispute, the Court noted, "We are not called on to decide, and do not decide, what constitutes 'procurement' under the Act.  The Act contains no definition, and the Labor Commission has struggled over time to better delineate which actions involve mere general assistance to an artist's career and which stray across the line to illicit procurement." *Marathon Supra* at 15.  *Marathon* also noted how in 1989, the California Legislature again "expressed dissatisfaction with the Act's enforcement scheme," citing a legislative committee "decrying absence of effective regulatory and enforcement mechanisms in the wake of the Entertainment Commission's inability to devise an equitable civil or criminal penalty system." *Ibid* at 27 (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1359 (1989-1990 Reg. Sess.) as amended May 1, 1989, p. 2).

36.     At least one other California court has noted the constitutional problems of the current enforcement.  Quoting *Wachs v. Curry* (1993) 13 Cal.App.4th 6116, 626, "Although the Act contains no criminal penalty for the unlicensed procuring of employment, the financial penalties to which the unlicensed agent is exposed are clearly sufficient to raise due process concerns.  [7] 'Statutes, regardless whether criminal or civil in nature, must be sufficiently clear as to provide adequate notice of the prohibited conduct as well as to establish a standard of conduct which can be uniformly interpreted by the judiciary and administrative agencies.'" (*Hall v. Bureau of Employment Agencies* (1976) 64 Cal.App.3d 482, 491.)

37.     In *Wachs*, a personal manager raised a facial challenge to the TAA, and the court concluded that on its face the Act was not, 'so patently vague and so wholly devoid of objective meaning that it provides no standard at all.' (*Cranston v. City of Richmond Supra* 40 Cal.3d at 765).  Whether the Act is unconstitutional as applied ... is a question for another day." (*Ibid.*)  Just as the *Wachs* presciently predicted, because of the "due process concerns" (*Ibid.*) of TAA enforcement, that day has now come.

38.     There was controversy regarding procurement even before the TAA was enacted.  The first legislative committee analysis after the February 15, 1978 introduction of the Talent Agencies Act notes that "it is unclear what acts constitute procurement under the act, and the guidelines are uncertain." (AB2535: The Talent Agencies Act of 1978 at 67; Appendix Exhibit 2.)  Despite this initial analysis, no definition of procurement nor, therefor, statutory clarity was ever added to the statutes before or after their enactment.

39.     In 1982 the Legislature created and empowered the California Entertainment Commission ("CEC") to "study the laws and practices of this state, the State of New York, and other entertainment capitals of the United States relating to the licensing of agents and representatives of artists in the entertainment industry ... so as to enable the commission to recommend to the Legislature a model bill regarding this licensing."

40.     Two years later, the Commission submitted their recommendations.  In discussing what penalties there should be when a violation if found, the Commission noted that there was "an inherent inequity ... to sanctions in violation of a law which is so unclear and ambiguous as to leave reasonable personas in doubt about the meaning of the language or whether a violation has occurred.  ¶ Procure employment' is just such a phase." (1984

9

Report of the CEC at 25; Appendix Exhibit 3.)  Despite this understanding, the Commission offered no recommendations to more clearly define what constitutes procurement, and it remains today as undefined as the first committee analysis found it in 1978.

41.     As no changes were made after any of the above recognitions of the existing problems relative to enforcement, the uncertainty remains about what constitutes unlawful conduct thus leaving the Act unconstitutionally vague (per *Interstate Circuit, Inc.*)

42.     A "reasonable person" choosing to look for a professional opinion of what comprises illegal procurement would be on a quixotic expedition.  Unsure of how the Act affects them, in 2002 the Beverly Hills Bar Association sponsored a resolution "to exclude licensed attorneys from the definition of a talent agency" in *CA. Labor Code* § 1700.4 (a) "(b)ecause the word 'procurement' is vague enough to possibly include attorney contract negotiation, there is no ascertainable benchmark as to what role, if any, an attorney can perform in an artist's career without TAA licensing, and potential fee forfeiture.'" (Appendix, Exhibit 3)

43.     The "uncertainty" as to what constitutes forbidden conduct has been discussed in a litany of law review articles.  "Some commentators have argued that the TAA contains a significant ambiguity because the legislature neglected to define the term "procurement." Heath Zarem, *The California Controversy Over Procuring Employment: A Case For The Personal Managers Act* (Fordham Law Review Volume VII, Book 2: Spring 1997 at 954, citing Fred Jelin, *The Personal Manager Controversy: Carving the Turf, in* COUNSELING CLIENTS IN THE ENTERTAINMENT INDUSTRY 1993 at 476 (PLI Pats., Copyrights, Trademarks & Literary Prop. Course Handbook Series No. 359, 1993), Gary A Greenberg, *The Plight of the Personal Manger in California* in COUNSELING CLIENTS at 501 and James M. O'Brien III, *Regulation of Attorneys Under California's Talent Agencies Act,* 80 CAL Law Review at 497 (1992).

44.     A "reasonable person" who takes the extraordinary action of researching how the Labor Commission has enforced the Act would still be left unable to forge a clear understanding of what comprises unlawful 'procurement.'  The agency's "hearing officers have failed to provide the public with a consistent definition." *The California Controversy Supra* citing O'Brien *Supra* note 2, at 497-498; *see also* Jelin, *supra* note 10 at 477 (noting that cases have not established a consistent definition of procurement.")

10

45. "The requirements of the statute cannot be construed to call for a game of "Mother May I?" every time an artist manager takes some action during a long term relationship ... To find otherwise would be to ignore the realities of day to day life in the film industry." *Wesley Snipes v. Delores Robinson Entertainment* (TAC 36-96, at p. 6, fn. 2.)

46. *Creative Artists Group v. Jennifer O'Dell* (TAC 26-99) holds that procurement is allowed, "as long as the activities were done as part of a 'team effort' with a licensed agent." (Citing *Snipes* TAC 36-96). "At the very minimum an agent must be aware of the manager's procurement activity." *Ibid.*

47. However, in *Jason Behr v. Marv Dauer and Associates* (TAC 21-00), the same hearing officer from *Creative Artists Group* writes of a manager's incorrect assumption that "if he had a favorable relationship with a casting director or producer and was instructed by the agent to discuss a potential role with that casting director or producer, that those types of communications would be protected. They are not, absent convincing testimony from the artist's agent that the agent instructed the manager to conduct those specific communications." (*Id.,* at p. 9, lines 15-22.)

48. With three different interpretations, how would a "reasonable person" know what they can or cannot do? This aspect of the TAA is a paradigm of unconstitutional vagueness.

49. The Labor Commission is not even sure whether the accused or the accuser has the burden of proof. In *Marathon Entertainment v. Rosa Blasi*, the Labor Commissioner ruled the management firm had not met its burden of proving its acts of procurement were done lawfully. (TAC 15-03 at 7.) Yet in *Marathon Entertainment v. Reggie Hayes*, published the same day by the same hearing officer, the Commission determined Hayes had not met his burden of proving that Marathon had procured unlawfully. (TAC 33-02 at 6-7)

50. There is confusion as to whether and when repeating a lawful activity becomes unlawful. The Labor Commission denied singer Macy Grey's petition seeking "a determination voiding *ab initio*" (*Macy Gray v Lori Leve Management* (TAC 18-00) at 1) her management agreement deciding that the showcases her manager put together to find a recording contract deal and booking agent were not violations: "Labor Code §1700.4(a) exempts from licensing requirements the activities of procuring, offering, or promising to procure recording contracts for an artist." *Ibid* at 6.

11

51.     This decision came a year after a Court of Appeal found a personal manager had violated the Act by setting up of eighty-two showcases even while accepting the manager's "goal in procuring engagements for the Deftones was to obtain a recording agreement." *Park v. Deftones* (1999) 71 Cal. App.4th 1465.

52.     The Labor Commission differentiated the decisions by explaining Gray's manager succeeded in procuring the recording contract, whereas the Deftones' representative fell "short of the desired result." (*Id.,* at 7, lines 1-2) If it is lawful to arrange one showcase to procure a recording contract, yet unlawful to arrange eighty showcases with the same objective, how many times *can* one participate legally in the same activity before it becomes illegal?  The answer, currently uncertain, is required if such enforcement is constitutional.  Further, if as the Labor Commission holds, showcases are only exempt if the objective was realized, the exemption can only be satisfied if one knows in advance a recording deal will result ... an impossibility.

53.     The *Macy Gray* case spotlights another manifestation of the unconstitutional vagueness in enforcing the TAA against procurement.  It is a manager's fiduciary duty to "alleviate [the Artist's] logistical representative concerns." (*Gray Supra* at p. 10, lines 2-3) For a music or comedy act, the way to attract an agent is through live showcases.  However, according to *Gray*, procuring for the intended result of securing a talent agent "is not exempted within the Act." (*Id.*, lines 16-20)  As such, personal managers can neither lawfully find an unrepresented client a licensed talent agent nor find clients licensed alternatives when they are unhappy with their current licensees, another impossibility.

**The Talent Agencies Act, Enforced Differently Than All Other Occupational Licensing Schemes, It Is Violative Of Substantive Due Process**

54.     A provision will be invalidated as violative of substantive due process rights when it predicates liability on an "arbitrary and irrational" scheme. *See Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15 (1976).

55.     California, like all 50 States, regulates a litany of occupations and defines each regulated occupation with a listing of that occupation's potential responsibilities.  Whether for reasons of the public good or safety, the State has also chosen to regulate the activities these regulated occupations engage in; doing so by enacting statutes limiting the

12

1    engagement of those activities to individuals and corporations who have qualified for and
2    are holding the applicable licenses.

3        56.    For example, the *CA. Business and Professions Code* ("*BPC*") §7026 lists the
     numerous activities that define a contractor's potential responsibilities and §§ 7027 – 7031
4    prohibit those without a valid, unexpired and unrevoked contractor's license from engaging
5    in or receiving compensation for any such work.

6        57.    In California, only licensed cytotechnologists can lawfully examine cytological
7    slides (*BPC* §1270 (a); only licensed physicians may prescribe drugs (*BPC* § 2052); only
8    those with valid California veterinary licenses can practice veterinary medicine (*BPC* §
9    4825.1); and only those with valid locksmith licenses can engage in the activities of a
10   locksmith (*BPC* § 6980.10).

11       58.    Similarly, the occupational licensing schemes for dentists (*BPC* § 1700),
12   respiratory therapists, (*BPC* 3760 (a) and (b)), pharmacists (*BPC* § 4051 (a)), veterinarians
13   (*BPC* § 4825), acupuncturists (*BPC* § 4935), professional engineers (*BPC* § 6730), geologists
     (*BPC* § 7830), and structural pest control specialists (*BPC* § 8550(a)), among others, create
14   clear demarcation lines between those activities anyone can engage in and others that
15   require a license.

16       59.    If the defining responsibilities of an occupation were automatically limited to
17   licensees by the occupation's regulation, the statutes that limit the engaging of those
18   activities would be surplusage.  Again, California law provides that in determining the
19   Legislature's intent of creating laws, "a court must first look to the words of the statute
20   themselves, giving to the language its usual, ordinary import and according significance, if
21   possible, to every word, phrase and sentence in pursuance of the legislative purpose.  A
22   construction making some words surplusage is to be avoided." *Dyna-Med Inc. v Fair*
23   *Employment & Housing Comm.* (1987) 43.Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743
     P.2d 1323].

24       60.    "It is a 'settled rule of statutory construction that where a statute, with
25   reference to one subject contains a given provision, the omission of such provision from a
26   similar statute concerning a related subject is significant to show that a different legislative
27   intent existed with reference to the different statutes.'" *Schweitzer v. Westminster*
28   *Investments* (2007) 157 Cal.App.4th 1195 quoting *In re Marriage of Corman* (1997) 59

Cal.App.4th 1492, 1499 quoting *In re Jose A.* (1992) 5 Cal.App.4th 697, 701-702.)
Following *Schweitzer*, as its Legislature created statutes limiting activities to licensees when
it wanted to prohibit non-licensees from engaging in a particular activity, California courts
must accept that the Legislature must not have intended to create prohibitions to non-
licensees from activities where there is no statute requiring licensing.

61.    In most instances, California follows this enforcement pattern.  As in other
states, gardeners and landscape designers lawfully "preserve, develop and enhance
landscapes," the defining responsibilities of the licensed profession of "landscape architect"
(*BPC* § 5615).

62.    In California, unlicensed individual corporations and individuals can lawfully
help a client with furniture design choices, achieve weight loss objectives, or as a life coach
or corporate consultant, collect a fee for utilizing principles of psychology to influence
behavior as long as they do not incorporate a title or initials (e.g.: "RD" for "registered
dietitian") or otherwise hold themselves out as a licensed or certified interior designer,
dietitian or psychologist.

63.    Similarly, no activities are proscribed in the Ca. Accountancy Act (*BPC* § 5000
*et seq.*) and there are no penalties when non-licensed persons perform accounting activities.
"Unlicensed persons are permitted to make 'audits' and prepare 'reports.'" *Moore v. CA
State Board of Accountancy* (1992) 2 Cal. 4th 999

64.    *Moore* cites Federal case law in affirming that non-licensees can not only
engage in the defining activities of a licensed profession but also have the right to advertise
their doing so.  Non-licensed persons "must be permitted to use the terms 'accountant,'
'accounting,' or 'accounting services,' if the use of those terms is further qualified by an
explanation, disclaimer or warning stating that the advertiser is not licensed by the state, or
that the services being offered do not require a state license, thereby eliminating any
potential or likelihood of confusion regarding those terms." *Ibid* citing *Va. Pharmacy Board
v. Va. Consumer Council* (1975) 425 U.S. 748, *Bates v. State Bar of Arizona,* 433 U.S. 350
(1977) and *Peel v Attorney Disciplinary Commission of Illinois,* 496 U.S. 91 [110 L.Ed.2d 83,
110 S.Ct 2281] (1990).

65.    Like every occupational licensing scheme, the California Talent Agencies Act
offers a definition of a "talent agency" through its defining responsibility ("a person or

1   corporation who engages in the occupation of procuring, offering, promising, or attempting

2   to procure employment or engagements for an artist or artists"), then mirrors the state's

3   Interior Design, Landscape Architect and Accountancy Acts with a prohibitory statute

4   relevant to holding oneself out as a talent agent without a license ("one cannot engage in or

5   carry on the occupation of a talent agency without first procuring a license therefor from the

6   Labor Commissioner").  However, opposite to those schema that also prohibit specific

7   activities (*i.e.* the State Contractors, Physicians, Locksmith Acts), the TAA has no statute

8   prohibiting non-talent agency licensees from engaging in the activity that defines the

    licensed occupation.

9        66.     Therefore, following *Moore* and the statutory rule that interpretations of

10  statutes should avoid surplusage, it must be interpreted that as there is no law requiring

11  anyone who procures just once or incidentally as part of their overall fiduciary

12  responsibilities to have a license, it is therefor lawful for publicists, attorneys, personal

13  managers, producers, talent consultants or any other person or corporation to engage in

14  procuring employment opportunities for artists with the codicil that they do not hold

    themselves out or somehow market themselves as a talent agency.

15       67.     While no statute limits the activity to licensees, however, the TAA is enforced

16  as though procurement is regulated: "In its present incarnation, the Act requires anyone who

17  solicits or procures artistic employment for artists to obtain a talent agency license (§§

18  1700.4, 1700.5)." *Marathon Entertainment v. Rosa Blasi* (2008) S145428; citing *Park v.*

19  *Deftones,* (2000) 71 Cal App. 4th at 1470-1471; *Waisbren v. Peppercorn Productions* (2000)

20  41 Cal.App. 4th at 253.  Further, despite § 1700.5 making it unlawful to "engage in or carry

21  on the occupation of a talent agent," *Marathon* follow *Waisbren's* holding that even a single

22  instance of unlicensed procurement is a violation of the Act.

23       68.     Demanding a license for even a single instance of procurement without any

    statutory guidance to do so ignores California's stated understanding of what it had called a

24  "settled rule of statutory construction." *Schweitzer Supra*.  The omission of a statute

25  prohibiting non-licensees from engaging in the activity that defines talent agenting should,

26  per *Schweitzer*, be seen as "significant to show that a different legislative intent existed with

27  reference to the different statutes." *Ibid*.

28

69.     Not only does the current interpretation conflict with proper statutory construction, its enforcement violates both the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution.  Those who procure employment for artists are in the like condition of a litany of other professionals: they are engaging in a defining activity of a licensed occupation where no statute limits the activity to licensees.  Section One of the Fourteenth Amendment, whereby no state may deny a person within its jurisdiction the equal protection of the laws, demands that California stop its unequal treatment in this arena, where the current enforcement can deprive those entwined into a Talent Agencies Act dispute of their property; specifically their rightfully owed commissions.

70.     According to Webster's Third New International Dictionary, p. 1560, col. 3, "occupation" is defined as one's "principal" business endeavor; "a craft, trade, profession or other means of earning a living."  "Occupation" is synonymous with "employment" (ibid.), which includes "temporary or occasional work or service for pay" (id. at p. 743, col. 3).  No one of common intelligence would ever guess that doing something once would be synonymous with one's "craft," "trade," or "principal business endeavor."

71.     Further, "under this broad definition of occupation, the term occupation is unnecessary in defining talent agency because the TAA's definition of talent agency would be the same even if the word occupation was omitted.  Therefore, if defined broadly, the term occupation is rendered superfluous in the TAA's definition of talent agency."  Heath B. Zarem *The California Controversy of Procuring Employment: A Case For The Personal Managers Act*, FORDHAM INTELL. PROP. MEDIA & ENT. L.J. [7:927, 992}.  As one cannot conform the definition of occupation to engaging in an activity once, the Courts' definition cannot pass constitutional muster.

72.     While there are rare instances where Artists' choose to work without a licensed talent agent, the great majority of artists have dual representation, using those in the occupation of talent agent and personal management to facilitate their career objectives.  Most Artists with only personal managers or only publicists or only attorneys cannot find an appropriate agent willing to represent them.  This 'dual representation' standard moots the concept characterized by the California Supreme Court (*Marathon Supra* at 28), that personal managers are 'black marketeers.'  Black marketeers substitute for legal marketers;

16

personal managers bring their clients to and share their clients with talent agents. In Siegel's case, each ex-client who held back monies also had a talent agent who was the front line in terms of finding employment opportunities.

## PRAYER FOR RELIEF

73.     As currently applied and enforced, the *California Labor Code* § 1700.5 is unconstitutionally vague: there is an the unconstitutional lack of notice as to who is subject to its prohibitions, what actions are subject to dispute, and most indisputably, what penalties should be meted out if a violation if found. WHEREFORE, PLAINTIFFS prays the court to:

(1)     Declare CA. *Labor Code* 1700.5 unconstitutional as applied;

(2)     Prohibit defendants, by way of permanent injunction, from enforcing the foregoing statutes against Plaintiff or any other person who does not engage in the occupation of talent agent;

(3)     Grant Plaintiff its costs in this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and other applicable authorities; and

(4)     Grant Plaintiff such other relief as may be just and equitable.

Respectfully submitted,

Rick Siegel

April 15, 2008

Rick Siegel
Acting Pro per

COMPLAINT FOR DECLARITIVE AND INJUCTIVE RELIEF FROM APPLICATION OF *CA. LABOR CODE* 1700.5

# Exhibit B

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 25 of 163   Page ID
Case 2:08-cv-02480-CAS-SS   Document 25   Filed 07/14/08   Page 1 of 15   Page ID #:202
#:124

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
| Title | Rick Siegel v. Edmund G. Brown, et al. | | |

Present: The Honorable   CHRISTINA A. SNYDER

| PAUL SONGCO | LAURA ELIAS | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Rick Siegel (Pro Se) | Robert Villalovos |

**Proceedings:**      **MOTION TO DISMISS** (filed 06/06/08)

## I.    INTRODUCTION

Plaintiff Rick Siegel is a personal manager who represents actors, writers, and other artists in the entertainment industry. Compl. ¶ 14. Siegel also owns Marathon Entertainment, Inc. ("Marathon"), a personal management company. Id. On April 15, 2008, appearing pro se, Siegel filed the instant complaint against Angela M. Bradstreet, California State Labor Commissioner, in her official capacity.[1] The complaint asserts a claim under 42 U.S.C. §§ 1983 et seq. ("section 1983") for violation of Siegel's rights under Fourteenth Amendment to the United States Constitution, and a claim for declaratory relief pursuant to 28 U.S.C. §§ 2201 et seq. ("section 2201"). The gravamen of the complaint is that California's Talent Agencies Act (the "TAA"), Cal. Lab. Code §§ 1700 et seq., is unconstitutional as applied to Siegel.

On June 6, 2008, defendant Bradstreet filed the instant motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Siegel filed his opposition thereto on June 26, 2008. Defendant filed her reply on July 7, 2008. A hearing was held on July 14, 2008. After carefully considering the parties' arguments, the Court finds and concludes as follows.

---

[1] The complaint also named Edmund G. Brown, Jr., the California Attorney General, as a defendant. However, on May 20, 2008, Siegel filed a notice of dismissal as to defendant Brown.

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 26 of 163   Page ID
Case 2:08-cv-02480-CAS-SS   Document 25-1   Filed 07/14/08   Page 2 of 15   Page ID #:203
#:122

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|
| Title | Rick Siegel v. Edmund G. Brown, et al. | | |

## II.    BACKGROUND

### A.    THE TAA

The TAA regulates the conduct of talent agencies that represent artists.[2] See Cal.
Lab. Code §§ 1700 et seq. "Talent agency" is defined, with some exceptions, as "a
person or corporation who engages in the occupation of procuring, offering, promising,
or attempting to procure employment or engagements for an artist or artists." Cal. Lab.
Code § 1700.4. This definition "does not cover other services for which artists often
contract, such as personal and career management (i.e., advice, direction, coordination,
and oversight with respect to an artist's career or personal or financial affairs)." Styne v.
Stevens, 26 Cal. 4th 42, 51 (2001). However, "the [TAA] [does] extend[] to individual
incidents of procurement." Marathon Entertainment, Inc. v. Blasi, 42 Cal. 4th 974, 988
(2008). Thus, the TAA can also cover personal managers, like Siegel, if they solicit and
procure employment on behalf of artists. See id. at 989 (stating that to the extent that
personal managers engage in the conduct described by the TAA, they may be subject to
its provisions). The TAA requires a talent agency, or a personal manager who solicits
and procures employment for artists, to obtain a license from the Labor Commissioner.
Cal. Lab. Code § 1700.5 ("No person shall engage in or carry on the occupation of a
talent agency without first procuring a license therefor from the Labor Commissioner.").

---

[2] The TAA defines artists as

actors and actresses rendering services on the legitimate stage and in the
production of motion pictures, radio artists, musical artists, musical
organizations, directors of legitimate stage, motion picture and radio
productions, musical directors, writers, cinematographers, composers,
lyricists, arrangers, models, and other artists and persons rendering
professional services in motion picture, theatrical, radio, television and other
entertainment enterprises.

Cal. Lab. Code § 1700.4(b).

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 27 of 163   Page ID
#123
Case 2:08-cv-02480-CAS-SS   Document 25   Filed 07/14/08   Page 3 of 15   Page ID #:204

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|

| Title | Rick Siegel v. Edmund G. Brown, et al. |
|---|---|

The TAA does not, however, specify the proper remedy for a violation of this provision,
i.e., for the unlawful procurement of employment on behalf of an artist. In Blasi, the
California Supreme Court recognized that notwithstanding the TAA's silence in this
regard, when a personal manager engages in unlawful procurement, the Labor
Commissioner may void the manager-artist contract. Blasi, 42 Cal. 4th at 994-95.
However, the Labor Commissioner is not required to void the contract in its entirety;
instead, the Labor Commissioner may apply the doctrine of contract severability to
enforce parts of the contract. Id. at 996.

### B.     SIEGEL'S PRIOR STATE COURT ACTIONS

In 2002, Siegel and Marathon filed three civil actions in the Los Angeles County
Superior Court, against a former client who had failed to pay them in accordance with
their contracts.[3]

Specifically, Siegel and Marathon filed suit against Nia Vardalos for money
allegedly due them under the parties' oral personal management contract. Opp'n at 4.
Vardalos defended by filing a petition with the Labor Commissioner pursuant to Cal.
Lab. Code § 1700.44(a), alleging that Siegel and Marathon secured employment for
Vardalos without a talent agent's license. Compl. ¶ 14; Def.'s Request for Judicial
Notice ("RJN"), Ex. F (Labor Commission Decision (Vardalos)) at 1. Vardalos argued
that the parties' agreement was void ab initio and therefore unenforceable. Id. at 2. The
Labor Commissioner agreed, finding that Siegel and Marathon violated Cal. Lab. Code §
1700.5 by engaging in the occupation of a talent agency without a license. Id. at 8. The

---

[3] Under Fed. R. Evid. 201, a court may take judicial notice of "matters of public
record." Mack v. South Bay Beer Distrib., 798 F.2d 1279, 1282 (9th Cir.1986).
Accordingly, the Court takes judicial notice of Marathon Entertainment, Inc. v. Blasi, 42
Cal. 4th 974, 988 (2008), and Marathon Entertainment, Inc. v. Hayes, 2005 Cal. App.
Unpub. LEXIS 10487 (2005), for purposes of defendants' Fed. R. Civ. P. 12(b)(1)
motion only. The Court also takes judicial notice of exhibits E-G of defendant's request
for judicial notice. See Def.'s RJN, Ex. E (Labor Commissioner's Decision (Blasi)); Ex.
F (Labor Commissioner's Decision (Vardalos)); Ex. G (Labor Commissioner's Decision
(Hayes)).

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 28 of 163   Page ID
Case 2:08-cv-02480-CAS-SS   Document 25-1 Filed 07/14/08   Page 4 of 15   Page ID #:205
#:124

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|
| Title | Rick Siegel v. Edmund G. Brown, et al. | | |

Labor Commissioner concluded that this TAA violation rendered the oral agreement
between Vardalos, Siegel, and Marathon void, and unenforceable in all respects. Id.
Siegel and Marathon then settled their claims with Vardalos. Opp'n at 4.

On June 10, 2002, Siegel and Marathon filed suit against actor Reggie Hayes to
recover money allegedly due under the parties' contract. Compl. ¶ 14; Marathon
Entertainment v. Hayes, 2005 Cal. App. Unpub. LEXIS 10487, at *6 (2005); Opp'n at 3.
Hayes defended by obtaining a stay of the state court proceedings, and filing a petition
with the Labor Commissioner. Compl. ¶ 14; Hayes, 2005 Cal. App. Unpub. LEXIS
10487, at *6. The petition alleged that Siegel and Marathon had violated the TAA by
soliciting and procuring employment on Hayes' behalf without a talent agency license,
and that therefore the parties' contract was illegal and unenforceable. Hayes, 2005 Cal.
App. Unpub. LEXIS 10487, at *6; Def.'s RJN, Ex. G (Labor Commissioner Decision
(Hayes)) at 1-2. The Labor Commissioner, however, "found that the evidence showed
that Marathon's procurement activities were at the request of, and in conjunction with, a
licensed talent agency, and therefore within the safe harbor provision of the TAA."
Hayes, 2005 Cal. App. Unpub. LEXIS 10487, at *6-7; Def.'s RJN, Ex. G (Labor
Commissioner Decision (Hayes)) at 6-7.

Hayes then filed a notice of appeal from the Labor Commissioner's determination.
Hayes, 2005 Cal. App. Unpub. LEXIS 10487, at *7. In the civil action, Hayes filed an
answer asserting several affirmative defenses, including oral modification of the contract
(which allowed Hayes to terminate the parties' contract without any future obligation),
and invalidity of the contract due to Marathon's violation of the TAA. Id. Siegel and
Marathon moved for summary adjudication of Hayes's affirmative defense based on the
TAA, arguing that the TAA is unconstitutional. Id. The trial court denied the motion for
summary adjudication. Id. A jury trial was then held. Id. at *8-9. The trial court
required Marathon to elect between arguing either that there was not a valid modification
of the contract, or that the parties agreed to modify the contract and that Hayes failed to
fulfill his obligations under the modified agreement. Id. at *12-13. Marathon elected the
latter argument, and conceded that a jury instruction on contract modification was not
necessary. Id. at *13. The jury ultimately found that Hayes did not breach the contract,
that Hayes paid Marathon for the full value of the benefit he received, and that "Marathon
had procured or attempted to procure employment for Hayes, and not every procurement
or attempted procurement was done in conjunction with, and at the request of, a licensed

Case 2:17-cv-07203-CAS-SS  Document 13-1  Filed 11/30/17  Page 29 of 163  Page ID
Case 2:08-cv-02480-CAS-SS  Document 25-1 Filed 07/14/08  Page 5 of 15  Page ID #:206
#:125

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|

| Title | Rick Siegel v. Edmund G. Brown, et al. |
|---|---|

talent agent in the negotiation of an employment contract." Id. at *14-15. The trial court
entered judgment in favor of Hayes, and Marathon appealed. Id. at *15.

The California Court of Appeal held that by withdrawing its proposed contract
modification jury instruction, Marathon waived its right to argue on appeal that the
instruction should have been given. Id. at *15-16. The court found that in light of this
ruling, it was unnecessary to reach Marathon's constitutionality arguments, which
concerned Hayes' alternative defense to the breach of contract action based on
Marathon's alleged violation of the TAA. Id. at *20.

Finally, in 2002, Siegel and Marathon also filed suit against Rosa Blasi based on
Blasi's alleged failure to pay them in accordance with the parties' personal management
contract. Compl. ¶ 14; Marathon Entertainment, Inc. v. Blasi, 42 Cal. 4th 974, 981
(2008); Opp'n at 4. Blasi defended by obtaining a stay of the state court proceedings, and
filing a petition with the Labor Commissioner pursuant to Cal. Lab. Code § 1700.44(a),
alleging that Siegel and Marathon had violated the TAA by soliciting and procuring
employment on her behalf without a talent agency license. Compl. ¶ 14; Blasi, 42 Cal.
4th at 981; Def.'s RJN, Ex. E (Labor Commissioner Decision (Blasi)) at 1-2. The Labor
Commissioner found that Siegel and Marathon had violated § 1700.5 of the TAA. Blasi,
42 Cal. 4th at 981; Def.'s RJN Ex. E (Labor Commissioner Decision (Blasi)) at 7. The
Commissioner voided the parties' contract ab initio. Id. Marathon, but not Siegel, then
appealed to the Superior Court for a trial de novo pursuant to Cal. Lab. Code §
1700.44(a). Blasi, 42 Cal. 4th at 981; Def.'s RJN, Ex. E (Labor Commissioner Decision
(Blasi)) at *7-8. Marathon also amended its complaint to challenge the constitutionality
of the TAA. Blasi, 42 Cal. 4th at 981-82. Marathon alleged that invalidating the
contracts of personal managers who solicit or procure employment for artists without a
talent agency license, violated the managers' due process, equal protection, and free
speech rights under the California and United States Constitutions. Id. at 982.

Blasi moved for summary judgment on the ground that Marathon's TAA violation
rendered the personal management contract illegal, and therefore unenforceable in its
entirety. Id. Marathon filed a cross-motion for summary adjudication on its claims of the
TAA's unconstitutionality. Id. The trial court granted Blasi's motion for summary
judgment, denied Marathon's cross-motion, and entered judgment in favor of Blasi on
November 3, 2004. Id. Marathon appealed to the California Court of Appeal. Id. The

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 30 of 163   Page ID
Case 2:08-cv-02480-CAS-SS   Document 25-1  Filed 07/14/08   Page 6 of 15   Page ID #:207
#:126

O

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|

| Title | Rick Siegel v. Edmund G. Brown, et al. |
|---|---|

Court of Appeal agreed with the trial court that the TAA applies to personal managers, as well as to talent agents. Id. However, it concluded that under the doctrine of severability of contracts, there was a triable question of fact as to whether Blasi's obligation to pay Marathon could be severed from the unlawful parts of the parties' contract. Id. The California Court of Appeal declined to address Marathon's constitutional argument, "premised on its interpretation that [California law] prohibits the severance of contracts of personal managers who violated the [TAA]," in light of the court's "rejection of that widespread interpretation." Id.

The California Supreme Court in Blasi, then granted review as to whether the TAA applied to personal managers and whether, when a manager has unlawfully procured employment, the doctrine of severability can be applied to permit some recovery. Id. The Court answered both questions in the affirmative. Id. at 999.

Siegel and Marathon ultimately settled their claims against Blasi. Compl. ¶ 4.

### C.   SIEGEL'S INSTANT SUIT

In the present action, Siegel challenges the constitutionality of the TAA. In his complaint, Siegel concedes that Cal. Lab. Code § 1700.5 is facially constitutional. Id. ¶ 31. However, Siegel alleges that the application of the TAA is unconstitutional. Id. ¶¶ 32, 37. In this regard, Siegel alleges that it is not clear who is subject to the TAA.[4] Id. ¶¶

---

[4] Siegel alleges that

[A]s applied by California, § 1700.5 does not regulate an occupation: it "regulates conduct, not labels; it is the act of procuring (or soliciting), not the title of one's business, that qualifies one as a talent agency and subject one to the Act's licensure and related requirements." Marathon Supra at 10. This interpretation, which wrongly accepts the terms "occupation" and "conduct" as synonymous, renders such enforcement unconstitutional.

Compl. ¶ 32. According to Siegel, "applying § 1700.5 to those who hold themselves out as being in an occupation other than a talent agent, either licensed or unlicensed, cannot

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 31 of 163   Page ID
Case 2:08-cv-02480-CAS-SS   Document 25-1   Filed 07/14/08   Page 7 of 15   Page ID #:208
#:127

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|
| Title | Rick Siegel v. Edmund G. Brown, et al. | | |

32-34. Siegel also alleges that because the TAA does not define the term "procurement," it does not provide fair warning of the prohibited conducted. Id. ¶ 35. Additionally, Siegel attacks the application of the TAA because the statute does not give notice of the penalty for engaging in prohibited conduct. Id. ¶¶ 8, 20-27. He further alleges that applying the TAA to personal managers is violative of the equal protection clause of the Fourteenth Amendment. Id. ¶ 69. Specifically, Siegel alleges that by applying the TAA to personal managers, California enforces the TAA differently than other statutes regulating occupations. Id. ¶¶ 54-69. According to Siegel, these other statutes are only applied to the persons engaged in the particular occupation referenced by the statute. Id. Siegel contends that the Labor Commissioner's application of the TAA has or in the future will deprive him of property, i.e., his contracts.[5]

## III.   LEGAL STANDARD

### A.   FED. R. CIV. P. 12(b)(1)

A motion to dismiss an action under Federal Rule of Civil Procedure 12(b)(1) raises the question of the federal court's subject matter jurisdiction over the action. The objection presented by this motion is that the court has no authority to hear and decide the case. This defect may exist despite the formal sufficiency of the allegations in the complaint. See T.B. Harms Co. v. Eliscu, 226 F. Supp. 337, 338 (S.D. N.Y. 1964), aff'd 339 F.2d 823 (2d Cir. 1964) (the formal allegations must yield to the substance of the claim when a motion is filed to dismiss the complaint for lack of subject matter jurisdiction). When considering a Rule 12(b)(1) motion challenging the substance of jurisdictional allegations, the Court is not restricted to the face of the pleadings, but may review any evidence, such as declarations and testimony, to resolve any factual disputes concerning the existence of jurisdiction. See McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988).

---

pass constitutional muster." Id. ¶ 34.

[5] Allegations of past harm are predicated on the Blasi, Hayes, and Vardalos contracts. Compl. ¶ 18. With respect to future harm, the Siegel alleges that "[he] is currently owed money by another ex-client, Wendy Walsh, and concerned [sic] any effort to enforce his contractual rights will be similarly rebuffed." Id.

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 32 of 163   Page ID
Case 2:08-cv-02480-CAS-SS   Document 25 148iled 07/14/08   Page 8 of 15   Page ID #:209

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|

| Title | Rick Siegel v. Edmund G. Brown, et al. |
|---|---|

The burden of proof in a Rule 12(b)(1) motion is on the party asserting jurisdiction. See Sopcak v. Northern Mountain Helicopter Serv., 52 F.3d 817, 818 (9th Cir. 1995); Ass'n of Am. Med. Coll. v. United States, 217 F.3d 770, 778-79 (9th Cir. 2000). If jurisdiction is based on a federal question, the pleader must show that he has alleged a claim under federal law and that the claim is not frivolous. See 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1350, pp. 211, 231 (3d ed. 2004). On the other hand, if jurisdiction is based on diversity of citizenship, the pleader must show real and complete diversity, and also that his asserted claim exceeds the requisite jurisdictional amount of $75,000. See id.

### B.    FED. R. CIV. P. 12(b)(6)

A Fed. R. Civ. P. 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965.

In considering a motion pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them. Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). The complaint must be read in the light most favorable to the nonmoving party. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995). However, a court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. Sprewell, 266 F.3d at 988; W. Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990).

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 33 of 163   Page ID
Case 2:08-cv-02480-CAS-SS   Document 25 14   Filed 07/14/08   Page 9 of 15   Page ID #:210
#:129

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|

| Title | Rick Siegel v. Edmund G. Brown, et al. |
|---|---|

Furthermore, unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 102 F.3d 1524, 1537 (9th Cir. 1996), rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998). A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999); Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001).

For all of these reasons, it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6). United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).

As a general rule, leave to amend a complaint which has been dismissed should be freely granted. Fed. R. Civ. P. 15(a). However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986); see Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000).

## IV.    DISCUSSION

Defendant moves to dismiss Siegel's complaint for three reasons. First, defendant argues that Siegel lacks standing to sue. Next, defendant argues that Siegel's claims are barred by reason of Rooker v. Fid. Trust Co., 263 U.S. 413, 416 (1923), D.C. Court of Appeals v. Feldman, 460 U.S. 486-87 (1983) ("the Rooker-Feldman doctrine"). Finally, defendant argues that Siegel has failed to state claims for which relief may be granted.

### A.    Standing

First, defendant argues that Siegel lacks standing to bring this suit. Defendant argues that to establish Article III standing, Siegel must demonstrate (1) concrete injury in fact, (2) a causal connection between that injury and defendant's allegedly wrongful conduct, and (3) a likelihood that a favorable decision will redress that injury. See Lujan

Case 2:17-cv-07203-CAS-SS Document 13-1 Filed 11/30/17 Page 34 of 163 Page ID
#:130
Case 2:08-cv-02480-CAS-SS Document 25 Filed 07/14/08 Page 10 of 15 Page ID #:211

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 08-2480 CAS (SSx) | | Date | July 14, 2008 |
|---|---|---|---|---|
| Title | Rick Siegel v. Edmund G. Brown, et al. | | | |

v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Defendant argues that Siegel has not shown injury in fact. Specifically, according to defendant, Siegel's alleged injuries derive from the three cases previously decided against Marathon by the Labor Commissioner, and those cases are not subject to further judicial review. Defendant further argues that although Siegel alleges that he will suffer future injury because a former client presently owes him money, Siegel does not allege that there is any pending dispute before the Labor Commissioner. Defendant argues that because there is no pending dispute before the Labor Commissioner, Siegel has also failed to show the requisite causal connection between his alleged injury and the Labor Commissioner's allegedly unlawful conduct. Defendant contends that, in light of the fact that this case challenges the "Labor Commissioner's future conduct regarding a dispute for which no . . . facts are known," Siegel has failed to demonstrate likelihood of redressability. Mot. at 14. Finally, defendant argues that in an action under section 1983 for injunctive relief, the plaintiff must show the threat of repeated injury. Defendant urges that Siegel cannot demonstrate a threat of such imminent harm.

Siegel responds that he has standing to prosecute this action because by interfering with and/or impairing his contractual rights, the Labor Commissioner caused him injury. Siegel maintains that if he succeeds herein, "future breach of contract actions can be adjudicated in a Superior Court without the stay for the administrative conflict to be resolved," and there will no longer be any "constitutional questions about the inappropriateness of pronouncing penalties without proper statutory guidelines." Opp'n at 12.

The Court finds that Siegel has shown injury sufficient to confer standing. The Labor Commissioner has previously applied the TAA to Siegel, a personal manager, and it is clear that it may be applied to him in the future.

### B. The **Rooker-Feldman** Doctrine

Next, defendant contends that the instant action is a collateral attack on a prior state court judgment entered against Siegel. As such, defendant argues that, under the Rooker-Feldman doctrine, this Court has no jurisdiction over Siegel's claims.

Siegel argues that the Rooker-Feldman doctrine has no application here.

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 35 of 163   Page ID
#:121
Case 2:08-cv-02480-CAS-SS   Document 25   Filed 07/14/08   Page 11 of 15   Page ID #:212

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|
| Title | Rick Siegel v. Edmund G. Brown, et al. | | |

The Court finds that the Rooker-Feldman doctrine does not apply. Here, Siegel is seeking prospective relief only, and it does not appear that he asking this Court to re-adjudicate his prior contract claims. Further, Siegel never previously raised his as-applied challenge to the TAA. Therefore, it is clear that Siegel is not challenging any state court judgment. See Van Harken v. City of Chicago, 103 F.3d 1346, 1349 (7th Cir. 1997) ("Insofar as the plaintiffs merely seek a declaration that the procedures under which the parking charges against them were, or in the case of those members of the class whose cases have not yet been heard will be, adjudicated are constitutionally inadequate, they are not barred by Rooker-Feldman because they are not challenging the judgment in any parking case."); Dubinka v. Judges of the Superior Court, 23 F.3d 218, 221 (9th Cir. 1994).

### C.     Failure to State a Claim

To state a claim against an individual pursuant to section 1983 a plaintiff must allege: "(1) a violation of rights protected by the federal Constitution or created by federal statutes or regulations, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of [law]." Martin A. Schwartz, 1A Section 1983 Litigation Claims and Defenses § 1.04(A) (4th ed. 2007) (internal citations omitted).

Defendant argues that Siegel has failed to state a claim under section 1983. In this regard, defendant raises two arguments. First, defendant argues that there is no state action because the Labor Commissioner did not act affirmatively, but merely exercised her adjudicatory authority to resolve controversies under the TAA. Second, defendant argues that there is no constitutional deprivation for which prospective relief may be granted.

It appears that because the Labor Commissioner is acting in an adjudicatory capacity, she is not a proper party to this suit. In Grant v. Johnson, 15 F.3d 146 (9th Cir. 1994), the Ninth Circuit, following the First Circuit's approach in In re Justices of Supreme Court of Puerto Rico, 695 F.2d 17 (1st Cir. 1982), found that whether judges are proper defendants in a section 1983 action depends on whether they are acting as adjudicators or as administrators, enforcers, or advocates. Grant, 15 F.3d at 148. The Ninth Circuit in Grant held that "judges adjudicating cases pursuant to state statutes may

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|
| Title | Rick Siegel v. Edmund G. Brown, et al. | | |

not be sued under § 1983 in a suit challenging [a] state law." Id. There, the plaintiff
brought suit against a state court judge who had appointed a guardian ad litem for her,
challenging the constitutionality of an Oregon statute which "permitted a judge to appoint
a temporary guardian without notice or hearing." Id. at 147. The court found that
because there was "no doubt that [the judge] acted in an adjudicative capacity by
appointing a guardian for [the plaintiff] upon the application of a third party," he was not
a proper defendant to the section 1983 action.[6] Id. at 148 ("We agree with these decisions
holding that judges adjudicating cases pursuant to state statutes may not be sued under §
1983 in a suit challenging the state law.").

The Labor Commissioner appears to have both investigatory and adjudicatory
functions. In Preston v. Ferrer, 128 S. Ct. 978 (2008), the United States Supreme Court
recognized that "in proceedings under § 1700.44(a), the Labor Commissioner functions
not as an advocate advancing a cause before a tribunal authorized to find the facts and
apply the law; instead, the Commissioner serves as impartial arbiter." Id. at 987 (appeal
from state court judgment, which required all disputes under the TAA to be submitted to
the Labor Commissioner regardless of an arbitration provision in the parties' contract in a
case involving artist's allegations that his attorney acted as an unlicensed talent agent).
Here, the complaint attacks the defensive use of the TAA by Siegel's former clients.
These clients seek to have their contracts voided by initiating proceedings pursuant to
Cal. Lab. Code § 1700.44(a) before the Labor Commissioner. Because the Labor
Commissioner acts as an adjudicator in such proceedings, she is not a proper defendant to

---

[6] The Ninth Circuit in Grant also observed that a litigant might be able to file suit
against a private party to challenge the constitutionality of a state law:

> While a private party may not be a "state actor" for purposes of § 1983, the
> existence of the state statute and necessary involvement of a state judge
> could well provide the "state action" necessary to present a constitutional
> question suitable for decision in federal court.

Grant, 15 F.3d at 149 (noting that in Shelley v. Kraemer, 334 U.S. 1 (1948), involving an
action between two private parties, the Supreme Court found that the enforcement of
racially restrictive covenants deprived the plaintiffs of their constitutional rights).

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|
| Title | Rick Siegel v. Edmund G. Brown, et al. | | |

this section 1983 suit.[7]

In addition, the Court finds that Siegel's claims fail on the merits. The only allegations concerning the TAA's application to Siegel are found at paragraphs 14 and 18 of the complaint. Paragraph 14, alleges that the <u>Blasi</u> action,

> was just one of three times a former client first withheld owed commissions and when faced with a breach of contract action, petitioned the CLC [Labor Commissioner] alleging a violation of § 1700.5 and asking for the disgorgement <u>ab initio</u> of their manager/client contracts and thereby freeing them of their otherwise owed financial obligations.

Compl. ¶ 14. Paragraph 18 alleges that the "CLC rendered Siegel's company unable to enforce its contract with one client" and a jury forced it "to disgorge its contract with another" client. <u>Id.</u> ¶ 18. These allegations are insufficient, as a matter of law, to give rise to an as-applied challenge under section 1983.[8]

Nor cannot it be said that the TAA failed to put Siegel, a person, on notice that the TAA would apply to him if he procured or solicited employment for artists. This is because the TAA clearly states that a "talent agency," is "a person or corporation who

---

[7] In his opposition, Siegel argues that "[w]hile private parties rather than a government body initiates the TAA controversies, the Labor Commissioner is under no requirement to agree to intercede." Opp'n at 12. As such, Siegel argues that it is the Labor Commissioner's "agreement to adjudicate . . . that creates the deprivation of rights that allows for an action under § 1983." <u>Id.</u> at 12. In so arguing, however, Siegel ignores the express words of Cal. Lab. Code § 1700.44(a), which states that

> [i]n cases of controversy arising under this chapter, the parties involved shall refer the matters in dispute to the Labor Commissioner, who shall hear and determine the same, subject to an appeal within 10 days after determination, to the superior court where the same shall be heard de novo.

[8] In this regard, the Court notes the complaint does not describe Siegel's conduct.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|
| Title | Rick Siegel v. Edmund G. Brown, et al. | | |

engages in the occupation of" procuring or soliciting employment for an artists.[9] Cal. Lab. Code § 1700.4.

The Court also finds Siegel's contention that the TAA's application is unconstitutional because it does not state the consequences for engaging in prohibited conduct to be without merit. The TAA makes it illegal to procure employment for an artist without a license. Thus, it "defines conduct, and hence contractual arrangements, that are illegal." Marathon Entertainment, Inc. v. Blasi, 42 Cal. 4th 974, 991 (2008). Where a contract is made between parties to do an illegal act, the contract is void. See Cal. Civ. Code § 1598 ("Where a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void."); Cal. Civ. Code § 1599 ("Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."). As such, it is quite clear that a contract to procure employment for an artist without a license will be unenforceable unless severance is available. For this reason, it cannot be said that applying the TAA to Siegel deprives him of his property without due process of law.

Finally, Siegel's equal protection challenge asserts that the TAA is applied differently than other California statutes regulating occupations. This challenge is predicated on the contention that California applies the TAA to persons, like Siegel, who are not required to comply with the TAA, i.e., non-talent agents. Because it is clear that the TAA applies to all persons who procure employment for artists, the Court finds that there is no merit to Siegel's equal protection claim.

Based on the foregoing, the Court finds that the TAA's application to Siegel is not invalid on federal grounds as alleged in the complaint. Accordingly, Siegel's section 1983 claim must be dismissed.

---

[9] The TAA defines "person" as "any individual, company, society, firm, partnership, association, corporation, limited liability company, manager, or their agents or employees." Cal. Labor Code § 1700.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 08-2480 CAS (SSx) | Date | July 14, 2008 |
|---|---|---|---|
| Title | Rick Siegel v. Edmund G. Brown, et al. | | |

Siegel's claim for declaratory relief under section 2201 fails with his section 1983 claim. Hoeck v. City of Portland, 57 F.3d 781, 786 (9th Cir. 1995) (where the plaintiff's claim for declaratory relief rested on his contention that his due process rights had been violated, the court held that, in light of its holding that the plaintiff's due process rights had not been violated, the plaintiff's claim for declaratory relief was without merit).

**V.    CONCLUSION**

In accordance with the foregoing the Court hereby GRANTS defendant's motion to dismiss with leave to amend.  Plaintiff shall file this amended complaint on or before July 31, 2008.

IT IS SO ORDERED.

|  | 00 | : | 01 |
|---|---|---|---|
| Initials of Preparer | PS | | |

# Exhibit C

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 41 of 163   Page ID
Case 2:08-cv-02480-CAS-SS   Document 26-1 Filed 07/25/08   Page 1 of 18   Page ID #:217
#:187

FILED

Rick Siegel
3379 Tareco Drive
Los Angeles, CA 90068
Acting Pro Per
323.512.2600
ricks@marathonent.com

2008 JUL 25  PM 12: 38

CLERK US DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY _____

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| Rick Siegel, an individual, | ) CASE NO. CV 08-2480 CAS (SSx) |
| Plaintiff, | ) |
| vs. | ) |
| ANGELA M. BRADSTREET, in her official capacity as the Labor Commissioner for the State of California | ) **FIRST AMENDED CIVIL RIGHTS COMPLAINT** (42 U.S.C. §1983, 1985): |
| Defendants. | ) **(1) VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT OF THE U.S. CONSTITUTION** |
| | ) **(2) VIOLATIONS OF THE CONTRACT CLAUSE: ARTICLE 1, SECTION 10 OF THE U.S. CONSTITUTION** |
| | ) **(3) VIOLATIONS OF THE 5TH AMENDMENT OF THE U.S. CONSTITUTION: THE DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS** |
| | ) **(4) VIOLATIONS OF THE EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT OF THE U.S. CONSTITUTION** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This is a civil action for declaratory and injunctive relief arising under (1) the due process and (2) equal protection clauses of the Fourteenth Amendment to the United States Constitution; (3) the Fifth Amendment of the United States Constitution; and (3) Article 1, Section 10 of the Untied States Constitution.

2.      The court has subject matter jurisdiction to adjudicate both claims in this complaint under 28 U.S.C. 1331 and 1343(a).

## PARTIES AND JURISDICTION

3.      Rick Siegel is a personal manager.  He is the president and sole shareholder of the management firm involved in the recent CA. Supreme Court decision, Marathon

1

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 42 of 163   Page ID
Case 2:08-cv-02480-CAS-SS   Document 26-1  Filed 07/25/08   Page 2 of 18   Page ID #:218
#:139

Entertainment, Inc.  That was just one of the three times a former client first withheld owed commissions and when faced with a breach of contract action, petitioned the CLC alleging a violation of § 1700.5 and asking for the disgorgement *ab initio* of their manager/client contracts and thereby freeing them of their otherwise owed financial obligations.

4.      Angela M. Bradstreet is the Labor Commissioner of the State of California.  As stated in the agency's Request for Depublication of the *Marathon Entertainment v Rosa Blasi* Court of Appeals decision submitted to the California Supreme Court, the Commissioner is the "head of the Division of Labor Standards Enforcement" ("DLSE"), the "state agency charged with the administration and enforcement of the Talent Agencies Act (California Labor Code 1700 *et seq.*, all future references of statutes is to this Act)" (Exhibit A at 1.)  In advocating for depublication in *Marathon v. Blasi*, which was a 1700.44(a) dispute, the Labor Commission saw itself as, and more relevantly to this matter, acted as an enforcer and advocate rather than an arbiter.

5.      A January 16, 2007 Sacramento Bee article quotes Labor Commission spokesman Dean Fryer said the Commissioner's letter siding with Blasi was "appropriate" because "we [the Labor Commission] are not a party to the lawsuit."  (Exhibit B.)  While not a party, the Marathon/Blasi dispute originated at and with a finding against Marathon by the Defendant's office and was about to decide the matter for a second time: the Court of Appeals disposition directed the superior court to stay Marathon's breach of contract action "pending submission to the Labor Commissioner for an opportunity to grant a new hearing in light of this opinion."

6.      Per the CA. *Government Code* § 11425.30 (a): A person may not serve as presiding officer in an adjudicative proceeding if (1) *the person has served as investigator, prosecutor or advocate in the proceeding or its preadjudicative stage;* or (2) *the person is subject to the authority, direction or discretion of a person who has served as investigator, prosecutor or advocate in the proceeding or its preadjudicative stage.*  The Defendant's request for Depublication of this §1700.44(a) dispute, asking the Court to mute the *Marathon* holding because "the decision will have a deleterious effect on enforcement," is clearly a position of advocacy and not of an arbiter.

7.      It is as head of the DLSE and the advocate/enforcer who petitioned the CA. Supreme Court, quoting the Sacramento Bee article, "warning against any decision that

2

would dilute [the Commissioner's] ability to invalidate contracts," that Ms. Bradstreet is named as party to this action.

8.    Jurisdiction is proper in this court according to 42 U.S.C. §§ 1983 and 1985.

### STATEMENT OF FACTS

9.    A contract wherein a party is owed monies for work provided is a material asset (property) of the entity who is owed the money.

10.    In two instances, the Defendant first ruled that the Plaintiff had violated *CA Labor Code* § 1700.5 of the California Talent Agencies Act, procuring employment without a talent agency license, and decreed the contracts between the Plaintiff and his ex-clients void *ab initio*.

11.    The California Legislature never ratified any penalty guideline for anyone found to be in violation with §1700.5.

### FIRST CLAIM FOR RELIEF:
### THE DEFENDANT'S ASSESSING PENALTIES TO FOUND VIOLATORS OF CA. *LABOR CODE* 1700.5 IS ITSELF A VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT OF THE UNITED STATES

12.    Plaintiff re-alleges and incorporates herein by reference each and every allegation of paragraphs 1 through 11 as though fully set forth at length.

13.    The Defendant, as the enforcement body of the California Talent Agencies Act, has determined that literally hundreds of individuals and businesses of CA. *Labor Code* 1700.5 and rendered the contracts between the found violators, including the Plaintiff in two separate actions, and their artistic clients, void *ab initio*.

14.    The due process clause of the Fourteenth Amendment of the United States Constitution requires that a law be reasonably definite as to what persons and conduct are covered as well as the punishment that can be imposed.

15.    As the California Talent Agencies Act contains no statutory guidelines for penalties, punishment of any kind to those found to have violated a Talent Agencies Act statute is a violation of the due process clause.

16.    As such, every assessment of a penalty that has been meted out by the Defendant must be considered arbitrary and irrational and therefor a violation of the Fourteenth Amendment of the United States Constitution.

**SECOND CLAIM FOR RELIEF:**
**THE DEFENDANT'S IMPAIRMENT OF CONTRACTS OF FOUND VIOLATORS OF CA.**
***LABOR CODE*** **1700.5 IS ITSELF A VIOLATION OF ARTICLE 1, SECTION 10 OF THE**
**UNITED STATES CONSTITUTION:  THE CONTRACT CLAUSE**

17.    Plaintiff re-alleges and incorporates herein by reference each and every allegation of paragraphs 1 through 16 as though fully set forth at length.

18.    Per Article 1, Section 10 of the United States Constitution, "No State shall enter into any ... ex post facto Law, or Law impairing the Obligation of Contracts." However, this prohibition is accommodated to oblige States' inherent police power to safeguard the interests of its people.

19.    When substantial impairments are found and challenged, the State or state agency that has impaired the contract must be able to show a significant and legitimate public purpose behind the regulation and show that the adjustment of the contracting parties' rights and responsibilities of a character appropriate to the public purpose justifying the legislation's adoption.

20.    The California Legislature never adopted any statute that instructs, guides or provides the Labor Commission, which is empowered to hear all relevant controversies, to impair the contract when if finds an individual or business has violated the California Talent Agencies Act.  Without the Legislature ever adopting any such statute, it cannot show that there is a legitimate rationale for its actions.

21.    As such, the Defendant's impairment of contracts is a violation of Article 1, Section 10 of the United States Constitution.

**THIRD CLAIM FOR RELIEF:**
**THE DEFENDANT'S IMPAIRMENT OF CONTRACTS UNDER THE COVER OF LAW**
**WITHOUT ANY STATUTORY GUIDELINE TO DO SO IS AN UNCONSTITUTIONAL**
**DEPRIVATION OF PROPERTY AND A VIOLATION OF THE FIFTH AMENDMENT OF**
**THE UNITED STATES CONSTITUTION**

22.    Plaintiff re-alleges and incorporates herein by reference each and every allegation of paragraphs 1 through 21 as though fully set forth at length.

23.    Per the Fifth Amendment of the United States Constitution, "no person shall be deprived of life, liberty or property without due process of law."

4

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 45 of 163   Page ID
#:144
Case 2:08-cv-02480-CAS-SS   Document 26   Filed 07/25/08   Page 5 of 18   Page ID #:221

24.    As the Labor Commission's impairment of the Plaintiff's property – one contract valued at approximately a half-million dollars and another for over two million dollars – was assessed without any statutory instruction or guideline to do so and therefor without due process of law, the Defendant's actions was a wrongful deprivation of property and a violation of the Fifth Amendment of the United States Constitution.

### FOURTH CLAIM FOR RELIEF:
### THE DEFENDANT'S FINDING TALENT REPRESENTATIVES WHO ARE NOT TALENT AGENTS YET THEIR FIDUCIARY RESPONSIBILITIES MAKE THEM INVOLVED IN THEIR CLIENTS' REVENUE PRODUCTION VIOLATORS OF CA. *LABOR CODE* 1700.5 IS A VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT OF THE UNITED STATES

25.    Plaintiff re-alleges and incorporates herein by reference each and every allegation of paragraphs 1 through 24 as though fully set forth at length.

26.    As will be shown in full during the course of this action, all other California licensing schemes that impair the contracts when unlicensed persons found to have engaged in an activity statutorily limited to licensees provide statutory notice that such violators will have no right to contract.

27.    Similarly, with the notable exception of the Talent Agencies Act, there is no known instance where California has impaired a contract of anyone found to have engaged in an activity that define a regulated occupation without statutory notice informing potential violators that they risk losing their right to contract.

28.    As the Talent Agencies Act includes no such statute, the impairment of contract to violators of § 1700.5 is discriminatory to those like the Plaintiff -- publicists, talent consultants and bookers, entertainment attorneys, accountants and personal managers -- whose professional responsibilities necessarily include some involvement in the revenue creation for their actor, writer, director, musician, comedian or other artistic clients.  While there is no plain language in the Act itself, as the State interprets this chapter they must obtain a talent agency license before engaging in their occupations, even when they shared their clients with a licensed talent agent.  At a minimum, they must be provided notice of the potential consequences of their choice not to obtain that license before any such penalty can be meted out.  As the Defendant's impairing of the Plaintiff's contract was done without

FIRST AMENDED COMPLAINT FOR DECLARITIVE AND INJUCTIVE RELIEF

the same notice as all other Californians in similar circumstances, it is in violation of the equal protection clause of the 14th Amendment of the United States Constitution.

## PRAYER FOR RELIEF

The Defendant cannot use any previous case law, including *Marathon v. Blasi,* as a mechanism to claim the TAA "defines conduct, and hence contractual arrangements," (the tentative civil minutes of July 14, 2008, citing dicta from *Marathon v Blasi* California Supreme Court decision) as neither that case nor any other has considered and answered (1) what conduct, as applied, is defined in §1700.4(a), and (2) whether exacting a penalty, any penalty, is constitutional without there being any statutory guideline to do administer one.

With the above and other understandings to be brought out through the full examination of facts, the Plaintiff's constitutional rights and privileges have been violated per 42 U.S.C. § 1983Thus, as enforced by the Defendant, the *California Labor Code* § 1700.5 as applied unconstitutionally penalizes those found to have violated its provisions. WHEREFORE, PLAINTIFFS prays the court to:

(1)    Declare CA. *Labor Code* 1700.5 unconstitutional as applied pursuant to Article 1, Section 10, the Fifth Amendment, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution pursuant to 28 U.S.C. §§2201 *et seq.;*

(2)    Prohibit defendants, by way of permanent injunction, from any future assessment of penalties against Plaintiff or any other person found to have violated CA *Labor Code* § 1700.5 until or unless the California Legislature properly amends the Talent Agencies Act;

(3)    Grant Plaintiff its costs in this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and other applicable authorities; and

(4)    Grant Plaintiff such other relief as may be just and equitable pursuant to 28 U.S.C § 2202.

Respectfully submitted,

Rick Siegel
Acting Pro per        July 25, 2008

6

# Exhibit D

O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| RICK SIEGEL | ) | Case No. CV 08-2480 CAS (SSx) |
| | ) | |
| | ) | **ORDER DISMISSING PLAINTIFF'S** |
| Plaintiff, | ) | **FIRST AMENDED COMPLAINT** |
| | ) | **WITH PREJUDICE** |
| vs. | ) | |
| | ) | |
| ANGELA M. BRADSTREET | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |

## I.    INTRODUCTION

Plaintiff Rick Siegel is a personal manager who represents actors, writers, and other artists in the entertainment industry. Compl. ¶ 14. Plaintiff also owns Marathon Entertainment, Inc. ("Marathon"), a personal management company. Id. On April 15, 2008, plaintiff, appearing pro se, filed a complaint against Angela M. Bradstreet, California State Labor Commissioner, in her official capacity.[1]  The complaint asserts a

---

[1] The original complaint also named Edmund G. Brown, Jr., the California Attorney General, as a defendant. However, on May 20, 2008, plaintiff filed a notice of dismissal
(continued...)

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 49 of 163   Page ID
Case 2:08-cv-02480-CAS-SS   Document 36   Filed 09/08/08   Page 2 of 9   Page ID #:348
#:345

claim under 42 U.S.C. §§ 1983 et seq. for violation of plaintiff's rights under the Fourteenth Amendment to the United States Constitution, and a claim for declaratory relief pursuant to 28 U.S.C. §§ 2201 et seq. The gravamen of the complaint is that California's Talent Agencies Act (the "TAA"), Cal. Lab. Code §§ 1700 et seq., is unconstitutional as applied to plaintiff. This Court granted defendant's motion to dismiss with leave to amend on July 14, 2008.

On July 25, 2008, plaintiff filed his first amended complaint ("FAC"). Defendant filed the instant motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on August 8, 2008. Plaintiff filed his opposition thereto on August 18, 2008. Defendant filed a reply on August 29, 2008. Defendant's motion is presently before the Court. After carefully considering the parties' arguments, the Court grants defendant's motion with prejudice for the reasons set forth below.

## II.   BACKGROUND

The factual background of this case is known to the parties, and is set forth in the Court's July 14, 2008 order granting defendant's motion to dismiss. In 2002, plaintiff and Marathon filed three civil actions in Los Angeles County Superior Court, against three former clients who had failed to pay them in accordance with their contracts.[2] All three defendants responded by filing a petition with the Labor Commissioner pursuant to Cal. Lab. Code § 1700.44(a), alleging that plaintiff and Marathon secured employment without a talent agent's license.

---

[1](...continued)
as to defendant Brown.

[2] Under Fed. R. Evid. 201, a court may take judicial notice of "matters of public record." Mack v. South Bay Beer Distrib., 798 F.2d 1279, 1282 (9th Cir.1986). Accordingly, the Court takes judicial notice of exhibits A-C of defendant's request for judicial notice. See Def.'s RJN, Ex. A (Labor Commissioner's Decision (Blasi)); Ex. B (Labor Commissioner's Decision (Vardalos)); Ex. C (Labor Commissioner's Decision (Hayes)). The Court also takes judicial notice of exhibits A-C of plaintiff's request for judicial notice. See Pl.'s RJN Ex. A (email from defense counsel); Ex. B (1984 Report of the California Entertainment Commission); Ex. C (legislative history of TAA).

Plaintiff filed his initial complaint on April 15, 2008, alleging that the TAA is unconstitutional as applied to him.  Specifically, plaintiff alleges that it is not clear who is subject to the TAA.  Complaint ¶¶ 32-34.  Plaintiff also alleges that because the TAA does not define the term "procurement," it does not provide fair warning of the conduct it prohibits.  Id. ¶ 35.  Additionally, plaintiff attacks the TAA because it does not give notice of the penalty for engaging in prohibited conduct.  Id. ¶¶ 8, 20-27.  Plaintiff further alleges that applying the TAA to personal managers is violative of the equal protection clause of the Fourteenth Amendment.  Id. ¶ 69.  Specifically, plaintiff alleges that by applying the TAA to personal managers, California enforces the TAA in a manner that is different from other statutes regulating other occupations.  Id. ¶¶ 54-69.  Plaintiff also contends that the Labor Commissioner's application of the TAA has, or in the future will, deprive him of property, i.e., his contracts.

In his FAC, plaintiff again alleges that the application of the TAA is unconstitutional.  FAC ¶ 1.  Specifically, plaintiff alleges that (1) the TAA violates the due process clause of the Fourteenth Amendment because it is not "reasonably definite as to what persons and conduct are covered as well as the punishment that can be imposed," (2) defendant's actions in rendering his contracts void ab initio are a violation of the Article 1, Section 10 of the United States Constitution ("the Contracts Clause"), (3) defendant's impairment of his contracts without statutory guidelines constitutes an "unconstitutional deprivation of property and a violation of the Fifth Amendment of [sic] the United States Constitution," and (4) applying the TAA to personal managers is violative of the equal protection clause of the Fourteenth Amendment because in applying the TAA to personal managers, California enforces the TAA differently from the manner in which it enforces other statutes regulating occupations.  Id. ¶¶ 14, 17-24, 25-28.  Plaintiff alleges that these claims arise out of 42 U.S.C. §§ 1983 and 1985.  Id. ¶ 8.  Plaintiff also seeks declaratory relief under 28 U.S.C. §§ 2201 et seq., a permanent injunction, and costs, including reasonable attorney's fees.

## III.    LEGAL STANDARD

A Fed. R. Civ. P. 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007).  "[F]actual allegations must be enough to raise a right to relief above the speculative level."  Id. at 1965.

In considering a motion pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them.  Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998).  The complaint must be read in the light most favorable to the nonmoving party.  Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  However, a court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.  Sprewell, 266 F.3d at 988; W. Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

Dismissal pursuant to Rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990).

Furthermore, unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials).  In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 102 F.3d 1524, 1537 (9th Cir. 1996), rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998). A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201.  In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir.

1   1999); <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 689 (9th Cir. 2001).

2        For all of these reasons, it is only under extraordinary circumstances that

3   dismissal is proper under Rule 12(b)(6).  <u>United States v. City of Redwood City</u>, 640

4   F.2d 963, 966 (9th Cir. 1981).

5        As a general rule, leave to amend a complaint which has been dismissed should

6   be freely granted.  Fed. R. Civ. P. 15(a).  However, leave to amend may be denied when

7   "the court determines that the allegation of other facts consistent with the challenged

8   pleading could not possibly cure the deficiency."  <u>Schreiber Distrib. Co. v. Serv-Well</u>

9   <u>Furniture Co.</u>, 806 F.2d 1393, 1401 (9th Cir. 1986); <u>see</u> <u>Lopez v. Smith</u>, 203 F.3d 1122,

10   1127 (9th Cir. 2000).

11  **IV.**  **DISCUSSION**

12        In order to state a claim against an individual pursuant to section 1983, a plaintiff

13   must allege: "(1) a violation of rights protected by the federal Constitution or created by

14   federal statutes or regulations, (2) proximately caused (3) by the conduct of a 'person'

15   (4) who acted under color of [law]."  Martin A. Schwartz, 1A Section 1983 Litigation

16   Claims and Defenses § 1.04(A) (4th ed. 2007) (internal citations omitted).  This Court

17   dismissed plaintiff's initial complaint for failure to state a claim under section 1983 on

18   two separate grounds.[3]  July 14, 2008 Order at 12-13.  First, the Court found that there

19   was no state action because defendant did not act affirmatively but merely exercised her

20   adjudicatory authority to resolve controversies under the TAA.  <u>Id.</u>  Second, the Court

21   found that plaintiff's claims failed on the merits.  <u>Id.</u> at 13.

22     **A.**   **State Action**

23       In his FAC, plaintiff acknowledges that "suit would be unnecessary if the

24   [d]efendant served solely as an impartial arbiter," but contends that defendant has

25   shown an interest in "policing over adjudicating."  Opp'n at 6.  Plaintiff points to a letter

26

27       [3]Plaintiff's FAC lists 28 U.S.C. § 1985 as an alternative basis for his claims.

28  However, since plaintiff has not alleged any conspiracy, section 1985 is not applicable.
<u>Sykes v. State of California</u>, 497 F.2d 197, 200 (9th Cir. 1974).

from Robert A. Jones, acting State Labor Commissioner and Chief Counsel, petitioning

the California Supreme Court to depublish the Court of Appeal decision in Marathon

Entertainment, Inc. v. Blasi, as evidence that defendant acted as an enforcer rather than

an arbiter.  Id. at 5.[4]  The Commission's subsequent request for depublication of a

California Supreme Court decision does not alter this Court's conclusion that defendant

acted as an arbiter in hearing plaintiff's former clients' claims under Cal. Lab. Code §

1700.44(a) because no inference may be drawn from such conduct that the Labor

Commissioner is not acting as an impartial arbiter.  Plaintiff's section 1983 claims

against defendant therefore fail because she is not a proper defendant to this suit.

### B.    Plaintiff's Claims on the Merits

Plaintiff's claims also fail on the merits.  The Court clearly rejected plaintiff's

first claim for relief in its prior order.  July 14, 2008 Order at 12-13.  The Court rejected

plaintiff's contention that the TAA failed to put plaintiff on notice that it would apply to

him "because the TAA clearly states that a 'talent agency,' is 'a person or corporation

who engages in the occupation of' procuring or soliciting employment for an artists."

Id. at 14 (citing  Cal. Lab. Code § 1700.4).  Plaintiff now contends that the legislative

history of the TAA indicates that the legislature intended to exclude personal managers

from TAA regulation.  Opp'n at 17.  However, in its prior order, the Court noted that the

TAA does not cover services such as personal management, but does "cover personal

managers, like plaintiff, if they solicit and procure employment on behalf of artists."

July 14, 2008 Order at 2 (citing Marathon, Inc. v. Blasi, 42 Cal. 4th 974, 988 (2008).

The Court further rejected plaintiff's argument that the TAA's application is

unconstitutional because it does not state the consequences for engaging in prohibited

conduct.  Id.  The Court found that TAA clearly prohibits procurement of employment

_____

[4]In that letter, Mr. Jones argues that incorporating severability into Cal. Lab. Code
§ 1700 et seq. and allowing a personal manager who has engaged in unlicensed
procurement to potentially recover commissions "severely undermines the incentive for
compliance with the Act envisioned by the Commission."  Opp'n Ex. A at 4.

1   for an artist without a license and such contracts are deemed void by statute. Id. (citing

2   Cal. Civ. Code §§ 1598-99).[5]

3       The Court also addressed and rejected plaintiff's third claim to the effect that

4   defendant's alleged impairment of his contracts without statutory guidelines deprives

5   him of his property without due process of law.  The Court noted that the TAA clearly

6   prohibits procurement of employment for an artist without a license and such contracts

7   are deemed void by statute. Id. at 14 (citing Cal. Civ. Code §§ 1598-99).  Therefore, it

8   cannot be said that applying the TAA to plaintiff deprives him of his property without

9   due process of law.  Again, plaintiff's allegations in his FAC are largely unchanged.

10  Plaintiff again argues that the statute does not describe procurement without a license as

11  "illegal" or "criminal" and therefore Cal. Civ. Code §§ 1598-99, which operates to void

12  unlawful contracts, does not apply.  Opp'n at 18-19.  Regardless of the term used, the

13  TAA clearly prohibits unlicensed procurement and such procurement is therefore

14  "unlawful" for the purposes of  Cal. Civ. Code §§ 1598-99.[6]

15      Furthermore, the Court previously addressed plaintiff's fourth claim to the effect

16  that application of the TAA to personal managers is violative of the equal protection

17  clause of the Fourteenth Amendment.  In its prior order, the Court rejected plaintiff's

18  equal protection claim because "it is clear that the TAA applies to all persons who

19  procure employment for artists."  July 14, 2008 Order at 15.  Plaintiff has failed to plead

20  any new facts which would allow the Court to reach the conclusion that the TAA, as

---

22     [5]Where a contract is made between parties to do an illegal act, the contract is void.
23  See Cal. Civ. Code § 1598 ("Where a contract has but a single object, and such object is
    unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely
24  expressed as to be wholly unascertainable, the entire contract is void."); Cal. Civ. Code §
    1599 ("Where a contract has several distinct objects, of which one at least is lawful, and
25  one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as
26  to the rest.").  As such, it is quite clear that a contract to procure employment for an artist
    without a license will be unenforceable unless severance is available.
27

28     [6]Cal. Lab. Code § 1700.5 ("No person shall engage in or carry on the occupation of
    a talent agency without first procuring a license therefor from the Labor Commissioner.").

Case 2:17-cv-07203-CAS-SS   Document 13-1   Filed 11/30/17   Page 55 of 163   Page ID
#355
Case 2:08-cv-02480-CAS-SS   Document 36   Filed 09/08/08   Page 8 of 9   Page ID #:354

1    enforced, violates the equal protection clause of the Fourteenth Amendment.

2         Plaintiff's only new claim for relief is his second claim to the effect that

3    defendant's alleged impairment of his contracts violates the Contracts Clause.  FAC ¶¶

4    17-21. Plaintiff acknowledges, however, that the prohibition set forth in the Contracts

5    Clause must be "accommodated to oblige States' inherent police power to safeguard the

6    interests of its people." Id. ¶ 18.  Plaintiff argues that the California legislature never

7    provided the Labor Commission with authority to impair contracts under the TAA.  The

8    threshold inquiry in Contracts Clause analysis is "whether the state law has, in fact,

9    operated as a substantial impairment of a contractual relationship." Campanelli v.

10   Allstate Life Ins. Co., 322 F.3d 1086, 1098 (9th Cir. 2003) (internal citations and

11   quotations omitted).  "In determining the extent of the impairment, a court must

12   consider whether the industry the complaining party has entered has been regulated in

13   the past." Id. (quotations and citations omitted).  Even if a state regulation constitutes a

14   substantial impairment of contract, it is still constitutional if the state has a "significant

15   and legitimate public purpose behind the regulation." Id.  The final step of the

16   Contracts Clause analysis is to determine whether "the adjustment of the rights and

17   responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a

18   character appropriate to the public purpose justifying [the legislation's] adoption." Id.

19   (internal quotations and citations omitted).

20        Plaintiff's second claim under the Contracts Clause is therefore also without

21   merit. Even assuming arguendo that the defendant's actions were a substantial

22   impairment of plaintiff's contracts, there is a long history of regulation of personal

23   managers in California. Marathon Entertainment, Inc. v. Blasi, 42 Cal.4th 974, 984

24   (2008) ("[T]he representation of artists is principally governed by the [TAA].  The

25   [TAA's] roots extend back to 1913, when the Legislature passed the Private

26   Employment Agencies Law and imposed the first licensing requirements for

27   employment agents."). Furthermore, the TAA has a significant and legitimate public

28   purpose, namely, to protect artists from exploitation. Id. ("[T]he Legislature was

1   concerned that those representing aspiring artists might take advantage of them, whether

2   by concealing conflicts of interest when agents split fees with the venues where they

3   booked their clients, or by sending clients to houses of ill-repute under the guise of

4   providing employment opportunities."). Id. Lastly, the Court finds that the impairment

5   of plaintiff's contracts is reasonable and based on the public purpose underlying the

6   TAA and therefore rejects plaintiff's second claim for relief.

7       Based on the foregoing, the Court concludes as a matter of law that the TAA, as

8   applied to plaintiff, is not invalid as alleged in his FAC. Accordingly, plaintiff's section

9   1983 claim must be dismissed. Plaintiff's claim for declaratory relief under section

10  2201 fails for the same reasons as his section 1983 claim. Hoeck v. City of Portland, 57

11  F.3d 781, 786 (9th Cir. 1995). Based on the foregoing, the Court denies plaintiff's

12  request for a permanent injunction prohibiting defendant from any future assessment of

13  penalties under the TAA and plaintiff's request for costs, including reasonable

14  attorney's fees.

15  **V.   CONCLUSION**

16      In accordance with the foregoing the Court hereby GRANTS defendant's motion

17  to dismiss without leave to amend. The Court denies leave to amend because plaintiff

18  can allege no set of facts consistent with his pleading that would cure the deficiencies

19  outlined herein. Each side shall bear its attorneys' fees and costs.

20      IT IS SO ORDERED.

21

22  Dated:  September 9, 2008

23                                              CHRISTINA A. SNYDER
                                                UNITED STATES DISTRICT JUDGE

24

25

26

27

28

# Exhibit E

1   EDNA GARCIA EARLEY, Bar No. 195661
    STATE OF CALIFORNIA
2   DEPARTMENT OF INDUSTRIAL RELATIONS
    DIVISION OF LABOR STANDARDS ENFORCEMENT
3   320 W. 4th Street, Suite 430
    Los Angeles, California 90013
4   Telephone:  (213) 897-1511
    Facsimile:  (213) 897-2877
5
    Attorney for the Labor Commissioner
6

7

8            BEFORE THE LABOR COMMISSIONER

9            OF THE STATE OF CALIFORNIA

10

11  BILLY BLANKS, JR., an individual,        CASE NO. TAC 7163
    SHARON CATHERINE BLANKS, an
12  individual, and CARDIOKE, INC., a        **DETERMINATION OF**
    California Corporation,                  **CONTROVERSY**
13

14
                                             
15              Petitioners,

16      vs.

17
    ANTHONY P. RICCIO, an individual,
18
                Respondent.
19

20

21          The above-captioned matter, a Petition to Determine Controversy under

22  Labor Code §1700.44, came on regularly for hearing on July 17, 2008 in Los Angeles,

23  California, before the undersigned attorney for the Labor Commissioner assigned to hear

24  this case.  Petitioners BILLY BLANKS, JR, an individual, SHARON CATHERINE

25  BLANKS, an individual, and CARDIOKE, INC., a California Corporation, appeared

26  represented by Charles M. Coate, Esq. of Costa, Abrams & Coate.  Petitioners BILLY

27  BLANKS JR. and SHARON CATHERINE BLANKS are hereinafter collectively referred

28  to as "Petitioners."  Respondent ANTHONY P. RICCIO, an individual (hereinafter,

                                    1

1  referred to as "Respondent"), appeared and was represented by Walter B. Batt of Law

2  Office of Walter B. Batt.

3      Based on the evidence presented at this hearing and on the other papers on

4  file in this matter, the Labor Commissioner hereby adopts the following decision.

5  FINDINGS OF FACT

6      1.    Petitioners are musical performers and residents of California.  They are

7  also known as "The Blanx" and perform Top 40 / Rock and Soul.  In addition to

8  performing music, both Petitioners also act, write, and dance.

9      2.    Respondent is also a resident of California.  At no time relevant to

10  these proceedings has Respondent been a licensed talent agent in the State of California.

11      3.    Respondent began representing Petitioners as their manager in June, 2006.

12  The parties, who had been friends for a number of years prior to deciding to work

13  together, agreed that Respondent would assist Petitioners in obtaining a record deal and

14  other entertainment opportunities in television, film and theater.  At some point, Petitioner

15  BILLY BLANKS, JR. drafted an *Informal Management Agreement* which was never

16  executed by the parties.  Nonetheless, Petitioners paid Respondent a 10% commission on

17  an animated film they allege Respondent negotiated on behalf of Petitioner SHARON

18  CATHERINE BLANKS.

19      4.    In October, 2006, the parties agreed to form a partnership for the purpose of

20  marketing and distributing a fitness program known as "Cardioke," which the parties

21  jointly created.  Cardioke is described on Petitioners' website as a fitness program that

22  combines Petitioners' cardio workout with a Karaoke screen.  At the commencement of

23  the partnership, the parties agreed that Respondent would act as a silent partner and would

24  be entitled to a 30% interest in the partnership.  Petitioner BILLY BLANKS, JR. drafted a

25  *Billy Blanks Jr's Cardioke® Silent Partnership Informal Agreement*, but, like the

26  *Informal Management Agreement*, the parties failed to execute the partnership agreement.

27      5.    In early 2007, Respondent, not feeling he had the experience to continue to

28  manage Petitioners' careers, referred them to Ron DeBlasio, an experienced Personal

2

1  Manager. Mr. De Blasio began representing Petitioners in connection with Cardioke in

2  February, 2007. Around the same time, Creative Artist Agency (CAA) also began to

3  represent Petitioners as their agent, also in connection with their Cardioke project. As a

4  silent partner in Cardioke, Respondent continued to be included in the prospective

5  entertainment opportunities related to Cardioke, although with less frequency. In fact,

6  Respondent testified that he was not kept apprised of CAA negotiations which ultimately

7  led to investor Razor & Tie Direct, LLC, dba Razor & Tie Entertainment contracting to

8  produce and distribute the video for Cardioke.

9          6.      Petitioner BILLY BLANKS, JR. testified that after he and his wife signed

10  the "Exclusive Video Production Agreement" with Razor & Tie Entertainment for

11  distribution of the Cardioke videos, they had a meeting with Respondent to discuss their

12  dissatisfaction with his lack of performance in promoting Cardioke. Petitioner BILLY

13  BLANKS, JR. admitted that he and his wife were finally able to afford to have an attorney

14  review the draft of the *Billy Blanks Jr's Cardioke® Silent Partnership Informal*

15  *Agreement* he had previously prepared and had been advised not to sign the agreement.

16  Consequently, when Petitioners met with Respondent, they proposed that any partnership

17  agreement entered into between the parties provide Respondent with only a 10% interest.

18  Petitioner BILLY BLANKS, JR. testified that he felt 10% was more than fair for

19  Respondent's role in "dreaming up the idea" and suggesting the name, "Cardioke."

20  Petitioners also presented Respondent with a check for $900.00 reflecting 10% of the first

21  advance check from the Razor & Tie Entertainment contract at this meeting. Although

22  Respondent acknowledged receiving the check on Wednesday, September 19, 2007, he

23  testified that, on advice of his attorneys, he has not cashed the check.

24          7.      The parties all testified that the aforementioned meeting was their last

25  meeting before Respondent filed a Breach of Contract action in the Los Angeles Superior

26  Court on December 10, 2007. Nine days after Respondent filed his superior court action,

27  Petitioners filed the instant Petition for Determination of Controversy alleging that

28  Respondent violated the Talent Agencies Act ("Act") by procuring employment and

1    entertainment opportunities for them without being licensed as a talent agent.  Petitioners

2    allege that Respondent unlawfully procured and/or negotiated the following employment /

3    entertainment opportunities for Petitioners in violation of the Act: (1) Burnlounge; (2) the

4    Computer Animated Film "FOODFIGHT;" (3) an Appearance on the "Ellen DeGeneres

5    Show;" and (4) Meetings with Beach Body and Guthy-Renker for the purpose of

6    distributing and promoting "Cardioke."

7                                                    **Burnlounge**

8            8.      Respondent testified that Burnlounge was a network of marketing

9    companies where artists would sell their music online and cut out the middleman.

10   Registration on Burnlounge cost between $400-$500.  Artists were promised 50 cents per

11   each song sold/downloaded.  Respondent testified that he helped Petitioners register on

12   Burnlounge and even fronted the $400-$500 registration fee.  Respondent admitted that on

13   Burnlounge's recommendation, he arranged for Petitioners to perform live at four unpaid

14   events sponsored by Burnlounge in order to get publicity and eventually sell their songs

15   which were posted on Burnlounge's website.  Through these promotional events,

16   Petitioners sold 114 individual songs on Burnlounge.  It is undisputed that Burnlounge

17   turned out to be a scam and was eventually shut down by the federal government.  As

18   such, the parties never received any monies from their involvement with Burnlounge.

19                                                  **"FOODFIGHT"**

20           9.      FOODFIGHT was a computer animated film produced by Threshold

21   Entertainment.  Petitioner SHARON CATHERINE BLANKS testified that in the Fall of

22   2006, she performed the "motion capture" for the film which is an animated character's

23   movements.  Petitioner SHARON CATHERINE BLANKS also testified that Respondent

24   negotiated this entertainment opportunity for her and hence, received a 10% commission

25   check as payment for his services.  Respondent, on the other hand, testified that Petitioner

26   SHARON CATHERINE BLANKS got this opportunity on her own through contacts

27   made by her husband who had previously performed work on the film.  Respondent

28   testified that he accepted the commission check despite not having procured the

                                                          4

1    employment because Petitioners insisted he be paid 10% as their manager.

2                              **The Ellen DeGeneres Show**

3         10.    Petitioners appeared on the Ellen DeGeneres show in early 2007 to promote

4    Cardioke. The show aired on February 12, 2007. Petitioner BILLY BLANKS, JR.

5    testified he was paid at union scale for this appearance. His wife, Petitioner SHARON

6    CATHERINE BLANKS, also appeared but was not paid. Petitioners testified that

7    Respondent procured the appearance on their behalf. While Respondent denied at the

8    hearing that he contacted anyone on the show and denied that he negotiated any of the

9    terms related to this appearance, this testimony was in direct conflict with his Response to

10   the instant Petition as well as an allegation made in Respondent's superior court action. In

11   Paragraph 17 of the Response to the instant Petition, Respondent states: *"Respondent and*

12   *Petitioner continued to work together and through Respondent's personal efforts,*

13   *personal costs and diligence, he was able to subsequently negotiate and place Petitioners*

14   *without any re-numeration to Petitioners or Respondent on the "Ellen Degeneres Show"*

15   *on or about February 2007 to showcase and promote the packaged concept now called*

16   *Cardioke."* Additionally, in his Superior Court Complaint for Breach of Contract,

17   Respondent alleges *"Plaintiff [Respondent in this action] while working with Defendants*

18   *[Petitioners in this action] and through Plaintiff's sole efforts and diligence subsequently*

19   *negotiated and placed Defendants on the "Ellen Degeneres Show" on or about February*

20   *2007 to showcase the packaged concept now called Plaintiff's trademark name*

21   *Cardioke."*

22                      **Meetings with Beach Body and Guthy-Renker**

23        11.    Petitioners allege that Respondent attempted to arrange meetings with Beach

24   Body, a video production company and Guthy-Renker, who puts together infomercials

25   and is known for hip hop ads. The purpose of these meetings was to secure investors to

26   support developing Cardioke, that is, to produce and make the first set of videos of

27   Cardioke. The plan was that once the investors were secured, Petitioners would serve as

28   spokespersons for Cardioke and would perform on the videos and infomercials.

1  Petitioners claim that at their direction, Respondent began setting up these meetings in the

2  Fall of 2006, soon after Cardioke was conceptualized.  While Petitioners had an agent,

3  Nancy Abt of the Daniel Hoff Agency, during this time, she was not involved in setting up

4  any of these meetings and was fired by the parties in February, 2007.  Petitioners' current

5  manager, Mr. DeBlasio testified that he never made contact with anyone at Beach Body.

6  Respondent explained that he promoted Cardioke because he had a business interest in the

7  company as a silent partner.

8                                LEGAL ANALYSIS

9       1.      Labor Code §1700.4(b) defines "artists" as "actors and actresses rendering

10  services on the legitimate stage and in the production of motion pictures, radio artists,

11  musical artists, musical organizations, directors of legitimate stage, motion picture and

12  radio productions, musical directors, writers, cinematographers, composers, lyricists,

13  arrangers, models, and other artists and persons rendering professional services in motion

14  picture, theatrical, radio, television and other entertainment."  When Petitioners performed

15  as "The Blanx" they were performing as musicians.  As musicians, they are considered

16  "artists" within the meaning of Labor Code §1700.4(b).

17           Respondent claims in his Response to the Petition that Petitioners are not

18  "artists" under the jurisdiction of the Labor Code when they perform as aerobics

19  instructors.  In *Styne v. Stevens*, TAC 33-01, (on remand from the California Supreme

20  Court) we were faced with a similar issue. Connie Stevens, a well known entertainer,

21  developed a restorative skin care line known as Forever Spring, Inc., which she personally

22  sold on the Home Shopping Network (HSN) through infomercials.  Profits from Forever

23  Spring, Inc. exceeded everyone's expectations.  During the first couple of years of selling

24  this skin line on HSN, Stevens regularly compensated her manager, Norton Styne.

25  Payments, however, ceased at some point resulting in Styne filing a breach of contract

26  lawsuit against Stevens seeking more than $4,000,000.00 in unpaid profits.  The issue of

27  whether Stevens acted as an "artist" when selling her products on HSN via her

28  infomercials, was raised in the talent agency controversy.  In concluding that Stevens'

1   show-business life and her wholesale business enterprise life were "inextricably

2   interwined," the Labor Commissioner noted that Stevens used her name, personality,

3   charm and charisma to sell the product on television.  Additionally, HSN required Stevens

4   to appear on television as a condition of the sale.  The Commissioner also noted that a

5   rough script was followed and entertaining stories were told by Stevens during the

6   infomercials.

7          The evidence in this case establishes that Cardioke was being marketed as

8   Petitioner BILLY BLANKS, JR's Cardioke.  Petitioner BILLY BLANKS, JR. is the son

9   of Tae Bo creator Billy Blanks.  As such, like Connie Stevens, Petitioner BILLY

10  BLANKS, JR. was selling his name.  But, more importantly, Cardioke was being

11  promoted in this case by the parties, including Respondent, for the goal of securing an

12  investor who could assist in creating a video production of Cardioke.  It was contemplated

13  by the parties that as part of the video production, Petitioners would be required to

14  perform Cardioke in an infomercial similar to the one Connie Stevens performed in her

15  efforts to sell her product. In fact, when the parties actually succeeded in securing

16  investor, Razor & Tie Entertainment, the video production contract provided that

17  Petitioners would perform as fitness instructors / musicians.  Per the Razor & Tie

18  Entertainment contract (and consistent with the parties expectations at all times), the

19  performance on the video infomercial could not be performed by anyone but Petitioners

20  because of their musical talent and exercise experience.  While Petitioners might not

21  normally be considered "artists" within the meaning of the Act had they been merely

22  teaching Cardioke classes, the evidence here supports the conclusion that Petitioners were

23  required to perform in an infomercial for distribution of their video while capitalizing on

24  the well known Blanks name. Accordingly, like the circumstances involving Connie

25  Stevens, Petitioners are considered "artists" within the meaning of the Act.

26          2.  Labor Code §1700.4(a) defines "talent agency" as "a person or corporation who

27  engages in the occupation of procuring, offering, promising, or attempting to procure

28  employment or engagements for an artist or artists, except that the activities of procuring,

7

1   offering or promising to procure recording contracts for an artist or artists shall not of

2   itself subject a person or corporation to regulation and licensing under this chapter." "To

3   'procure' means 'to get possession of: obtain, acquire, to cause to happen or be done:

4   bring about.'" *Wachs v. Curry* (1993) 13 Cal.App.4th 616, 628.

5       3. Labor Code §1700.5 provides that "[n]o person shall engage in or carry on the

6   occupation of a talent agency without first procuring a license…from the Labor

7   Commissioner." It is undisputed that Respondent has never been licensed as a talent

8   agency in the State of California.

9       4. The evidence presented establishes that Respondent procured all four of

10   the engagements at issue. Specifically, Respondent admitted that he was responsible for

11   arranging Petitioners' live performances in connection with Burnlounge. This

12   procurement is in violation of the Act despite the fact that Petitioners did not get paid for

13   these promotional performances. "The Act regulates those who engage in the occupation

14   of procuring engagements for artists. The Act does not expressly include or exempt

15   procurement where no compensation is made." *Park v. Deftones* (1999) 71 Cal.App.4th

16   1465, 1471. Thus, the fact that Respondent did not get paid a commission because

17   Petitioners did not get paid to perform does not exempt Respondent from the Act's

18   licensure requirements. Additionally, procurement of these promotional performances

19   does not fall within the limited recording contract exemption since Burnlounge was not a

20   record label and no evidence was presented that the purpose of these promotional

21   performances was to secure a recording contract but instead, to sell individual songs.

22       5. We also find that the evidence presented supports a finding that Respondent

23   negotiated the FOODFIGHT engagement on behalf of Petitioner SHARON CATHERINE

24   BLANKS. Respondent's contention that he did not provide any services in return for the

25   10% commission that he collected on this engagement is unconvincing.

26       6. While Respondent testified that he did not procure the Ellen DeGeneres

27   performance, as previously recognized, his Response to this Petition as well as his

28   Complaint for Breach of Contract filed in the Los Angeles Superior Court indicates

1   otherwise.  In both pleadings, Respondent openly and admittedly stated that through his

2   personal efforts, personal costs and diligence, he was responsible for negotiating and

3   placing Petitioners on the Ellen DeGeneres show. (See *Nathaniel Stroman pka*

4   *Earthquake v. NW Entertainment, Inc. dba New Wave Entertainment, et al.*, TAC 38-05

5   (July 11, 2006) where the Labor Commissioner held that statements made by personal

6   manager in pleadings filed in the Superior Court constituted admissions of procurement in

7   violation of the Act since manager was not a licensed talent agent).

8       Even though this appearance was made for the purpose of promoting Cardioke, a

9   program in which Respondent was a silent partner and had a business interest in

10  promoting, Respondent's role as Petitioners' manager cannot be so easily and

11  conveniently separated for purposes of avoiding liability under the Act as Respondent

12  somehow suggests. Simply put, Respondent was wearing two hats, one as Petitioners'

13  Manager and one as Petitioners' silent partner in the Cardioke joint venture. From the

14  inception of Cardioke until the time Respondent stopped managing Petitioners in early

15  2007, those two roles were intertwined.  Because, in addition to being Petitioners'

16  business partner on Cardioke, Respondent also served as their manager and unlawfully

17  negotiated the Ellen DeGeneres appearance, he is in violation of the Act.

18      We are not ruling today that anyone who enters into a business relationship with an

19  artist and who then promotes the joint product/service that inevitably involves

20  entertainment efforts by the artist/business partner, violates the Act. Rather, we are

21  holding that in a situation such as the present one, where the business partner has *also*

22  agreed to be the artist's manager, there will be a violation of the Act if the manager is

23  procuring employment without a license and without working at the request of and in

24  conjunction with a licensed agent.  This conclusion is supported by the express language

25  of the Act which does not exempt "business partners" from the licensing requirements.

26      7.  Lastly, we find that the documentary evidence presented at the hearing supports

27  a finding that Respondent, at Petitioners' behest, set up meetings and attempted to procure

28  financing for Cardioke with Beach Body and Guthy-Renker.  The emails produced as

1  evidence indicate that production of the Cardioke videos would require future

2  performances by Petitioners. As such, these meetings constitute attempts to procure

3  entertainment engagements for Petitioners, whom we have already ruled, are considered

4  "artists" within the meaning of the Act when promoting Cardioke.

5      8. In accord with *Marathon Entertainment Inc. v. Rosa Blasi* (2008) 42 Cal.4[th]

6  974, Respondent urges us to apply the doctrine of severability if we find that Respondent

7  violated the Act in any of the four identified engagements at issue herein. While the

8  *Marathon* court recognized that the Labor Commissioner may invalidate an entire contract

9  when the Act is violated, the Court also left it to the discretion of the Labor Commissioner

10  to apply the doctrine of severability to preserve and enforce the lawful portions of the

11  parties' contract where the facts so warrant. As the Supreme Court explained in

12  *Marathon:*

13

14      "Courts are to look to the various purposes of the

15      contract. If the central purpose of the contract is tainted

16      with illegality, then the contract as a whole cannot be

17      enforced. If the illegality is collateral to the main

18      purpose of the contract, and the illegal provision can be

19      extirpated from the contract by means of severance or

20      restriction, then such severance and restriction are

21      appropriate." [Citations omitted].

22  *Marathon, supra* at p.996.

23      In this case, we find that Respondent unlawfully attempted and actually procured

24  employment / entertainment opportunities for Petitioners without being licensed as a

25  talent agent. We also find that although the parties failed to execute the *Informal*

26  *Management Agreement* prepared by Petitioner, the parties nonetheless operated under an

27  oral management agreement. While the term of this oral management agreement was

28  brief, (from June 2006 through January 2007), Respondent presented no compelling

10

1   evidence that the duties Respondent primarily performed during this period of time were

2   of the type typically considered "managerial" such as providing career advice, counsel

3   and coordinating the development of Petitioners' careers.  Instead, the evidence presented

4   establishes that during this brief period, Respondent was engaged in procuring

5   employment for Petitioners and that Respondent unlawfully procured employment on the

6   four engagements alleged by Petitioners.  Consequently, we find that the central purpose

7   of this oral management agreement is tainted with illegality and cannot be enforced.  In

8   such a case, severance is not appropriate.  The oral management agreement is therefore

9   deemed void *ab initio*.

10         Petitioners seek an order of disgorgement of all paid commissions.  Yet, the only

11   commission paid to Respondent during the management term was in connection with

12   Petitioner SHARON CATHERINE BLANKS' performance on FOODFIGHT.  While

13   Respondent received this commission payment within one year prior to the filing of the

14   Petition, the actual violation of procurement appears to have been committed more than

15   one year prior to the filing of the Petition. As such, Petitioners are not entitled to

16   disgorgement of this commission.

17         We make no determination regarding the effect of this decision on the *Billy Blanks*

18   *Jr's Cardioke® Silent Partnership Informal Agreement* which the parties also failed to

19   execute nor any oral <u>partnership</u> agreement between the parties in connection with

20   Cardioke.  The Petition to Determine Controversy filed by Petitioners did not present that

21   question for determination by the Labor Commissioner and Petitioners did not argue at the

22   hearing that we dismiss this separate partnership contract.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1

### ORDER

2        For the reasons set forth above, IT IS HEREBY ORDERED that the oral

3   management agreement entered into between Petitioners and Respondent in June, 2006 is

4   deemed void *ab initio*. Petitioners have no liability thereon to Respondent, and

5   Respondent has no rights or privileges thereunder.

6   DATED: January 9, 2009          Respectfully submitted,

7

8                     By: _____

9                       EDNA GARCIA EARLEY

10                    Attorneys for the Labor Commissioner

11

12

ADOPTED AS THE DETERMINATION OF THE LABOR COMMISSIONER

13

14

15

16  Dated: _____ By: _____

17                       ANGELA BRADSTREET
                         State Labor Commissioner

18

19

20

21

22

23

24

25

26

27

28

# Exhibit F

1    **STATE OF CALIFORNIA**
Department of Industrial Relations
2    Division of Labor Standards Enforcement
BY:   EDNA GARCIA EARLEY, State Bar No. 195661
3    320 W. 4th Street, Suite 430
Los Angeles, California 90013
4    Tel.: (213) 897-1511
Fax: (213) 897-2877
5
Attorney for the Labor Commissioner
6

7

8                    **BEFORE THE LABOR COMMISSIONER**
9                      **OF THE STATE OF CALIFORNIA**
10

11

12   GOLDEN BROOKS, an individual,          )  CASE NO. TAC 43-04
                                            )
13                 Petitioner,              )
                                            )  **DETERMINATION OF**
14   vs.                                    )  **CONTROVERSY**
                                            )
15                                          )
                                            )
16                                          )
RICK AX, an individual and dba RICK         )
17   AX MANAGEMENT, a sole                  )
proprietorship; LORI COATS, an             )
18   individual,                            )
                                            )
19                 Respondents.             )
                                            )
20

21        The above-captioned matter, a petition to determine controversy under Labor Code

22   §1700.44, came on regularly for hearing on June 19, 2006 in Los Angeles, California, before

23   the undersigned attorney for the Labor Commissioner assigned to hear this case. Petitioner

24   GOLDEN BROOKS, an individual, (hereinafter, referred to as "BROOKS"), appeared and

25   was represented by Andrew D. Stein of Blanchard Stein & Stein.  Respondent RICK AX, an

26

27                                          1

28
                         DETERMINATION OF CONTROVERSY (TAC 43-04)

1  individual and dba RICK AX MANAGEMENT, a sole proprietorship, not having been
2  served with this Petition, is hereby dismissed as a party to this action. Respondent LORI
3  COATS, an individual, (hereinafter, referred to as "COATS"), appeared telephonically from
4  New York. Appearing telephonically from New York as a witness for COATS was
5  Shalimar Roedica.

6  Based on the evidence presented at this hearing and on the other papers on file in this
7  matter, the Labor Commissioner hereby adopts the following decision.

8  ## FINDINGS OF FACT

9  1. BROOKS is an actress who currently appears on the television sitcom
10  *"Girlfriends."* At all times mentioned herein, BROOKS was a resident of the County of Los
11  Angeles, State of California.

12  2. At all times mentioned herein, COATS was employed in the County of Los
13  Angeles, State of California. COATS currently resides in New York City, New York.
14  COATS was personally served with the Petition to Determine Controversy and Notice to
15  Answer on September 27, 2005 at her residence in New York City. At no time, has COATS
16  been licensed as a talent agent in the State of California.

17  3. BROOKS first met COATS in late 1998 or early 1999 when COATS worked
18  as an assistant manager for a talent management company called Mindel Donegan. COATS
19  eventually left Mindel Donegan and began working as a manager with Rick Ax's company,
20  which at the time was called "Goldcoast" and is now called Rick Ax Management. COATS
21  asked BROOKS, who at the time, was not represented by a manager and who had just ended
22  her relationship with her former agent, Writers and Artists, to join her at Rick Ax
23  Management. BROOKS testified that COATS promised her that if she hired Rick Ax
24  Management, COATS could do a better job for her. BROOKS eventually hired Rick Ax
25  Management to represent her as her management company.

26  4. As her manager, Rick Ax, with the assistance of COATS, set up

27

28  2.

1  interviews for BROOKS with talent agents and attorneys that Rick Ax personally knew. In

2  March 2000, BROOKS testified that Rick Ax introduced her to her current talent agent,

3  Abrams Talent Agency, (hereinafter, referred to as "Abrams"). It was also around this time

4  that BROOKS successfully auditioned for a role on the pilot for "*Girlfriends*." On July 14,

5  2000, after the "*Girlfriends*" pilot was picked up, BROOKS signed a one page contract with

6  Rick Ax Management and COATS which was referred to as the "*Girlfriends*" Commission

7  Payment Agreement. This agreement provided as follows:

8        "In consideration of personal management services rendered
         on my behalf by Rick Ax Management, including, without
9        limitation, Lori Coats (the receipt of which I acknowledge), I
         Golden Brooks, agree to pay to Rick Ax Management a
10       commission equal to 10% of my total gross earnings on the
         television series currently entitled "Girlfriends: for the duration
11       of the contract (but excluding any increased compensation received
         as a result of any renegotiations unless I am still represented by Rick
12       Ax Management)."

13       5.      BROOKS argued that this contract was proof that COATS along with

14  Rick Ax, procured the "*Girlfriends*" employment. However, when pressed by COATS on

15  cross examination, BROOKS admitted that she has always paid Abrams a 10% commission

16  because they, along with Rick Ax Management, submitted her for "*Girlfriends*."

17  Furthermore, when asked if she had any proof that COATS had personally submitted her or

18  attempted to submit her for the role on "*Girlfriends*," BROOKS admitted that she was

19  informed by the Executive Producer of "*Girlfriends*" that Rick Ax's company had contacted

20  them. BROOKS also testified that because COATS worked for Rick Ax's company, she

21  helped Rick Ax obtain auditions and jobs which he was not supposed to obtain for her

22  without a talent agency license.

23       6.      BROOKS also testified that she had numerous faxes showing that COATS

24  sent her out on auditions for various pilots during Pilot Season 2000 as well as independent

25  movies. However, when asked on cross examination to produce such faxes, she stated they

26  were at home but that she could get them later.

27

28                                            3

7.     COATS testified that, as BROOKS' manager, her job was to make sure BROOKS went to the auditions that Abrams procured for BROOKS. Additionally, she made sure that BROOKS had all the information for the auditions, including the directions and copies of the scripts. After the auditions, COATS testified that she would seek feedback on how BROOKS performed. With regard to "*Girlfriends*," COATS testified that after Abrams obtained the employment for BROOKS, COATS accompanied BROOKS to meetings with publicists, photo shoots and helped BROOKS with whatever else she needed to be done. COATS testified that she earned her commission by performing these tasks for BROOKS, as her manager. Moreover, COATS argues that it was never her role nor did she have the capacity to acquire or solicit work for BROOKS. In response, BROOKS testified that she didn't hire COATS to get her coffee, babysit her or do miscellaneous things that she could do herself. Rather, she hired COATS because COATS promised her that she could do a much better job for BROOKS once she became a manager at Rick Ax Management.

8.     BROOKS fired Rick Ax Management during season two of "*Girlfriends*." In an effort to get out of her contract with Rick Ax Management, in early April 2002, the parties[1] entered into a settlement agreement without filing a civil action, wherein they modified the terms of the original July 14, 2000 "*Girlfriends" Commission Payment Agreement.* In this settlement agreement, referred to as "*Agreement for Compromise, Settlement and Release of Disputed Claims,*" BROOKS agreed to pay the parties $47,025 for the second season of "*Girlfriends*," 7.5% of her gross earnings for the third season, and 7% of her gross earnings for the fourth, fifth and sixth seasons. BROOKS testified that she paid Rick Ax up until the point she was advised that she didn't have to pay due to Rick Ax, Rick Ax Management and COATS having violated the Talent Agencies Act. COATS, however, never received any of her portion of the settlement proceeds from Rick Ax and in turn, sued him, his company and GOLDEN BROOKS for breach of the "*Agreement for*

---

[1]The parties include BROOKS, COATS, Rick Ax and Rick Ax Management.

4

1  *Compromise, Settlement, and Release of Disputed Claims.*" In settlement of that case,

2  COATS testified that Rick Ax and Rick Ax Management paid her a sum of money and

3  agreed to assign their rights to commissions earned during season six, to COATS.

4  BROOKS testified that she was dismissed from the suit filed against her by COATS. At

5  some point after season five, BROOKS stopped payment altogether. BROOKS stopped

6  making payments on the *"Agreement for Compromise, Settlement and Release of Disputed*

7  *Claims,"* after season five on the basis that the settlement agreement and the original

8  management agreement (dated July 14, 2000), were all void due to violations of the Talent

9  Agencies Act.

10       9.     In this action, BROOKS seeks a determination that the July 14, 2000

11  *"Girlfriends" Commission Payment Agreement* and the April 9, 2002 *"Agreement for*

12  *Compromise, Settlement, and Release of Disputed Claims"* are illegal and void *ab initio*

13  because COATS violated the Talent Agencies Act.

14  <u>**CONCLUSIONS OF LAW**</u>

15       1.     Labor Code §1700.4(b) includes "actors" in the definition of "artist" and

16  BROOKS is therefore an "artist" within the meaning of §1700.4(b). The Labor

17  Commissioner has jurisdiction to determine this controversy pursuant to Labor Code

18  §1700.44(a).

19       2.     The contested issues here are whether COATS functioned as a "talent agency"

20  within the meaning of Labor Code §1700.4(a), and if so, what consequences should flow

21  from the fact that COATS was not licensed by the Labor Commissioner as a talent agency.

22       3.     Labor Code §1700.4(a) defines "talent agency" in pertinent part, as "a person

23  or corporation who engages in the occupation of procuring, offering, promising, or

24  attempting to procure employment or engagements for an artist or artists..." Labor Code

25  §1700.5 provides that "[n]o person shall engage in or carry on the occupation of a talent

26  agency without first procuring a license...from the Labor Commissioner."

27

28  5

1    4.    The term "procure," as used in Labor Code §1700.4(a) means "to get

2    possession of: obtain, acquire, to cause to happen or be done: bring about." *Wachs v. Curry*

3    (1993) 13 Cal.App.4th 616, 628.

4    5.    The burden of proof in establishing a violation of the Talent Agencies Act,

5    (hereinafter, referred to as "Act"), falls on the petitioner. In this case, BROOKS failed to

6    meet her burden. Specifically, BROOKS failed to prove that COATS violated the Act by

7    procuring, offering, promising or attempting to procure any engagement or employment for

8    BROOKS, including employment on the *"Girlfriends"* television show.

9    6.    The proper burden of proof in actions before the Labor Commissioner is

10   found at Evidence Code §115 which states, "[e]xcept as otherwise provided by law, the

11   burden of proof requires proof by preponderance of the evidence." Further, *McCoy v. Board*

12   *of Retirement of the County of Los Angeles Employees Retirement Association* (1986) 183

13   Cal.App.3d 1044, 1051 states, "the party asserting the affirmative at an administrative

14   hearing has the burden of proof, including both the initial burden of going forward and the

15   burden of persuasion by preponderance of the evidence [cite omitted]. "Preponderance of

16   the evidence standard of proof requires the trier of fact to believe that the existence of a fact

17   is more probable than its nonexistence." *In re Michael G.* 74 Cal.Rptr.2d 642.

18   7.    As we stated in *A.C. Watson and Clarang, Inc. v. Richard Glasser, et al.,* TAC

19   24-99 at p. 11-12, "When establishing a preponderance of the evidence, the moving party

20   must supply more than 'he said/she said' when both parties testify credibly. There must be

21   evidence of an offer, a promise, or an attempt by respondents to procure employment.

22   Minimally, an element of negotiation established through documentary evidence or

23   testimony from a witness with personal knowledge of respondents' procurement activity will

24   suffice." As in TAC 24-99, these elements were not present in this case. First, BROOKS

25   testified that she had many faxes that she received from COATS which showed that COATS

26   was sending her out on auditions. Yet, at the hearing she stated that she did not have any

27

28                                          6

faxes with her. They were left at home. Additionally, when she was asked on cross examination by COATS if she had any witnesses that could confirm that COATS ever called anyone on BROOKS' behalf to get BROOKS an audition, BROOKS replied, "I don't need witnesses" and "I will not present witnesses and my word is fine." Lastly, when asked if she had a copy of her agreement with Abrams, (since presumably it would show if it was signed before or after she obtained "*Girlfriends*"), BROOKS responded, "We don't have it with us today because it is irrelevant." Finding that both BROOKS and COATS were equally credible, such documents and witnesses would have been beneficial to this determination. By not providing them, BROOKS has failed to meet her burden of proof.

8. BROOKS argues that Exhibit B, which is the July 14, 2000 *"Girlfriends" Commission Payment Agreement*, is proof that COATS was being paid commissions for procuring "*Girlfriends*." We disagree. Exhibit B clearly states that the commissions are being paid in consideration <u>for personal management services</u> rendered by Rick Ax Management, including, without limitation, Lori Coats. COATS testified that she provided management services to BROOKS. Conversely, BROOKS testified that she didn't hire COATS to be a babysitter or an assistant. She hired COATS to work on her behalf by procuring work for her. On this issue, we find COATS' testimony to be more credible, mainly because it doesn't make sense that BROOKS would pay both Abrams Talent Agency <u>and</u> Rick Ax Management to procure work on her behalf.

9. It follows that COATS did not violate the Act. Accordingly, the July 14, 2000 *"Girlfriends" Commission Payment Agreement* and the April 9, 2002 *"Agreement for Compromise, Settlement and Release of Disputed Claims"* are not illegal nor void *ab initio*.

## ORDER

For the above-state reasons, IT IS HEREBY ORDERED that the July 14,

//

//

7

1  2000 *"Girlfriends" Commission Payment Agreement* and the April 9, 2002 *"Agreement for*
2  *Compromise, Settlement and Release of Disputed Claims"* are not illegal nor void *ab initio.*
3  Therefore, the petition is denied.

6  Dated: 11-7-06

EDNA GARCIA EARLEY
Attorney for the Labor Commissioner

10  **Adopted:**

13  Dated: 11-7-06

ROBERT JONES
Acting State Labor Commissioner

28  8

DETERMINATION OF CONTROVERSY (TAC 43-04)

# Exhibit G

1 | Miles E. Locker, No. 103510
DIVISION OF LABOR STANDARDS ENFORCEMENT
2 | Department of Industrial Relations
State of California
3 | 455 Golden Gate Avenue, 9th Floor
San Francisco, CA  94102
4 | Telephone:  (415) 703-4863
Fax:       (415) 703-4806
5 | Attorney for the Labor Commissioner

6

7

8 | BEFORE THE LABOR COMMISSIONER

9 | OF THE STATE OF CALIFORNIA

10

11 | AISHA TYLER, an individual,          )     No. TAC 31-01
                                       )
12 |               Petitioner,           )
                                       )
13 | vs.                                 )     DETERMINATION OF
                                       )     CONTROVERSY
14 | LAUGH FACTORY MANAGEMENT, a business )
entity of unknown form; and JAMIE    )
15 | MASADA, an individual,              )
                                       )
16 |               Respondent.           )
   |_____)

17

18 |     The above-captioned matter, a petition to determine

19 | controversy under Labor Code §1700.44, came on regularly for

20 | hearing on June 24 and 25, 2002, in Los Angeles, California,

21 | before the Labor Commissioner's undersigned attorney specially

22 | designated hearing officer.  Petitioner appeared and was

23 | represented by attorneys Michael J. Plonsker and Mark D. Passin,

24 | and Respondent appeared and was represented by attorney Joan

25 | Kenegos.  Based on the evidence presented at this hearing and on

26 | the other papers on file in this matter, the Labor Commissioner

27 | hereby adopts the following decision.

28 | //

TAC 31-01 Decision                    1

# FINDINGS OF FACT

1.  AISHA TYLER (hereinafter "Tyler" or "Petitioner") is an actress and a comedian, and is now well-known for her stand-up comedy performances.  She has been a California resident at all times relevant herein.

2.  Respondent JAMIE MASADA operates a comedy club in Los Angeles, California, doing business as a corporation under the name "The Laugh Factory."  The club is known as a venue for aspiring young comedians, many of whom are "managed" by Masada, including some who have gone on to become nationally known performers.  Respondent "LAUGH FACTORY MANAGEMENT" is the fictitious business name under which Masada operates his business as a "personal manager" for comedians.  Masada and Laugh Factory Management have never been licensed as talent agents by the State Labor Commissioner.

3.  On January 23, 1997, Tyler and Masada/Laugh Factory Management executed a written agreement under which Masada was to serve as Tyler's personal manager for which Masada would be paid commissions in the amount of 15% of Tyler's entertainment industry earnings.  This personal management agreement contains a paragraph which states: "YOU HAVE SPECIFICALLY ADVISED ME THAT YOU ARE NOT A 'TALENT AGENT' BUT ACTING SOLELY AS A PERSONAL MANAGER, AND THAT YOU ARE NOT LICENSED AS A 'TALENT AGENT' UNDER THE LABOR CODE OF THE STATE OF CALIFORNIA; YOU HAVE AT ALL TIMES ADVISED ME THAT YOU ARE NOT LICENSED TO SEEK TO OBTAIN EMPLOYMENT OR ENGAGEMENTS FOR ME AND THAT YOU DO NOT AGREE TO DO SO, AND YOU HAVE MADE NO REPRESENTATIONS TO ME, EITHER ORAL OR WRITTEN, TO THE CONTRARY."  Notwithstanding this contractual language, prior

1  to entering into this agreement Masada did in fact advise Tyler

2  that he would be able to get her work in the entertainment

3  industry, that he had lots of connections with producers,

4  television executives and owners of other comedy clubs, and that

5  he could "close deals" with them.[1]

6      4.  Masada engaged Tyler's services to perform at the Laugh

7  Factory on a frequent basis throughout the period from January

8  1997 through December 2000.  Masada frequently invited motion

9  picture and television producers, casting directors and other

10  entertainment industry executives to see Tyler (and other

11  comedians for whom he provided personal management services)

12  performing at his club, in the hope that this would lead to

13  employment offers for Tyler (and these other comedians).  On some

14  occasions, these producers, directors and executives would

15  observe Tyler and the other comedians performing at regularly

16  scheduled shows that were advertised by the Laugh Factory and

17  that were open to the public.  On other occasions, Masada would

18  set up "special showcases," which were performances that were not

19  open to the public, at which Tyler and other performers would

20  showcase their talents before producers.

21      5.  In February or March 1997, Masada introduced Tyler to

22  the Endeavor Talent Agency, and Endeavor began serving as Tyler's

23  talent agency.  Endeavor never undertook the responsibility of

24

25  [1] This finding is consistent with Tyler's testimony, which
we credit.  Although Masada denied making these representations,
we find his testimony in this area to be less than truthful.
26  This credibility finding is based in part on his demeanor while
testifying, his evasiveness in answering questions, our
27  conclusion that he was not truthful about other matters to which
he testified, and on our conclusion that he proffered into
28  evidence two falsified documents, discussed below.

1  procuring or booking "personal appearances" at comedy clubs or

2  other live engagements.  Rather, its representation of Tyler was

3  limited to securing employment for her in the motion picture or

4  television industries.

5       6.  During the period from 1997 through the end of 2000,

6  Tyler made several "personal appearances" at venues other than

7  The Laugh Factory, in which she performed stand-up comedy before

8  live audiences, including a one-week engagement at the Riviera

9  Hotel in Las Vegas in January 1998, an engagement at an event

10  called "Laughing All the Way to the Bank" at the Bellagio Hotel

11  in Las Vegas in July 1999, another engagement at the Bellagio,

12  called "Celebration of the Century," on December 31, 1999, and an

13  engagement to perform at Marymount College in February 2000.

14      7.  Masada called Tyler in late 1997, telling her that he

15  got her booked for a week at the Riviera Comedy Club, that the

16  person who books comedians for the Riviera is a friend of his,

17  and that he negotiated the deal with his friend under which Tyler

18  was to be paid $1,000.  The Riviera sent a contract for Tyler's

19  services to Masada, and Tyler came into The Laugh Factory to sign

20  the contract.  There is no evidence that any person other than

21  Masada procured this engagement for Tyler or negotiated the terms

22  of her employment.  Tyler performed this engagement during the

23  week of January 5, 1998, received the agreed upon compensation,

24  and paid a commission to Masada on the amount she earned.[2]

25  _____

26      [2]Masada testified that he did not solicit or procure the
    engagement for Tyler, or negotiate the terms of her compensation,
    although he acknowledged that Steve Shirripa, the Riviera's
27  booking agent, called the Laugh Factory and asked for "my
    recommendation for a female minority comic," and that in
28  response, Masada might have recommended that they hire Tyler for

1    .8.   In May 1999, Cristi Chadwick, a booker for the Bellagio

2    Hotel, called Masada and told him that the Bellagio needed four

3    comedians to perform at an event scheduled for July 24, 1999

4    called "Laughing All the Way to the Bank."  Masada told her to

5    come out to Los Angeles and see the comedians performing at The

6    Laugh Factory in order to decide which comedians to hire for the

7    engagement.   Chadwick attended regularly scheduled performances

8    at the Laugh Factory during the weekend of May 14 and 15, and she

9

10   the engagement.  Masada further testified that on December 13,
     1997, he provided Tyler with a copy of the proposed contract,
11   along with a cover letter.  Tyler denied ever having seen a copy
     of the purported cover letter until the day of the hearing in
12   this matter.  This letter was introduced into evidence.  It
     states: "Enclosed please find the agreement dated 12/8/97 from
13   Rio [sic].  This offer is a starting point in my opinion.  You
     should have your husband, who knows the law and your agent read
14   and negotiate some of the points in the agreement.  You know I
     cannot negotiate for you.  Look at our agreement, it is stated in
15   big letters in paragraph 3.  That's the reason I made it in big
     letters because I do not want to get in any kind of trouble with
16   the law."  The letter bears Masada's signature, and according to
     Masada it was typed by his assistant, Karmen Cahn.  There are
17   many factors, in addition to Tyler's testimony, upon which we
     base our finding that this letter was created by Masada as a
18   fictitious piece of "evidence" some time after the instant
     petition to determine controversy was filed.  Masada failed to
19   produce the person who allegedly typed the letter as a witness in
     this proceeding.  The letter itself seems almost over the top in
20   its earnest, self-serving tone, as if it were written with the
     issues of this litigation in mind, rather than in the more
21   matter-of-fact tone one would expect if indeed it had been
     written four years prior to the filing of the petition to
22   determine controversy.  Furthermore, it flies in the face of the
     declaration of Steven Shirripa, wherein he states that Masada
23   repeatedly telephoned him with requests that the Riviera hire
     Tyler for a comedy engagement, and that after he agreed to hire
24   Tyler for the engagement, Masada then negotiated the terms of her
     employment.  Also, at the time the letter was purportedly
25   written, Tyler's husband was a first-year law student with no
     expertise or exposure in the field of entertainment law, not
26   "someone who knows the law."  Finally, if the letter were
     actually written in December 1997, rather than four or four-and-a
27   half years later, it is inconceivable that Masada would have
     confused the Riviera with the Rio, another Las Vegas hotel which
28   never engaged Tyler's services.

TAC 31-01 Decision                    5

1   watched 24 comedians perform their stand-up acts. She later
2   informed Masada which comedians she wanted for the Bellagio
3   engagement. Ultimately, she informed Masada that she wanted to
4   book Tyler for this engagement, and she offered something less
5   than $5,000 for Tyler's appearance. Masada told her that Tyler
6   should get $5,000 for the engagement, and after some discussion,
7   Chadwick increased her offer to $5,000. Masada accepted that
8   offer, and he then told Tyler that through his efforts, he got
9   more money for her than the amount the Bellagio had originally
10  offered. Masada also spoke to Chadwich in an attempt to convince
11  her to have the Bellagio pay for Tyler's round trip air fare from
12  Los Angeles to Las Vegas. No one other than Masada negotiated
13  the terms of this engagement. Tyler performed at this event,
14  received the agreed upon compensation, and paid Masada his
15  commission on these earnings.[3]

16

17  [3] Masada testified that he did not negotiate the terms of
    this engagement, but merely told Chadwick what he thought would
    be the "fair amount" for the Bellagio to pay Tyler. Masada also
18  testified that on June 12, 1999, he sent Tyler a copy of the
    proposed contract, along with a cover letter. Tyler denied ever
19  seeing a copy of the purported cover letter until the day of the
    hearing in this proceeding. This letter was introduced into
20  evidence. It states: "Enclosed find the agreement from Bellagio
    dated 6/5/99.... When Cristi Chadwich from Bellagio called,
21  without crossing the line, I gave her my expert opinion as a club
    owner.... I was very careful not to cross the line.... Cristi
22  told me she was paying everyone $5,000, but was going to pay you
    $3,500. I told her in my club I pay everyone the same.... So she
23  is going to pay everyone the same too...." There are many
    factors, in addition to Tyler's testimony, upon which we base our
24  finding that this letter was created by Masada as a fictitious
    piece of "evidence" some time after the instant petition to
25  determine controversy was filed. Masada failed to produce the
    person who allegedly typed the letter as a witness in this
26  proceeding. Moreover, Masada's account of his "discussion" with
    Chadwick is at odds with Chadwik's deposition testimony that
27  Masada told her that Tyler "wouldn't do it for that amount" that
    had originally been offered. It is therefore apparent that
28  Masada's statement that $5,000 would constitute a "fair price"

9. In late 1999, Cristi Chadwick decided that she wanted to obtain Tyler's services to serve as the master of ceremonies for a comedy performance to be held at the Bellagio on New Year's Eve, called "Celebration of the Century." Chadwick contacted Masada, and they negotiated the terms of Tyler's services. Chadwich told Masada the Bellagio would pay Tyler $3,500 for this event. Masada unsuccessfully sought to have Chadwick increase this offer to $5,000. Although Tyler later spoke to Chadwick directly with her request that the Bellagio provide her with one free night of lodging, she had no discussions with Chadwick over her monetary compensation. No one other than Masada negotiated with Chadwick over the amount of Tyler's monetary compensation for this event. Tyler performed at this event on December 31, 1999, was paid the agreed upon compensation, and she then paid Masada's commission on these earnings.

10. In late 1999 or early 2000, Andre Coleman, a resident director at Marymount College and the advisor of the school's Black Student Alliance, was given the responsibility of booking a comedian to appear at an event scheduled to be held at the Marymount Student Center on February 8, 2000. Coleman did not have a specific comedian in mind, and at that time he did not know anything about Tyler. Based on a colleague's recommendation, he called the Laugh Factory and after explaining

---

was offered not as an academic "expert opinion," but rather, as a desired target in the context of a negotiation for Tyler's services. Finally, the letter's focus on "not crossing the line" between the role of a talent agent and the role of a personal manager sounds much more like an explanation created in the context of ongoing litigation, rather than a communication between the parties that supposedly occurred two and a half years before the filing of the petition to determine controversy.

1  the reason for his call, he was connected to Jennifer Parks,

2  Masada's assistant at Laugh Factory Management. Coleman told

3  Parks he wanted to obtain the services of an African American

4  comedian for this event, and Parks recommended Tyler for this

5  engagement. Over the course of two or three telephone

6  conversations, Coleman and Parks negotiated the terms of Tyler's

7  appearance at this event.[4] Parks prepared a written contract on

8  Laugh Factory Management letterhead, under which Tyler was to be

9  paid $700 for this performance. Tyler performed at this event,

10  received the agreed upon compensation, and paid a commission to

11  Masada on these earnings.

12    11. Despite Endeavor's role as Tyler's talent agency in

13  connection with television and film work, Masada also

14

15    [4] According to Masada, Parks was never authorized by him to
negotiate contracts for an artist's services. Masada claims that
16  as soon as he learned that Parks was attempting to negotiate this
deal for Tyler he told Parks that she was supposed to pass on any
17  communication of interest in a client to the client's talent
agent, so that the agent could take over the negotiations.
18  Moreover, Masada claims that as soon as he learned what Parks was
doing, he called Tyler's agent (either Adam Venit or Rick Rosen
19  at Endeavor), and asked the agent to handle the negotiations.
However, according to Masada, the agent declined to step into the
20  negotiations, and instead gave Masada permission to negotiate the
terms of the deal, and Masada then completed the negotiations
21  with Marymount College. Masada's account is unbelievable.
First, it defies credulity that Masada would seek Endeavor's
22  involvement in this personal appearance at a live comedy event
when Endeavor's representation was strictly limited to film and
23  television work. Second, Masada's recent activities in
negotiating the terms of Tyler's two Bellagio engagements
24  (without any talent agent involvement) belies his assertion that
he told Parks that she should have turned over the negotiation of
25  this much smaller deal to an agent. Third, Masada did not
produce any corroborating testimony from Parks, Venit or Rosen.
26  Finally, Masada's claim that he completed the negotiation is
contradicted by Coleman's testimony that all negotiations on
27  Tyler's behalf were conducted by Parks. We therefore discredit
all of Masada's testimony as to this engagement, including his
28  claim that Parks acted without his authorization.

1  communicated with various television executives, producers or
2  bookers in an effort to procure employment for Tyler.  Tyler's
3  appearance as a guest comedian on the NBC show "Friday Night" in
4  March 1997 came about as a result of Masada's communications with
5  NBC.  No one other than Masada was involved in procuring or
6  negotiating the terms of that engagement for Tyler, and when
7  Masada told Tyler about the upcoming appearance, he said "I got
8  you a spot on [the show]."  In his testimony, Masada conceded
9  that he "may have" recommended Tyler for a role in a television
10  show, "From the Hip," in a conversation with the producer of that
11  show.  Masada admitted that he had more than one conversation
12  with the booker for the CBS "Late Late Show With Craig Kilburn,"
13  during which Masada told the booker that he'd "like to get
14  [Tyler] on the show."  Tyler performed on that show on
15  November 28, 2000.

16      12.  On January 26, 2001, Tyler sent a letter to Masada
17  terminating the agreement under which he had served as her
18  personal manager.  On October 3, 2001, Masada filed a lawsuit
19  against Tyler in the Los Angeles County Superior Court, for
20  breach of contract, quantum meruit and an accounting.  Tyler then
21  filed this petition to determine controversy on November 6, 2001,
22  seeking a determination that Masada acted as a talent agent
23  without the requisite license and that as a result, the personal
24  management agreement is void *ab initio*, and that Masada has no
25  enforceable rights thereunder.  The petition also seeks recovery
26  of all amounts that Tyler paid to Masada pursuant to this
27  agreement, along with interest.

28      13.  During the one-year period preceding the filing of the

1 petition to determine controversy, Tyler paid a total of $16,500
2 in commissions to Masada pursuant to the terms of the personal
3 management agreement. These payments were made on November 7,
4 2000, and Tyler did not make any other payments to Masada after
5 that date.

6                              LEGAL ANALYSIS

7      1.   Petitioner is an "artist" within the meaning of Labor
8 Code §1700.4(b).

9      2.   Labor Code §1700.4(a) defines "talent agency" as "a
10 person or corporation who engages in the occupation of procuring,
11 offering, promising, or attempting to procure employment or
12 engagements for an artist or artists, except that the activities
13 of procuring, offering or promising to procure recording
14 contracts for an artist or artists shall not of itself subject a
15 person or corporation to regulation and licensing under this
16 chapter." The term "procure," as used in this statute, means "to
17 get possession of: obtain, acquire, to cause to happen or be
18 done: bring about." *Wachs v. Curry* (1993) 13 Cal.App.4th 616,
19 628. Thus, under Labor Code §1700.4(a), "procuring employment"
20 is not limited to initiating discussions with a potential
21 purchaser of an artist's services regarding employment; rather,
22 "procurement" includes any active participation in a
23 communication with that potential purchaser aimed at obtaining
24 employment for the artist, regardless of who initiated the
25 communication. *Hall v. X Management* (TAC No. 19-90, pp. 29-31.)
26 To be sure, a person does not engage in the procurement of
27 employment for an artist by merely taking a phone call from a
28 booking agent where the booking agent provides information about

1 a potential engagement, and then advising the artist of the
2 information that was received from the booking agent about the
3 potential employment, leaving it to the artist (or the artist's
4 licensed talent agent) to contact the booking agent to negotiate
5 the terms of employment. But calling a booking agent to
6 "recommend" an artist for an engagement, or carrying on
7 negotiations with a booking agent in response to a phone call
8 from the booking agent, brings us into the realm of
9 "procurement," as that term is used in Labor Code §1700.4(a).
10　　　3.　Based on the evidence herein, we conclude that
11 Respondent acted as a talent agency within the meaning of Labor
12 Code §1700.4(a) by procuring, attempting to procure, and
13 promising to procure stand-up comedy and television comedy
14 engagements for Tyler. The evidence presented here leaves no
15 doubt that throughout the period of January 1997 to the end of
16 2000, Respondent repeatedly engaged in activities that fall
17 within the statutory definition of a talent agency with respect
18 to his representation of Aisha Tyler.
19　　　4.　Labor Code §1700.5 provides that "[n]o person shall
20 engage in or carry on the occupation of a talent agency without
21 first procuring a license . . . from the Labor Commissioner."
22 The Talent Agencies Act is a remedial statute that must be
23 liberally construed to promote its general object, the protection
24 of artists seeking professional employment. *Buschwald v.*
25 *Superior Court* (1967) 254 Cal.App.2d 347, 354. For that reason,
26 the overwhelming weight of judicial authority supports the Labor
27 Commissioner's historic enforcement policy, and holds that "even
28 the incidental or occasional provision of such [procurement]

1   services requires licensure." *Styne v. Stevens* (2001) 26 Cal.4th

2   42, 51.  "The [Talent Agencies] Act imposes a total prohibition

3   on the procurement efforts of unlicensed persons," and thus, "the

4   Act requires a license to engage in any procurement activities."

5   *Waisbren v. Peppercorn Productions, Inc.* (1995) 41 Cal.App.4th

6   246, 258-259; see also *Park v. Deftones* (1999) 71 Cal.App.4th

7   1465 [license required even though procurement activities

8   constituted a negligible portion of personal manager's efforts on

9   behalf of artist, and manager was not compensated for these

10  procurement activities].

11       5.  An agreement that violates the licensing requirement of

12  the Talent Agencies Act is illegal and unenforceable.  "Since the

13  clear object of the Act is to prevent improper persons from

14  becoming [talent agents] and to regulate such activity for the

15  protection of the public, a contract between an unlicensed

16  [agent] and an artist is void."  *Buchwald v. Superior Court*,

17  *supra*, 254 Cal.App.2d at 351.  Having determined that a person or

18  business entity procured, promised or attempted to procure

19  employment for an artist without the requisite talent agency

20  license, "the [Labor] Commissioner may declare the contract

21  [between the unlicensed agent and the artist] void and

22  unenforceable as involving the services of an unlicensed person

23  in violation of the Act."  *Styne v. Stevens, supra,* 26 Cal.4th at

24  55.  "[A]n agreement that violates the licensing requirement is

25  illegal and unenforceable . . . ."  *Waisbren v. Peppercorn*

26  *Productions, Inc., supra,* 41 Cal.App.4th at 262.  Moreover, the

27  artist that is party to such an agreement may seek disgorgement

28  of amounts paid pursuant to the agreement, and "may . . . [be]

1 entitle[d] . . . to restitution of all fees paid the agent."

2 *Wachs v. Curry* (1993) 13 Cal.App.4th 616, 626.  Restitution, as a

3 species of affirmative relief, is subject to the one-year

4 limitations period set out at Labor Code §1700.44(c), so that the

5 artist is only entitled to restitution of amounts paid within the

6 one-year period prior to the filing of the petition to determine

7 controversy.  *Greenfield v. Superior Court* (2003) 106 Cal.App.4th

8 743.

9     6.  On the other hand, this statute of limitations does not

10 apply to the defense of contract illegality and unenforceability,

11 even where this defense is raised by the petitioner in a

12 proceeding under the Talent Agencies Act.  "If the result the

13 [artist] seeks is [a determination] that he or she owes no

14 obligations under an agreement alleged by [the respondent] ...

15 the statute of limitations does not apply."  *Styne v. Stevens*,

16 *supra*, 26 Cal.4th at 53.  The Labor Commissioner has exclusive

17 primary jurisdiction to determine all controversies arising under

18 the Talent Agencies Act.  "When the Talent Agencies Act is

19 invoked in the course of a contract dispute, the Commissioner has

20 exclusive jurisdiction to determine his jurisdiction in the

21 matter, including whether the contract involved the services of a

22 talent agency."  *Ibid.* at 54.  This means that the Labor

23 Commissioner has "the exclusive right to decide in the first

24 instance *all the legal and factual issues on which an Act-based*

25 *defense depends*."  *Ibid.*, at fn. 6, italics in original.  In

26 doing so, the Labor Commissioner will "search out illegality

27 lying behind the form in which a transaction has been cast for

28 the purpose of concealing such illegality," and "will look

1 through provisions, valid on their face, and with the aid of

2 parol evidence, determine [whether] the contract is actually

3 illegal or part of an illegal transaction." *Buchwald v. Superior*

4 *Court, supra,* 254 Cal.App.2d at 351.

5     7. Applying these legal principles to the facts of this

6 case, we conclude that the personal management agreement was void

7 *ab intio,* that Respondent has no enforceable rights thereunder,

8 and that nothing is owed to Respondent for the services that he

9 provided to Tyler, regardless of whether Respondent is seeking

10 payment for such services through a claim of breach of contract,

11 or under any other legal theory, including unjust enrichment or

12 quantum meruit. See *Yoo v. Robi* (2005) 126 Cal.App.4th 1089,

13 1004 n. 30. We also conclude that Tyler is entitled to

14 restitution of the commissions she paid to Masada under this

15 agreement during the one year period prior to the filing of this

16 petition, with interest at the 10% legal rate from the date these

17 payments were made.

18                          ORDER

19     For the reasons set forth above, IT IS HEREBY ORDERED that

20 the parties' personal management contract is void *ab initio* and

21 unenforceable under the Talent Agencies Act, that nothing is owed

22 to Respondent for services provided to Tyler pursuant to this

23 agreement, and that Respondent shall pay restitution to Tyler in

24 the amount of $16,500, plus interest in the amount of

25 $8,620.68, for a total of $25,120.68.

26

27 Dated: 1/30/06                  _____

                                   MILES E. LOCKER

28                            Attorney for the Labor Commissioner

1   ADOPTED AS THE DETERMINATION OF THE LABOR COMMISSIONER:

2

3   Dated: 2/3/06

                    ROBERT A.  JONES

4                    Acting Labor Commissioner

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit H

1  DIVISION OF LABOR STANDARDS ENFORCEMENT
   Department of Industrial Relations
2  State of California
   BY: DAVID L. GURLEY (Bar No. 194298)
3  455 Golden Gate Ave., 9th Floor
   San Francisco, CA  94102
4  Telephone: (415) 703-4863

5  Attorney for the Labor Commissioner

6                    BEFORE THE LABOR COMMISSIONER

7                     OF THE STATE OF CALIFORNIA

8

9
   HILARIO MIRAVALLES,                    )   Case No. TAC 33-99
10                          Petitioner,   )
                                          )   DETERMINATION OF
11 vs.                                    )   CONTROVERSY
                                          )
12                                        )
   ARTISTS, INC.,                         )
13                                        )
                            Respondent.   )
14                                        )
   _____)
15

16                          **INTRODUCTION**

17         The above-captioned petition was filed on September 3,

18 1999  by  HILARIO  MIRAVALLES  (hereinafter  "Petitioner"  or

19 "MIRAVALLES"),  alleging  that  ARTISTS,  INC.,  operated  by  Vice

20 President, Thad Weinlein, (hereinafter "Respondent" or "Weinlein"),

21 acted  as  an  unlicensed  talent  agency  in  violation  of  Labor  Code

22 §1700.5[1].     Petitioner  seeks  a  determination  from  the  Labor

23 Commissioner voiding a 1997 written agreement *ab initio,* and seeks

24 disgorgement  of  all  consideration  collected  by  respondent  stemming

25 from this agreement.

26 ─────────────
      [1]   All statutory citations will refer to the California Labor Code unless
27 otherwise specified.

                                    1

1     Respondent was served with a copy of the petition on

2   September 28, 1999.  Respondent filed his answer with this agency

3   on October 29, 1999, defending on the position that the respondent

4   did not act an agent, but rather acted as an employer and is

5   therefore not subject to the jurisdiction of the Labor

6   Commissioner.  A hearing was scheduled and commenced before the

7   undersigned attorney, specially designated by the Labor

8   Commissioner to hear this matter on March 31, 2000, in Los Angeles,

9   California.  Petitioner was present and represented by Stuart

10  Libicki of Schwartz, Steinsapir, Dohrmann & Sommers LLP;

11  Respondent did not appear personally but was represented through

12  his attorney, Alan M. Brunswick of Manatt Phelps Phillips.  Post

13  trial briefs were submitted on June 5, 2000.

14     Due consideration having been given to the testimony,

15  documentary evidence, arguments and briefs presented, the matter

16  was taken under submission.  The Labor Commissioner adopts the

17  following determination of controversy.

18

19                    **FINDINGS OF FACT**

20

21     1.  Hilario Miravalles was born, lived and educated in

22  the Philippines.  In or around June of 1997, the respondent's Vice

23  President, Thad Weinlein, flew to the Philippines in an effort to

24  locate experienced animated artists[2].  Respondent would lure

25  _____

26     [2] The petitioner's expertise as an animated artist includes working on
    background and character design for animated motion pictures, (i.e. "The Rugrats
27  Movie").

                              2

1  artists back to the United States with promises of higher pay.

2       2.  Respondent did not own an animation production

3  company himself but rather acted as a broker of artists.

4  Respondent would attempt to find an animation production company in

5  need of artists and then subcontract his workers out to a third-

6  party production company.  Irrespective of the compensation

7  negotiated with the production company, the artist would receive a

8  first-year $40,000.00 salary, pro-rated based upon the duration of

9  employment respondent was able to obtain.  In other words, the

10 artist was "on-call" and would be paid only for time actually

11 worked.

12      3.  Petitioner, a college graduate with extensive

13 experience in background layout animation successfully passed

14 respondents aptitude tests and was offered a job in the United

15 States, including travel expenses.  On June 30, 1997, the parties

16 entered into a written agreement titled, "Employment Agreement."

17 The terms of the agreement provided for an initial three (3) years,

18 with a first year salary of $40,000.00, coupled with two (2), two

19 (2) year options.  Respondent secured an H-1B Visa[3] for the

20 petitioner who was then transported to the United States to begin

21 work.

22      4.  In September of 1997 through early May 1998,

23 respondent began work with Klasky Csupo, Inc., for the production

24

25    [3]  Sect 214(g) of the Immigration and Nationality Act provides that an
   H-1B Visa is required of an alien who will be employed in a specialty occupation
26 of distinguished merit that requires theoretical and practical application of a
   body of specialized knowledge and attainment of a bachelor's or higher degree in
27 the specific specialty.  This is a minimum for entry into the United States.

                              3

of the "The Rugrats Movie." After "The Rugrats Movie" was completed, petitioner was laid off. Petitioner was next assigned to work at Baer Animation which lasted approximately three weeks and ended on May 31, 1998. During the next four months, respondent unsuccessfully attempted to locate work for the petitioner.

5. In October of 1998, after four months of unemployment, petitioner began to look for work himself. Petitioner interviewed with Rough Draft Studios and was promptly hired in October of 1998 with an annual salary of $62,400.00 based on a similar pro-rated formula. Miravalles enjoyed uninterrupted employment for the next several months.

6. In or around mid December 1998, Rough Draft Studios Senior Vice President, Claudia Katz, received a phone call from Thad Weinlein. Weinlein explained that he was petitioner's "agent" and as his "agent" he would require reimbursement for petitioner's travel expenses and 20% of petitioner's earnings. Weinlein later reconsidered his request and stated he would forego the 20% and travel expenses if Katz would agree to hire respondent's other workers under contract. Katz agreed to consider the proposition. Weinlein then instructed Katz to sign a "Personnel Service Agreement" which provided the terms and conditions governing the relationship between Rough Draft Studios, and Artist's Inc.. Notably, provision (A) states, "**Employer (Artists, Inc.) is in the business of providing the services of Personnel for theatrical, television and commercial productions.**" Katz explained to Weinlein that she would prefer to have her attorney look over the agreement prior to signing. Weinlein's attorney called Katz and barked that

4

he would have the petitioner deported immediately if Katz did not sign the agreement that day. Katz, who found petitioner to be a valuable worker, sought to avoid his deportation and reluctantly signed the agreement after striking a provision she found offensive.

7. Under the terms of the agreement between Artist, Inc. and Rough Draft, the payroll and workers' compensation responsibility would be transferred back to Artists Inc.. Petitioner continued to be compensated at $1200.00 per week, although the payroll was now being conducted by Artist, Inc.'s payroll service.

8. Over the next several months, Weinlein would call Katz and inquire whether Rough Draft Studios had hired more of Weinlein's workers without his knowledge. Sometime in the early summer of 1999, it was discovered that Katz had unknowingly hired two additional employees under contract to Weinlein. Weinlein again requested a 20% fee for each worker. Weinlein and his attorney threatened a civil lawsuit seeking compensatory damages and immediate deportation of the workers if Katz refused. Katz, unwilling to bear the expense of litigation, paid Weinlein 20% of the worker's wages. To the credit of Rough Draft Studios and Katz, the workers' earnings were unaffected as Rough Draft paid Weinlein 20% over and above the worker's current salary. This payment arrangement continued from August 1999 through September 1999. In September of 1999, on advice from counsel, Katz terminated payment to Artists, Inc.. This Petition to Determine Controversy was filed on September 3, 1999.

5

1

2

## CONCLUSIONS OF LAW

3

4

5        1.    The Labor Commissioner has jurisdiction to hear and

determine controversies, arising between an artist and an agent,

6        pursuant to Labor Code section 1700.44(a).

7

8        2.    Labor Code §1700.4(b) defines "artists"

9            "'Artists' means actors and actresses rendering services
             on the legitimate stage in the production of motion
10            pictures, radio artists, musical artists . . . and other
             artists and persons rendering professional services in
11            motion picture, theatrical, radio, television and other
             entertainment enterprises."

12

13        The parties stipulated that petitioner is an artist

14   within the meaning of Labor Code §1700.4(b).

15        3.    The sole issue in this matter is whether the

16   respondent acted as a "talent agent" within the meaning of Labor

17   Code §1700.4(a); or alternatively as an "employer", who is not

18   subject to the Act[4].

19        4.    Labor Code §1700.40(a) defines "talent agency" as:

20   "a person or corporation who engages in the occupation of

21   procuring, offering, promising, or attempting to procure employment

22   or engagements for an artist or artists."

23        5.    The respondent does not dispute petitioner's status

24   as an artist and likewise does not contend that employment was

25   obtained.  Instead, the respondent focuses his defense on the fact

26
      _____

27        [4]    The "Act" refers to the "Talent Agencies Act", Labor Code §§1700
      through 1700.47 et. seq., regulating talent agencies and creating protection for
      those artists seeking employment.

6

that, "[t]his dispute involves an artist-*employer* relationship ... [and] [a]n employer does not 'procure employment' for its own employees within the meaning of the Act and therefore cannot be a talent agent." Respondent argues that if he acted as an employer, it would be impossible for him to simultaneously act as agent. And if he is not an agent, he could not be subject to the Labor Commissioner's jurisdiction. Respondent cites *Kern v. Entertainment Direct, Case No. TAC 25-96* in support of his theory. *Kern* is distinguishable and therefore does not lend support to respondent's conclusion.

6. The respondent in *Kern* provided clowns and magicians to parties and corporate events. The amounts charged to customers were predetermined, as all rates were published in their advertisements. The engagements for the artists in *Kern* were typically for parties, limited to a one-time show, costing approximately $150.00 per performance. The hearing officer in *Kern* held, "respondents' business did not involve the representation of artists **vis-a-vis third party employers** or the negotiation of artists' compensation [and] . . . By operating its business in this fashion, respondents became the direct employer of the performers, rather than the performers' talent agency." *Kern supra. pg.* 7.

7. *Kern* is distinguishable in several respects. In *Kern*, unlike petitioner's employment, the engagements were for a very limited time, usually a few hours. Here, the jobs lasted as long as the work was available. In fact, Rough Draft offered employment that spanned over a three year period and these extended

7

employment opportunities were exactly the type of employment respondent sought for his artists. The length of employment between the third-party production company and the artist lends strength to the argument that the production party is the actual employer and not the respondent.

8. Moreover, in *Kern,* the hearing officer held that the recipients seeking entertainment were not employers but rather customers and held further that if a customer did not pay the artist for his performance, then the employer/respondent would be ultimately liable for the payment of the artist's wages. The employer would then be forced to seek his compensatory damages for breach of contract against the customer in small claims court. What *Kern* states ostensibly, is that the "economic reality" places the true employer in the position of providing economic viability for the artist and that is where *Kern* deviates from our case.

9. In assessing who is ultimately responsible for the payment of wages, or in other words, which party is the petitioner economically dependent on, the terms of the written agreement between Rough Draft and respondent are telling.

Section (7) of the "Personnel Services Agreement" entered into between Rough Draft and respondent states, "PRODUCER(Rough Draft) acknowledges and agrees that understanding of and compliance with all applicable state and/or federal wage and hour laws [are] the responsibility of the PRODUCER." Section (8) states, "PRODUCER shall pay EMPLOYER (respondent) . . . all gross wages, allowances, fringe benefits, and other

8

payments as may be required by applicable law."

10. These provisions imply that the legal responsibility to follow all relevant laws relating to the payment of wages fall squarely on Rough Draft. Rough Draft is therefore required to provide accurate accounting of hours worked, overtime, provide the legally applicable break and lunch periods and turn those accurate figures over to respondent's payroll service for final calculation. Also, the "Service Schedule[5]," provides that **payroll is issued on check exchange only.** This provision requires respondent to verify Rough Draft's payment to respondent prior to issuing the employees' payroll (emphasis added). The reality of the arrangement is significant because it places Rough Draft as the party ultimately responsible for the payment of wages and consequently is another important factor in creating an employer-employee relationship between petitioner and Rough Draft. Conversely, a "talent agent" is not responsible for reimbursing his artist should the production company refuse to tender payment. Here, by the express terms of respondent's agreement with Rough Draft, respondent would **not be responsible for issuing payroll** if Rough Draft failed or refused to first exchange checks with the respondent.

11. Additionally, Industrial Welfare Commission (IWC) Order No. 12-80 sec. 2(f), regulating the wages, hours and working conditions in the motion picture industry, defines "employer" as "any person, . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over wages,

---

[5] The "Service Schedule" is a one page attachment to the "Personnel Services Agreement", establishing, *inter alia*, the time and amount Rough Draft was to pay Artist's Inc..

9

hours, or working conditions of any person. In our case, Rough Draft sets the hours of employment, breaks, meal periods and controls every aspect of petitioner's day to day activities.

12.    In looking at the entertainment industry as a whole, it is without exception the creator of the entertainment product is the employer[6]. Whether film, television, stage, commercials or print modeling the production company is invariably the employer. Rough Draft creates the product and Rough Draft is consequently the petitioner's employer.

13.    Respondent contends that contrary to an artist-agency relationship, he did not negotiate an employment deal providing the most lucrative terms for the artist and conversely negotiated the terms with prospective employers for his own primary benefit. Again, *Kern* is distinguished as the employer did not negotiate with third parties. Here, respondent was free to negotiate any compensation terms he chose, consequently this circular argument further establishes respondent's breach of his fiduciary duty toward the artist.

14.    Now that it is established that the respondent acted as a "talent agent" within the meaning of the Act, we must now determine whether he "procured employment" for the artist. The term "procure", as used in this statute, means to get possession of: obtain, acquire, to cause to happen or be done: bring about." *Wachs v. Curry (1993) 13 Cal.App.4th 616, 628.* Thus "procuring employment" under the statute includes entering into discussions

---

[6] "Independent Contractor" status of the employee was not discussed and is not relevant to this proceeding.

regarding contractual terms with prospective employers that leads to employment.  In *Waisbren v. Peppercorn Production, Inc* (1995) 41 Cal.App.4th 246, the court held that any single act of procuring employment subjects the agent to the Talent Agencies Act's licensing requirements.  Applying *Waisbren*, it is clear respondent "procured employment" within the meaning of Labor Code §1700.4(a). In fact, respondent's sole responsibility was to "procure employment" for artists in the entertainment industry as reflected by respondent's efforts with Klasky Csupo, Inc. and Baer Animation and the express terms of Provision (A) of the "Personal Services Agreement" between Rough Draft and Artists Inc.  Respondent's activities fall squarely within the meaning of "procure" and he is therefore subject to the jurisdiction of the Labor Commissioner.

15.  Labor Code §1700.5 provides that "no person shall engage in or carry on the occupation of a talent agency without first procuring a license therefor from the Labor Commissioner." It was stipulated that the respondent has never been a licensed talent agent.

16.  Since the clear object of the Act is to prevent improper persons from becoming [talent agents] and to regulate such activity for the protection of the public, a contract between and an unlicensed agent and an artist is void." *Buchwald v. Superior Court supra.; Waisbren v. Peppercorn supra*, at 261.  Under *Civil Code section 1667*, contracts that are contrary to express statutes or public policy as set forth in statutes are illegal contracts and the illegality voids the entire contract.  The evidence does not

11

leave a doubt that respondent procured employment for his artist
without possessing a talent agency license. Therefore, the
"Employment Agreement" between the parties must fall.

17. Respondent also contends that the express terms of
the agreement create an employer-employee relationship. In
*Buchwald v. Superior Court, supra.* at 347, the court rejected the
argument that contractual language established, as a matter of law,
the relationship between the parties. The court stated, "the
Labor Commissioner is free to search out illegality lying behind
the form in which a transaction has been cast for the purpose of
concealing such illegality. [citation omitted.] The court will look
through provisions, valid on their face, and with the aid of parol
evidence, determine that the contract is actually illegal or part
of an illegal transaction." As discussed, the facts establish
respondent's role as an agent – not an employer – and he is
therefore in violation of Labor Code §1700.5.

### ORDER

1. For the above-stated reasons, IT IS HEREBY ORDERED
that the "Employment Agreement" between petitioner, HILARIO
MIRAVALLES and ARTISTS, INC., operated by Vice President, Thad
Weinlein, is void *ab initio.* The respondent has no further
enforceable rights under this contract.

2. Having not made a showing that respondent collected
profits within the one-year statute of limitations found at Labor
Code §1700.44(c), the petitioner is not entitled to a recoupment of
profits.

3. The petitioner has obtained a new H-1B Visa through

12

1    Rough Draft Inc. and is therefor not in danger of deportation.

2

3              IT IS SO ORDERED

4

5

6

7    Dated: _10/11/00_              _____

8                                        DAVID L. GURLEY
                                    Attorney for the Labor Commissioner
9

10

11   ADOPTED AS THE DETERMINATION OF THE LABOR COMMISSIONER:

12

13

14            OCT 1 1 2000
15   Dated: _____         _____
                                        THOMAS GROGAN
16                                      Assistant Chief
                                    to the Labor Commissioner
17

18

19

20

21

22

23

24

25

26

27

                              13

# Exhibit I

1  STATE OF CALIFORNIA
   DEPARTMENT OF INDUSTRIAL RELATIONS
2  DIVISION OF LABOR STANDARDS ENFORCEMENT
   William A. Reich, Esq. (SBN 51397)
3  1901 N. Rice Avenue, Suite 200
   Oxnard, California 93030
4  Telephone No. (805) 973-1244
   Facsimile No. (805) 973-1251
5
   Special Hearing Officer for the Labor Commissioner
6

7

8                    BEFORE THE LABOR COMMISSIONER
9                       OF THE STATE OF CALIFORNIA
10

11 MARIO SOLIS, an individual,              CASE NO.: TAC-27089

12            Petitioner,                   DETERMINATION OF
                                            CONTROVERSY
13       vs.

14 JAMES E. BLANCARTE, a
   Professional Corporation,
15
              Respondent.
16

17         The above-captioned matter, a petition to determine controversy under Labor Code
18 §1700.44, came on regularly for hearing on January 10, 2013 in Los Angeles, California,
19 before the undersigned attorney for the Labor Commissioner assigned to hear this case.
20 Petitioner MARIO SOLIS (hereinafter "Petitioner") appeared personally and was
21 represented by attorney Miles J. Feldman.   Respondent JAMES E. BLANCARTE
22 (hereinafter "Respondent") appeared personally and was represented by attorney Robert
23 D. Lipscomb.
24

25         This proceeding arises out of the Petition to Determine Controversy filed by
26 petitioner with the Labor Commissioner on April 30, 2012.  The petition alleges that
27 respondent entered into a representation agreement with petitioner, pursuant to which
28
                                          1
                        DETERMINATION OF CONTROVERSY

1    respondent agreed to act and acted as an unlicensed talent agent in violation of Labor

2    Code section 1700.5, a provision of the Talent Agencies Act (TAA), Labor Code section

3    1700 et seq.  The petition seeks a declaration that the contract is void and unenforceable,

4    and that respondent is therefore barred from seeking any recovery under the terms of the

5    contract.  Due consideration having been given to the evidence presented at the hearing

6    and to the documents and other papers on file in this proceeding, the Labor Commissioner

7    now renders the following decision.

8

9                          **FINDINGS OF FACT**

10

11            1.    Petitioner is a sports reporter and news anchor for a Los Angeles

12    television station, KNBC Channel 4.  Apart from his talents and activities as a broadcast

13    journalist, petitioner's artistic pursuits include acting, script writing, voice overs, and

14    performing as an entertainer.

15

16            2.    Respondent is a duly licensed attorney who is admitted by the state

17    bar to practice law in the State of California.

18

19            3.    Prior to July, 2002, when the parties entered into the engagement

20    contract described below, respondent had on certain occasions provided legal services to

21    the petitioner.  In addition, according to petitioner, respondent had provided management

22    type services to petitioner in connection with petitioner's interest in breaking into network

23    television; specifically, respondent advised petitioner that he would keep his eye open for

24    opportunities for petitioner to work in television.

25

26            4.    Sometime prior to July 8, 2002, KNBC approached petitioner and

27    expressed an interest in hiring petitioner to work for the station as a sports reporter, news

28

2

1  anchor, commentator, and analyst, as well as in other roles related to the entertainment
2  programming offered by the station.

3
4          5.      Following this expression of interest by KNBC, petitioner contacted
5  respondent and asked him to represent petitioner in handling the negotiation of the terms
6  of his employment with the station.  Respondent was receptive to the proposal, and on
7  July 8, 2002 the parties entered into a written engagement contract set out in the form of
8  an engagement letter from respondent to petitioner.  At the outset the letter states: "We
9  appreciate your asking us to represent you in connection with your broadcasting and
10 entertainment career, including without limitation, contract negotiations with KNBC
11 Channel 4."

12
13         6.      The engagement contract provided that respondent would be paid a
14 five percent (5%) commission on all net monies paid to petitioner under the contract to be
15 negotiated by respondent with KNBC.  According to petitioner, respondent wanted to be
16 paid a commission instead of a one-time fee because of the follow-up work he would do
17 on the contract and because he would be acting as petitioner's representative and agent.

18
19         7.      At the time that respondent was brought in, there was no deal in
20 place with KNBC: neither the compensation arrangements, nor the length of the contract,
21 nor any of the other terms and conditions under which petitioner would be employed by
22 KNBC had been addressed or worked out.  These were all matters that respondent had
23 been engaged to negotiate.

24
25         8.      Thereafter, respondent proceeded to negotiate an employment
26 agreement for petitioner with KNBC, which was signed by both parties and became
27 effective August 5, 2002.

28
                                        3
                        **DETERMINATION OF CONTROVERSY**

9.    During the four-year period covered by petitioner's employment agreement, August 5, 2002 through August 6, 2006, respondent was paid the commissions due to him under the engagement contract.

10.   Prior to August 7, 2006, respondent negotiated a three year renewal of petitioner's employment agreement, which included an increase in annual compensation for each of the three years.   The agreement was signed and became effective August 7, 2006.

11.   During the period August 7, 2006 through the end of 2007, respondent received his 5% share of petitioner's net monthly income under the employment agreement, representing the commissions due pursuant to the engagement contract.  Thereafter, petitioner made no further commission payments to respondent.

12.   Prior to June 2, 2009, respondent negotiated a two-year further renewal of the employment agreement set to expire in August, 2009.  Because prevailing economic conditions resulted in a decrease in the compensation offered to and ultimately accepted by petitioner, respondent is making no claim for commissions due under this second renewal of the employment agreement.

13.   At one point, apparently during the time that respondent was still being paid his commissions, an opportunity arose for petitioner to go to work for ESPN. Petitioner asserts that this opportunity was arranged by and presented to petitioner by respondent.   Respondent, on the other hand, asserts that the ESPN opportunity was brought to his attention by petitioner, and that it was petitioner himself who was contacted directly by ESPN.

4

1       14.    Throughout the period encompassing respondent's asserted

2 entitlement to commissions under the engagement contract, July 8, 2002 to August 31,

3 2009, respondent was not licensed as a "talent agency" under the provisions of the TAA.

4

5       15.    On December 30, 2011, respondent filed a civil action against

6 petitioner in the Los Angeles County Superior Court, Central District—Blancarte v. Solis,

7 Case No. BC476169.  The complaint sought to recover the commissions due under the

8 engagement contract based on the net monies paid to petitioner between January 1, 2008

9 and August 31, 2009 pursuant to the employment agreement with KNBC.

10

11       16.    After filing an answer to the complaint, which included an

12 affirmative defense based on the TAA, petitioner filed the instant petition with the Labor

13 Commissioner seeking a determination that the engagement contract was entered into is

14 violation of the TAA and was therefore void and unenforceable.

15

16       **LEGAL ANALYSIS**

17

18       1.    Labor Code section 1700.5 provides in relevant part as follows:

19

20       No person shall engage in or carry on the occupation of a talent agency without first procuring a license therefor from the Labor Commissioner.

21

22

23       2.    Under Labor Code section 1700.4, subdivision (a), "[t]alent agency"

24 is defined in relevant part as follows:

25       "Talent agency" means a person or corporation who engages in the occupation of procuring, offering, promising, or attempting to procure

26       employment or engagements for an artist or artists, except that the activities

27       of procuring, offering, or promising to procure recording contracts for an artist or artists shall not of itself subject a person or corporation to

28

**DETERMINATION OF CONTROVERSY**

regulation and licensing under this chapter.

3.     Labor Code section 1700.4, subdivision (b) defines "[a]rtists" in part as follows:

> "Artists" means actors and actresses . . . , radio artists, . . . writers, . . . and other artists and persons rendering professional services in motion picture, theatrical, radio, television and other entertainment enterprises.

4.     In the present case, the evidence establishes that petitioner was a person rendering artistic and professional services in the medium of television for purposes of entertaining the public.   Thus, it is clear petitioner was an artist within the meaning of section 1700.4, subdivision (b).

5.     The next, and crucial question, is whether respondent was engaged in the occupation of a talent agency, that is to say, whether he was engaged in procuring or in offering, promising, or attempting to procure employment or engagements for petitioner.

6.     The principal and dominant activities that respondent performed on behalf of petitioner pursuant to the engagement contract involved the negotiation of the compensation and other terms of the agreements for the employment of petitioner by KNBC.   The Labor Commissioner has long recognized that the acts undertaken in the course of negotiating an agreement for the employment of an artist constitute "procuring . . . or attempting to procure employment" within the meaning of section 1700.4, subdivision (a).

> The term "procure," as used in Labor Code §1700.4(a), means "to get possession of: obtain, acquire, to cause to happen or be done: bring about." *Wachs v. Curry* (1993) 13

6

> Cal.App.4th 616, 628. Thus, "procuring employment" under the Talent Agencies Act is not limited to initiating discussions with potential purchasers of the artist's professional services or otherwise soliciting employment; rather, "procurement" includes any active participation in a communication with a potential purchaser of the artist's services aimed at obtaining employment for the artist, regardless of who initiated the communication. *Hall v. X Management* (TAC No. 19-90, pp. 29-31.) The Labor Commissioner has long held that "procurement" includes the process of negotiating an agreement for an artist's services. *Pryor v. Franklin* (TAC 17 MP 114). Significantly, the Talent Agencies Act specifically provides that an unlicensed person may nevertheless participate in negotiating an employment contract for an artist, provided he or she does so "in conjunction with, and at the request of a licensed talent agent." Labor Code §1700.44(d). This limited exception to the licensing requirement would be unnecessary if negotiating an employment contract for an artist did not require a license in the first place.

(*Danielewski v. Agon Investment Company* (Cal.Lab.Com., October 28, 2005) TAC No. 41-03, pages 15-16.)

7.     The negotiation of petitioner's employment agreements with KNBC represented the bulk of the activities that respondent engaged in on behalf of petitioner under the engagement contract. Indeed, the contract was entered into for the purpose of having respondent conduct such negotiations, and respondent carried out the contract by effectuating and accomplishing that purpose. By negotiating the KNBC agreements on petitioner's behalf, respondent attempted to procure and procured employment for petitioner. As a consequence, respondent engaged in and carried out the occupation of a talent agency; because he did so without having first obtained a talent agency license from the Labor Commissioner, respondent violated the provision of Labor Code section 1700.5.

7

8.    Respondent contends that because he is a duly licensed attorney, his activities in negotiating the KNBC agreements on behalf of petitioner should be treated as exempt from the licensing requirements of section 1700.5.  The provisions of the TAA do not contain or recognize any such exemption.  Moreover, respondent has provided no authority that would support the propriety of applying or creating such an exemption.

9.    The applicable scope of the TAA has been delineated by the Supreme Court:

> The Act establishes its scope through a functional, not a titular, definition.  It regulates *conduct*, not labels; it is the act of procuring (or soliciting), not the title of one's business, that qualifies one as a talent agency and subjects one to the Act's licensure and related requirements. (§1700.4, subd. (a).)  Any person who procures employment—any individual, any corporation, any manager—is a talent agency subject to regulation.  (§§1700.4, subd. (a).)

(*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 986.)  As the foregoing makes perfectly clear, anyone who procures or solicits engagements for an artist is carrying on the occupation of a talent agency and must be licensed.

10.    It is evident that the functional scope of the TAA admits of no exceptions and encompasses the procurement activities of respondent, even though he is an attorney.  In this regard, it is of no moment that some of the skills respondent may have brought to the negotiations on behalf of petitioner are the result of skills for which he has been licensed as an attorney.  As Labor Code section 1700.44 makes unequivocally clear, when someone who is not licensed under the TAA wishes to bring such skills to bear on the negotiation of an artist's contract, he must do so "in conjunction with, and at the request of, a licensed talent agency."  Here, respondent acted entirely on his own and

8

1  without a talent agency license; consequently, his conduct constituted a clear violation of

2  the licensure requirements of section 1700.5.

3      11.    The consequences that flow from a violation of the TAA are well

4  settled.  When a person contracts to act as a talent agent without first having obtained a

5  talent agency license as required by the TAA, the contract that has been entered into is

6  illegal, void, and unenforceable.  "Since the clear object of the Act is to prevent improper

7  persons from becoming [talent agents] and to regulate such activity for the protection of

8  the public, a contract between an unlicensed [talent agent] and an artist is void."

9  (*Buchwald v. Superior Court* (1967) 254 Cal.App. 2d 347, 351.).

10

11      12.    As recognized in *Marathon Entertainment, Inc. v. Blasi, supra*, in

12  some cases there may be a basis for severing the illegal portions of a contract violative of

13  the TAA's licensure requirements from the other parts of the contract.  However, this will

14  be permissible only where there are both illegal and legal aspects to the contract and

15  where the two aspects can be properly severed in accordance with the legal standards

16  governing application of the severance doctrine.

17

18      13.    There is no basis for applying the doctrine of severability in the

19  circumstances of this case.  It is established law that if the central purpose of a contract is

20  illegal, the entire contract is void and will not be enforced.  In the present case, the central

21  purpose of the engagement contract was to enable respondent to act as petitioners'

22  unlicensed talent agent.  This illegal purpose contaminated the entire contract, and

23  rendered it void and unenforceable. (See *Marathon Entertainment, Inc. v. Blasi, supra*,

24  42 Cal.4th at pp. 997-998.)  In addition, in this case respondent is seeking to preserve his

25  right to recover certain commissions under the engagement contract; the commissions that

26  he seeks to protect are based on the income that respondent generated for petitioner

27  through his illegal procurement activities.  Plainly, respondent cannot capitalize on and

28

DETERMINATION OF CONTROVERSY

1   gain a benefit from illegal conduct under a contract; in these circumstances, the illegality
2   permeates the entire engagement contract and renders it void and unenforceable.  In light
3   of these conclusions, it is unnecessary to consider whether, in rendering services under
4   the engagement contract, respondent engaged in other conduct violative of the TAA.

5

6       14.    In sum, for the reasons stated above, it is determined that in entering
7   into the engagement contract with petitioner, and in performing under that contract,
8   respondent engaged in the occupation of a talent agency without having obtained a
9   license from the Labor Commissioner.  Because it was pervaded by illegality, the entire
10  contract is found to be void and unenforceable.

11

12  **ORDER**

13

14      For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

15

16      The contract between petitioner and respondent is declared to be illegal,
17  void and unenforceable, and respondent is barred from enforcing or seeking to enforce
18  the contract against petitioner in any manner.

19

20  Dated:  *9 - 30 - 2013*

21

22                          William A. Reich
                        Special Hearing Officer

23  Adopted:

24

25  Dated:  *9. 30. 2013*

26                          Julie A. Su
                        State Labor Commissioner

27

28

10

**DETERMINATION OF CONTROVERSY**

# Exhibit J



Search 

**State of California**
# Department of Industrial Relations

| Labor Law | Cal/OSHA - Safety & Health | Workers' Comp | Self Insurance | Apprenticeship | Director's Office | Boards |

Labor Commissioner's Office   |   Talent agency license database

# Talent agency license database

**New search**

This data was updated on **11/20/2017**
Here are the results of your search (1 records):

| License No. | Name | Address 1 (click for map) | Expires | Workers' Comp Insurer | Workers' Comp Expires [1] | Bond Issuer | Bond Effective |
|---|---|---|---|---|---|---|---|
| TA000220796 | David M. Patton Talent Agency | 10065 E. Becker Lane , Scottsdale , AZ 85260 | **12/16/2016** | | | Hartford Fire | 5/25/2016 |

[1] Workers' Compensation (WC) information is only updated at initial registration or renewal. An expired WC policy date does not necessarily indicate that the insurance has lapsed. In addition, if a talent agency has no employees (owner operated), Worker's Compensation coverage is not required.

**New search**

About DIR

Who we are

DIR Divisions, Boards & Commissions

Contact DIR



Work with Us

Jobs at DIR

Licensing, registrations, certifications & permits

Required Notifications

Public Records Requests

Learn More

Acceso al idioma

Frequently Asked Questions

Site Map

  

Back to Top      Conditions of Use      Privacy Policy      Disclaimer      Disability Accommodation
Standard Browser Usability Features      Site Help

Copyright © 2017 State of California



Search 

### State of California
# Department of Industrial Relations

Labor | Cal/OSHA - Safety & | Workers' | Self | Apprenticeship | Director's | Boards

# Talent agency license database

New search

This data was updated on **11/20/2017**
Here are the results of your search (3 records):

| License No. | Name | Address 1 (click for map) | Expires | Workers' Comp Insurer | Workers' Comp Expires [1] | Bond Issuer | Bond Effective |
|---|---|---|---|---|---|---|---|
| TA000212014 | Cox Modeling LLC | 9900 Stirling Road, Suite 226 , Cooper City , FL 33024 | **12/14/2017** | | | Hartford Fire | 10/6/2015 |
| TA000222368 | HUSSIE MODELS, LLC | 200 CENTRAL AVENUE 18TH FLOOR , SAINT PETERSBURG , FL 33701 | **04/19/2018** | | | Hartford Fire | 11/14/2014 |
| TA000213284 | Palomera De La Ree Producciones | 1460 NW 107 Ave Suite Q , Miami , FL 33172 | **03/14/2018** | EASTERN | 8/1/2017 | HARTFORD FIRE | 11/12/2013 |

[1] Workers' Compensation (WC) information is only updated at initial registration or renewal. An expired WC policy date does not necessarily indicate that the insurance has lapsed. In addition, if a talent agency has no employees (owner operated), Worker's Compensation coverage is not required.

New search

About DIR

Who we are

DIR Divisions, Boards & Commissions

Contact DIR

Work with Us

Jobs at DIR

Licensing, registrations, certifications & permits

Required Notifications

Public Records Requests

Learn More

Acceso al idioma

Frequently Asked Questions

Site Map

Search 



**State of California**

# Department of Industrial Relations

| Labor Law | Cal/OSHA - Safety & Health | Workers' Comp | Self Insurance | Apprenticeship | Director's Office | Boards |

Labor Commissioner's Office   |   Talent agency license database

# Talent agency license database

**New search**

This data was updated on **11/20/2017**
Here are the results of your search (1 records):

| License No. | Name | Address 1 (click for map) | Expires | Workers' Comp Insurer | Workers' Comp Expires [1] | Bond Issuer | Bond Effective |
|---|---|---|---|---|---|---|---|
| TA000216234 | Digital Development Management, Inc. | 17 New South St., Suite 205 , Northampton , MA 01060 | 04/13/2018 | Travelers | 1/8/2018 | HCC | 1/6/2017 |

[1] Workers' Compensation (WC) information is only updated at initial registration or renewal. An expired WC policy date does not necessarily indicate that the insurance has lapsed. In addition, if a talent agency has no employees (owner operated), Worker's Compensation coverage is not required.

**New search**

| About DIR | Work with Us | Learn More |
|---|---|---|
| Who we are | Jobs at DIR | Acceso al idioma |
| DIR Divisions, Boards & Commissions | Licensing, registrations, certifications & permits | Frequently Asked Questions |
| Contact DIR | Required Notifications | Site Map |
| | Public Records Requests | |

Site Feedback

 

Back to Top      Conditions of Use      Privacy Policy      Disclaimer      Disability Accommodation

Standard Browser Usability Features      Site Help

Copyright © 2017 State of California



Search 

### State of California
# Department of Industrial Relations

Labor    Cal/OSHA - Safety &    Workers'    Self    Apprenticeship    Director's    Boards

# Talent agency license database

**New search**

This data was updated on **11/20/2017**
Here are the results of your search (8 records):

| License No. | Name | Address 1 (click for map) | Expires | Workers' Comp Insurer | Workers' Comp Expires [1] | Bond Issuer | Bond Effective |
|---|---|---|---|---|---|---|---|
| TA000220733 | Atlas Talent Agency/LA, Inc. | 15 East 32nd Street, 6th Floor , New York , NY 10016 | **06/07/2018** | ACE American | 3/1/2018 | INTERNATIONAL FIDELITY INSURANCE COMPANY | 9/1/2011 |
| TA000216757 | Bienstock LLC dba Bienstock, A United Talent Agen | 250 West 57th Street Suite 333 , New York , NY 10107 | **03/10/2018** | PACIFIC INDEMNITY COMPANY | 1/1/2018 | VIGILANT INSURANCE COMPANY | 2/20/2014 |
| TA000216135 | Common Chord, LLC | 25 Madison Avenue , New York , NY 10010-8601 | **02/24/2018** | MITSUI SUMITOMO INSURANCE | 4/1/2017 | SAFECO INSURANCE COMPANY OF AMERICA | 2/20/2009 |
| TA000206977 | Ford Models, Inc. | 11 E. 26th St., Floor 14 , New York , NY 10010 | **01/22/2018** | AMERICAN ZURICH INSURANCE COMPANY | 2/1/2017 | TRAVELERS CASUALTY AND SURETY COMPANY | 5/1/1998 |
| TA000250733 | Ford Models, Inc. | 11 E. 26th St., 14th Floor , New York , NY 10010 | **01/22/2018** | WC-10-15-361-01 | 2/1/2018 | Hartford Fore Insurance Company | 7/20/2017 |
| TA000253872 | If Management Inc | 152 West 57th Street, Floor 19 , New York , NY 10019 | **10/24/2018** | STATE COMPENS | 5/15/2018 | HARTFORD FIRE | 12/19/2006 |

1 of 2    11/21/2017 4:49 PM

| License No. | Name | Address 1 (click for map) | Expires | Workers' Comp Insurer | Workers' Comp Expires [1] | Bond Issuer | Bond Effective |
|---|---|---|---|---|---|---|---|
| TA000230426 | IF MANAGEMENT, INC. | 152 WEST 57TH STREET, FLOOR 19 , NEW YORK , NY 10019 | 10/24/2017 | STATE COMPENSATION INSURANCE FUND | 5/16/2017 | HARTFORD FIRE INSURANCE COMPANY | 12/19/2006 |
| TA000213524 | Next Management LLC | 15 Watts Street , New York , NY 10013 | 03/04/2018 | Chubb | 12/19/2017 | Travelers | 3/1/2006 |

[1] Workers' Compensation (WC) information is only updated at initial registration or renewal. An expired WC policy date does not necessarily indicate that the insurance has lapsed. In addition, if a talent agency has no employees (owner operated), Worker's Compensation coverage is not required.

**New search**

## About DIR

Who we are

DIR Divisions, Boards & Commissions

Contact DIR

Site Feedback

## Work with Us

Jobs at DIR

Licensing, registrations, certifications & permits

Required Notifications

Public Records Requests

## Learn More

Acceso al idioma

Frequently Asked Questions

Site Map

 

Back to Top       Conditions of Use       Privacy Policy       Disclaimer       Disability Accommodation

Standard Browser Usability Features       Site Help

Copyright © 2017 State of California



Search 

### State of California
# Department of Industrial Relations

| Labor | Cal/OSHA - Safety & | Workers' | Self | Apprenticeship | Director's | Boards |

# Talent agency license database

**New search**

This data was updated on **11/20/2017**
Here are the results of your search (3 records):

| License No. | Name | Address 1 (click for map) | Expires | Workers' Comp Insurer | Workers' Comp Expires [1] | Bond Issuer | Bond Effective |
|---|---|---|---|---|---|---|---|
| TA000214974 | 25 Live, LLC | 25 Music Square West , Nashville , TN 37203 | 12/08/2016 | Travelers Casualty & Surety Company | 3/1/2017 | RLI Insurance Company | 9/2/2010 |
| TA000242756 | 25 LIVE, LLC | 25 MUSIC SQARE WEST , NASHVILLE , TN 37203 | 12/08/2017 | OBI NATIONAL INSURANCE COMPANY | 3/1/2018 | SURETEC INSURANCE COMPANY | 1/8/2017 |
| TA000242756 | 25 LIVE, LLC | 25 MUSIC SQARE WEST , NASHVILLE , TN 37203 | 12/08/2018 | OBI NATIONAL INSURANCE COMPANY | 3/1/2018 | SURETEC INSURANC COMPANY | 1/8/2017 |

[1] Workers' Compensation (WC) information is only updated at initial registration or renewal. An expired WC policy date does not necessarily indicate that the insurance has lapsed. In addition, if a talent agency has no employees (owner operated), Worker's Compensation coverage is not required.

**New search**

### About DIR
Who we are

DIR Divisions, Boards & Commissions

Contact DIR

### Work with Us
Jobs at DIR

Licensing, registrations, certifications & permits

Required Notifications

Public Records Requests

### Learn More
Acceso al idioma

Frequently Asked Questions

Site Map

11/21/2017 4:50 PM



Search 

### State of California
# Department of Industrial Relations

| Labor Law | Cal/OSHA - Safety & Health | Workers' Comp | Self Insurance | Apprenticeship | Director's Office | Boards |

Labor Commissioner's Office  |  Talent agency license database

# Talent agency license database

**New search**

This data was updated on **11/20/2017**

Here are the results of your search (1 records):

| License No. | Name | Address 1 (click for map) | Expires | Workers' Comp Insurer | Workers' Comp Expires [1] | Bond Issuer | Bond Effective |
|---|---|---|---|---|---|---|---|
| TA000223130 | PROST MARKETING, INC. | 130 STANFORD DRIVE , SAN ANTONIO , TX 78212 | 07/27/2018 | | | SURETEC INSURANCE COMPANY | 5/12/2014 |

[1] Workers' Compensation (WC) information is only updated at initial registration or renewal. An expired WC policy date does not necessarily indicate that the insurance has lapsed. In addition, if a talent agency has no employees (owner operated), Worker's Compensation coverage is not required.

**New search**

About DIR

Who we are

DIR Divisions, Boards & Commissions

Contact DIR

Site Feedback

Work with Us

Jobs at DIR

Licensing, registrations, certifications & permits

Required Notifications

Public Records Requests

Learn More

Acceso al idioma

Frequently Asked Questions

Site Map

  

Back to Top       Conditions of Use       Privacy Policy       Disclaimer       Disability Accommodation
Standard Browser Usability Features       Site Help

Copyright © 2017 State of California

1 of 1

11/21/2017 4:50 PM

# Exhibit K

Return Application to:
DLSE Licensing
1515 Clay Street, Ste. 401
Oakland, CA 94612
(510) 285-3397

State of California
Department Of Industrial Relations
DIVISION OF LABOR STANDARDS ENFORCEMENT



# TALENT AGENCY LICENSE APPLICATION

Application is hereby made pursuant to Labor Code sections 1700, et seq., California Code of Regulations, Title 8, Subchapter 3, Sections 12000-12006 and the applicable Industrial Welfare Commission Order, for a license to carry on the business of a talent agency. *PLEASE CAREFULLY READ THE ACCOMPANYING EXPLANATION OF REQUIREMENTS PRIOR TO COMPLETING THIS APPLICATION. AN INCOMPLETE APPLICATION, INCLUDING INCOMPLETE SUBMISSION OF REQUIRED SUPPORTING DOCUMENTATION, WILL DELAY THE ISSUANCE OF YOUR LICENSE.*

| 1. Name of legal entity applying for a license: | 2. This is an application for a:<br>○ New        ○ Renewal |
|---|---|
| 3. DBA (Doing Business As): | 4. If renewal, give previous license #: |
| 5. Main office address (number, street, city, state, zip code): | 6. Business telephone: |
| 7. Branch office address (number, street, city, state, zip code): | 8. Branch business telephone: |
| 9. Type of ownership (Please check one):<br>⊙ Individual    ○ Partnership    ○ Corporation    ○ LLC | 10. Birth date *(See Instructions)*: |
| 11. If individual, give full name and residence address of owner: | Home telephone: |
| 12. If partnership, corporation, or LLC, give full name and residence address of each partner, corporate officer, or LLC member (use additional sheet if necessary): | Home telephone: |
|  |  |
|  |  |

| 13. Date incorporated: | 14. State in which incorporated: | 15. If a foreign corporation, give date Articles of Incorporation were filed with the California Secretary of State: |
|---|---|---|

16. Name, residence address and percentage of interest of each partner or member of LLC having a financial interest in the business. If corporation, include only those having a financial interest of 10% or more. Omit if Individual ownership:

---

## DO NOT WRITE BELOW THIS LINE – PLEASE COMPLETE REVERSE SIDE

| Application Number: | ☐ B       ☐ F/C | | |
|---|---|---|---|
| | ☐ P/R     ☐ P/C | Amount Received | Check Number |
| Approved<br>State Labor Commissioner | ☐ A/C     ☐ F/S | Postmark Date | Date Mailed |
| By: _____ | ☐ CON     ☐ WCI | Effective Date | Expiration Date |

State of California            **TALENT AGENCY LICENSE**
Department of Industrial Relations        **APPLICATION**           Division of Labor Standards Enforcement

17. Name, residence address and position of each person with responsibility and authority to manage the business:

18. Name, residence address and percentage of profit sharing of each person with profit sharing interest in the business (exclude bona fide employees on stated salaries:

19. Will the business of this talent agency be conducted in connection with any other business?    ○ Yes    ○ No
If yes, indicate the kind of business and circumstances (use separate sheet if necessary):

20. Does the talent agency or any of the persons names in Items 11, 12 or 16 presently:
(a) Owe any unpaid wages?      ○ Yes    ○ No
(b) Have any unpaid outstanding judgments?    ○ Yes    ○ No
If yes to either, indicate the kind of business and explain the circumstances (use separate sheet if necessary):

21. Have any of the persons listed in items 11, 12 or 16 ever been convicted[1] of a crime, either misdemeanor or felony?
○ Yes   ○ No
If yes, indicate the name of the person, the date, the place and explain the circumstances for each crime (use separate sheet if necessary). *Attach documentation to indicate disposition.*

22. Will the talent agency have sub-agents or any other employees? ○ Yes   ○ No
If yes, complete Items 23, 24 and 25 below and *attach a copy of the Workers Compensation Certificate of Insurance*

23. Name of Workers' Compensation Insurance carrier:

| 24. Policy Number: | 25. Period covered:<br>From:          To: |
| --- | --- |

**CERTIFICATION**

I am/We are aware of and agree to comply with the provisions of Section 3700 of the Labor Code which requires every employer to be insured against liability for workers' compensation.

I/We agree to operate as a talent agency in compliance with the provisions of the California Labor Code and with the Rules and Regulations issued by the Labor Commissioner of the State of California.

I/We hereby certify, under penalty of perjury, that the foregoing statements are true and correct and that I am/we are aware of the fact that **ANY MATERIAL MISREPRESENTATION IS GROUNDS FOR DENIAL OR SUBSEQUENT REVOCATION OF A LICENSE.**

Executed at [2] _____ California, this _____ day of _____ , 20 _____

Signatures: (Individual owner, each partner or each LLC member must sign; if corporation, any authorized corporate officer may sign. He/She must show his/her title and submit a copy of Articles of Incorporation and Statement by Domestic Stock Corporation)

_____      _____
Printed name and title                      Signature

_____      _____
Printed name and title                      Signature

_____      _____
Printed name and title                      Signature

---

[1] The term "convicted" includes instances in which suspension of sentence was had and probation granted, and where expungement proceedings under Penal Code section 1203.4 and the following were undertaken.
[2] If place of execution is outside California, the foregoing statements must be sworn to before a notary public or other officer authorized to take oaths and affirmations.

# Exhibit L

1  STATE OF CALIFORNIA
   Department of Industrial Relations
2  Division of Labor Standards Enforcement
   BY:    EDNA GARCIA EARLEY, State Bar No. 195661
3  320 W. 4th Street, Suite 430
   Los Angeles, California 90013
4  Tel.: (213) 897-1511

5  Attorney for the Labor Commissioner

6

7

8              BEFORE THE LABOR COMMISSIONER

9                OF THE STATE OF CALIFORNIA

10

11  MICHAEL RAYMOND JAMES, an        )   CASE NO. TAC 17-03
12  individual,                      )
                                     )
13              Petitioner,          )
                                     )   DETERMINATION OF
14                                   )   CONTROVERSY; ORDER
    vs.                              )   DISMISSING PETITION
15                                   )
                                     )
16                                   )
    THOMPSON MANAGEMENT, an          )
17  unincorporated association,      )
                                     )
18              Respondent.          )
                                     )
19  ─────────────────────────────────

20
          The above-captioned matter, a petition to determine controversy under Labor Code
21
    §1700.44, came on regularly for hearing on February 17, 2006 in Los Angeles, California,
22
    before the undersigned attorney for the Labor Commissioner assigned to hear this case.
23
    Petitioner MICHAEL RAYMOND JAMES, An Individual appeared represented by Kristen
24
    A. Savelle, Esq. of Quinn Emanual Urquhart Oliver & Hedges, LLP. Respondent
25
    THOMPSON MANAGEMENT, an unincorporated association, who was properly served
26

27                                      1

28
          DETERMINATION OF CONTROVERSY; ORDER DISMISSING PETITION

## FINDINGS OF FACT

1.     Petitioner MICHAEL RAYMOND JAMES, (hereinafter, referred to as "petitioner"), is an actor.

2.     Respondent THOMPSON MANAGEMENT, an unincorporated association, (hereinafter, referred to as "respondent"), having its principal place of business in Yardley, Pennsylvania, is not licensed as a talent agent in the State of California.

3.     On or about August 4, 2002, petitioner and respondent entered into a written contract wherein respondent agreed to render services as a personal manager to petitioner in exchange for which petitioner promised to pay respondent a 15% commission on all gross earnings and receipts for a three year period commencing from the date of execution of the Agreement.

4.     During the 2002-2003 television season, Respondent submitted petitioner to various New York television shows, including, but not limited to: "Law & Order," "Law & Order SVU," "Law & Order Criminal Intent," "ED," "Queens Supreme""Third Watch" and "Hack."

5.     As a direct result of respondent submitting petitioner to the aforementioned shows, on September 24, 2002, petitioner was cast in the role of "Greg" on the television show "Hack."

6.     Petitioner moved to California in January, 2003.

7.     In early 2003, petitioner contacted Respondent and informed it that he wanted to end their relationship.  In response, Respondent informed petitioner that it needed two days to think it over.  Respondent subsequently contacted petitioner and informed him that he could: (1) "suck it up" for the term of the contract; (2) ignore respondent but continue to pay it 15% commissions on all earnings petitioner received; or (3) contact an attorney.

8.     On or about March 26, 2003, respondent left a voicemail message with petitioner, informing him of an upcoming casting call in California that respondent wanted petitioner to attend.

9.     The following day, March 27, 2003, respondent left another voicemail

2

DETERMINATION OF CONTROVERSY; ORDER DISMISSING PETITION

1  message with petitioner, reprimanding him for not attending the casting call and possibly

2  harming its networking relationship with casting directors.

3      10.    On April 22, 2003, petitioner filed the instant petition.

4                              **LEGAL ANALYSIS**

5      1.    Petitioner, an actor, is an "artist" within the meaning of Labor Code

6  §1700.4(b).

7      2.    Labor Code §1700.4(a) defines "talent agency" as "a person or corporation

8  who engages in the occupation of procuring, offering, promising, or attempting to procure

9  employment or engagements for an artist or artists."

10     3.    Labor Code §1700.5 provides that no person shall engage in or carry on the

11 occupation of a talent agency without first procuring a license therefor from the Labor

12 Commissioner.  Any agreement between an artist and an unlicensed talent agency is

13 unlawful and void *ab initio* and the licensed talent agency has no right to retain commissions

14 arising under such an agreement. *Waisbren v. Peppercorn Productions, Inc.* (1995) 41

15 Cal.App.4th 246, *Buchwald v. Superior Court* (1967) 254 Cal.App.2d 347.

16     4.    The issue in this case is whether the Labor Commissioner has jurisdiction over

17 respondent, an out of state management company.

18     5.    Respondent's principal place of business is in Pennsylvania. No evidence was

19 provided at the hearing that respondent has any business interests or relations with California

20 or that it conducts business in California on a regular and continuous basis.  Nor was there

21 evidence presented at the hearing that respondent came out to California for the purpose of

22 submitting petitioner to casting calls or other employment or engagements.  Rather,

23 petitioner argues that California has jurisdiction over this respondent because on one

24 occasion, respondent attempted to procure employment for Petitioner in the State of

25 California.[1]

26

27      [1]It is unclear whether respondent attempted to procure such employment for petitioner by phone

28 or facsimile.

3

**DETERMINATION OF CONTROVERSY; ORDER DISMISSING PETITION**

6.      California's power to compel a nonresident defendant to answer in its courts of law is limited by principles of due process.  In essence, due process prohibits a state's assertion of jurisdiction where it would be unreasonable in light of the defendant's limited relation to the forum state. See *International Shoe Co. v. Washington* (1946) 326 U.S. 310.

If a nonresident defendant's activities may be described as "extensive or wide-ranging"(*Buckeye Boiler Co. v. Superior Court* (1969) 71 Cal.2d 893, 898-900) or "substantial...continuous and systematic" (*Perkins v. Benguet Mining Co.* (1952) 342 U.S. 437), there is a constitutionally sufficient relationship to warrant jurisdiction for all causes of action asserted against him.  In such circumstances, it is not necessary that the specific cause of action alleged be connected with the defendant's business relationship to the forum. *Cornelison v. Chaney* (1976) 16 Cal.3d 143, 147.

If, however, the defendant's activities in the forum are not so pervasive as to justify the exercises of general jurisdiction over him, then jurisdiction depends upon the quality and nature of his activity in the forum in relation to the particular cause of action.  In such a situation, the cause of action must arise out of an act done or transaction consummated in the forum, or defendant must perform some other act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws.  Thus, as the relationship of the defendant with the state seeking to exercise jurisdiction over him grows more tenuous, the scope of jurisdiction also retracts, and fairness is assured by limiting the circumstances under which the plaintiff can compel him to appear and defend.  The crucial inquiry concerns the character of defendant's activity in the forum, whether the cause of action arises out of or has a substantial connection with that activity, and upon the balancing of the convenience of the parties and the interests of the state in assuming jurisdiction. (*Hanson v. Denckla* (1958) 357 U.S. 235; *McGee v. International Life Ins. Co.,* (1957) 355 U.S. 220.)  *Cornelison v. Chaney, supra* 16 Cal.3d 143 at p.147-148.

Applying these rules to the instant case, we find that respondent's activities in California are not so substantial or wide-ranging as to justify general jurisdiction over him to

4

1   adjudicate all matters regardless of their relevance to the cause of action by petitioner.

2   Respondent allegedly attempted to procure employment for Petitioner in the State of

3   California on one occasion. Moreover, the attempt was made by telephone or facsimile. No

4   evidence was presented that respondent traveled to the State of California in an effort to

5   procure work for petitioner, who is now domiciled in California.

6        We turn then, to an assessment of the relation between petitioner's activities in

7   California and the cause of action alleged by petitioner. Respondent purposefully availed

8   itself of the privilege of conducting activities within California by attempting to secure an

9   audition for petitioner in California, thus invoking the benefits and protections of its laws.

10   See *Sibley v. Superior* Court (1976) 16 Cal.3d 442, 446-447. Moreover, petitioner's claim

11   under the Talent Agencies Act is unquestionably connected with and arises out of

12   respondents' forum-related activities of attempting to procure employment for petitioner

13   without the requisite talent agency license. However, the exercise of jurisdiction would not

14   be fair nor reasonable in this case. Respondent allegedly made <u>one</u> contact by phone or

15   facsimile in an attempt to procure employment for petitioner. To require petitioner to travel

16   to California to defend in this action based on <u>one</u> phone call or fax would not be fair nor

17   reasonable.

18        Petitioner relies on our decision in *Breuer v. Top Draw Entertainment, Inc.,* (1996)

19   TAC 18-95 for the proposition that we have jurisdiction over respondent, herein. *Breuer* is

20   distinguishable from this case in that the respondents in *Bruer*, both New York residents,

21   traveled to California with the petitioner for a one week period in order to promote the

22   petitioner's talents to potential employers at an industry "showcase" in Los Angeles.

23   Moreover, the respondents charged the petitioner for their expenses in connection with the

24   business trip to California, obtained auditions for the petitioner at various comedy clubs in

25   Los Angeles, and sent written materials to Disney Studios and other promoters/employers in

26   an effort to procure employment for the petitioner. We found that all these activities taken

27   together, constituted sufficient contacts with California for us to assert jurisdiction over the

28   respondents.

5

1     In contrast, this case involves only <u>one</u> alleged contact which was made by phone or

2  facsimile. Assertion of jurisdiction over respondent in this case, based on that one phone call

3  or facsimile transmission, in our opinion, would offend "traditional notions of fair play and

4  substantial justice." See *International Shoe Co. Washington, supra.*  As such, we find that

5  we do not have jurisdiction over this respondent.

6     7.    Because we find that we don't have jurisdiction over the respondent, this

7  petition must be dismissed.

8

9                            **ORDER**

10     For the reasons set forth above, IT IS HEREBY ORDERED that this petition be

11  dismissed.

12

13  Dated: April 21, 2006

14                            EDNA GARCIA EARLEY
                               Special Hearing Officer

15

16  **Adopted:**

17  Dated:  April 25, 2006

18                            ROBERT A. JONES
                             Acting State Labor Commissioner

19

20

21

22

23

24

25

26

27

28

DETERMINATION OF CONTROVERSY; ORDER DISMISSING PETITION

# Exhibit M

1 | DIVISION OF LABOR STANDARDS ENFORCEMENT
Department of Industrial Relations
2 | State of California
BY:  MILES E. LOCKER, Attorney No. 103510
3 | 45 Golden Gate Avenue, Suite 3166
San Francisco, California  94105
4 | Telephone:  (415) 975-2060

5 | Attorney for the Labor Commissioner

6

7 |                    BEFORE THE LABOR COMMISSIONER

8 |                      OF THE STATE OF CALIFORNIA

9

10 | JAMES BREUER,                    )    Case No. TAC 18-95
                                 )
11 |                    Petitioner,  )    SUPPLEMENTAL ORDER RE:
                                 )    JURISDICTIONAL ISSUES
12 | vs.                              )    AND NOTICE OF HEARING
                                 )    ON PETITION TO
13 | TOP DRAW ENTERTAINMENT, INC.,    )    DETERMINE CONTROVERSY
a New York corporation; ANTONIO U. )
14 | CAMACHO, an individual,          )HEARING DATE: 8/27/97
                                 )      TIME: 10:00 a.m.
15 |                    Respondent.   )  LOCATION: 107 S. Broadway,
                                          Suite 5015
16 | _____)        Los Angeles, CA

17

18 |      By this petition to determine controversy, filed on July 26,

19 | 1995, petitioner James Breuer alleges, inter alia, that in or

20 | about July 1992, the parties entered into an agreement under which

21 | respondents were to perform services as petitioner's personal

22 | manager, and to attempt to procure employment within the

23 | entertainment industry for the petitioner; that thereafter

24 | respondents performed services as a talent agent within the

25 | meaning of Labor Code §1700.4(a); and that respondents violated

26 | Labor Code §1700.5 in that they were never licensed as a talent

27 | agency by the State Labor Commissioner.  The petitioner seeks a

28 | determination that the parties' agreement is void ab initio and

1   unenforceable, that the petitioner—has no liability thereon to

2   respondents, and an order requiring respondents to reimburse

3   petitioner for all amounts received pursuant to the parties'

4   agreement.

5       Respondents contend that the Labor Commissioner is without

6   jurisdiction to hear and determine this controversy.  In support

7   of this contention, respondents have presented evidence that shows

8   that respondent ANTONIO CAMACHO has been a New York resident at

9   all times relevant herein; that respondent TOP DRAWER

10   ENTERTAINMENT, INC., has been a New York corporation at all times

11   relevant herein; that petitioner lived in New York State when the

12   parties entered into their agreement; that thereafter petitioner

13   lived in New York or New Jersey; that until the filing of this

14   petition, James Breuer never claimed to be a California resident;

15   and that the only payments made by petitioner to respondents were

16   pursuant to petitioner's employment as an entertainer in New York.

17   Respondents argue, therefore, that "the entire business

18   relationship between petitioner and respondents took place outside

19   the State of California".  However, respondents concede that

20   during their representation of petitioner, they booked him to

21   "showcase" engagements in California to expose his talent to

22   potential interested parties.

23      In response to our previous order re: jurisdictional issues,

24   petitioner provided a declaration in which he alleges that from

25   January 1993 to the present, he has been a California resident.

26   This allegation is unsupported by any sort of documentation or

27   corroborative evidence, and it fails to overcome respondent's

28   showing that petitioner has been, at all relevant times, a

1   resident of New York or New Jersey.  Nonetheless, petitioner has

2   provided other evidence which, taken together, establishes that

3   the Labor Commissioner has jurisdiction to hear and determine this

4   controversy.  Specifically, the evidence provided by petitioner

5   shows that Antonio Camacho traveled to California with the

6   petitioner during the period of March 16 through March 24, 1993,

7   in order to promote petitioner's talents to potential employers at

8   an industry "showcase" in Los Angeles; that respondents charged

9   petitioner for their expenses in connection with this business

10  trip to California; that Antonio Camacho obtained auditions for

11  petitioner at various comedy clubs in Los Angeles and that those

12  auditions were held during the period of October 26 to October 29,

13  1992 or 1993; and that Camacho sent written materials to Pam

14  Thomas in Pacific Palisades, California, and to Mitchell Bank at

15  Disney Studios in Burbank, California, in an effort to procure

16  employment for the petitioner.

17      The evidence presented establishes that respondents have

18  sufficient contacts with California for the exercise of

19  jurisdiction by the Labor Commissioner.  The guiding principle,

20  set forth by the U.S. Supreme Court in International Shoe Co. v.

21  Washington (1945) 326 U.S. 310, is that a non-resident defendant

22  is subject to personal jurisdiction if that defendant has "certain

23  minimum contacts" with the forum state "such that the maintenance

24  of the [action or proceeding] does not offend traditional notions

25  of fair play and substantial justice".  Due process requires that

26  in order to exercise personal jurisdiction over a non-resident as

27  to a specific claim or cause of action (1) the defendant must have

28  "purposefully avail[ed] itself of the privilege of conducting

1   activities within the forum state, thus invoking the benefits and

2   protections of its laws" [Sibley v. Superior Court (1976) 16

3   Cal.3d 442, 446-447], and (2) the plaintiff's claim either arises

4   out of or is connected with the defendant's forum-related

5   activities [Buckey Boiler Co. v. Superior Court (1969) 71 Cal.2d

6   893, 898-899) or there is a "substantial nexus" between

7   defendant's forum-related activities and plaintiff's cause of

8   action [Cornelison v. Chaney (1976) 16 Cal.3d 143, 149], and (3)

9   the exercise of jurisdiction would be fair and reasonable [Id.].

10  As to the first factor, respondents' visit to California to

11  attempt to procure employment for petitioner at the industry

12  showcase, respondents' efforts in obtaining and scheduling

13  auditions for petitioner in California, and respondents'

14  communications with potential California employers on behalf of

15  petitioner establish "purposeful availment". As to the second

16  factor, petitioner's claim under the Talent Agencies Act is

17  unquestionably connected with and arises out of respondents'

18  forum-related activities of attempting to procure employment for

19  petitioner without the requisite talent agency license. As to the

20  final factor, it is apparent that most of the witnesses who could

21  testify to respondents' alleged procurement activities in

22  California are California residents and thus, a hearing in

23  California would be fair and reasonable.

24      For all of the reaons set forth above, it is hereby

25  determined that the Labor Commissioner has jurisdiction to hear

26  and determine this controversy. An evidentiary hearing on the

27  merits of the controversy shall be held on August 27, 1996 at

28  10:00 a.m. at the State Building, 107 S. Broadway, Suite 5015, Los

1  Angeles, California, before the undersigned attorney specially

2  designated by the Labor Commissioner to hear this matter. The

3  determination of this controversy shall be based upon the

4  testimony and evidence presented at this hearing.

5  DATED:    7/18/96

6

7                                    MILES E. LOCKER
                          Attorney for the Labor Commissioner

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit N

1  DIVISION OF LABOR STANDARDS ENFORCEMENT
   Department of Industrial Relations
2  BY:  THOMAS S. KERRIGAN, State Bar No. 36003
   107 South Broadway, Room 5022
3  Los Angeles, California 90012
   (213) 897-1511
4
   Attorney for the Labor Commissioner
5

6

7

8              BEFORE THE LABOR COMMISSIONER

9                 STATE OF CALIFORNIA

10

11 ANITA BAKER BRIDGFORTH, aka      )  CASE NO. TAC 12-96
   ANITA BAKER,                     )
12                                  )  DETERMINATION OF CONTROVERSY
          Plaintiff/Respondent      )
13                                  )
   vs.                              )
14                                  )
   BNB ASSOCIATES, LTD., SHERWIN    )
15 BASH,                            )
                                    )
16        Defendant/Appellant       )
   _____)
17

18       The above-entitled petition to determine controversy, filed on May

19 2, 1996, alleges, _inter alia_, that from October 1, 1983 and continuing

20 thereafter, each of the respondents performed the functions and acted in

21 the capacity of a talent agent without a license, in violation of Labor

22 Code §1700.5.  Petitioner [hereinafter "Baker"] seeks a determination

23 from the Labor Commissioner that the written and oral agreements under

24 which respondents [hereinafter "Bash" and "BNB"] performed these services

25 for petitioner are void _ab initio_ and are therefore unenforceable from

26 the time of inception.  Petitioner also seeks restitution of all sums

27 paid to respondent as commissions pursuant to these written and oral

28                                 1

1  agreements.  Respondents have admitted that they were not licensed talent

2  agents during the times in question but deny that they have violated the

3  Talent Agencies Act.  In addition, they claim that the petition is barred

4  by the one-year statute of limitations set forth in Labor Code

5  §1700.44(c) and have requested dismissal of the petition on that ground.[1]

6      The matter came on for several days of hearing in July and August of

7  1996 before Thomas S. Kerrigan, Special Hearing Officer, in Los Angeles,

8  California.  Petitioner appeared through her attorneys Gerard P. Fox and

9  Cynthia Vroom of Fox & Spillane; respondents appeared through their

10  attorney Thomas A. Schultz of the Harney Law Offices.  The matter was

11  taken under submission at the close of the hearing on August 15, 1996.

12                            ISSUES

13      The questions presented are as follows:

14          1.   Did respondents function as talent agents as that phrase

15  is defined in the Labor Code?

16          2.   If so, what relief, if any, is petitioner entitled to?

17                    DISCUSSION AND FINDINGS

18      There is no dispute between the parties that Baker, a well-known

19  singer and performer, is an artist within the meaning of Labor Code

20  §1700.4(b).

21      The parties stipulated that Bash and BNB  were not licensed as

22  talent agents during the times material to the allegations of the

23  petition.

24      Between October, 1983 and December, 1994, Baker and BNB entered into

25

26  _____
    [1]      The Labor Commissioner issued a preliminary order denying the request
27  for dismissal on June 4, 1996, finding that if the aforementioned contracts are,
    in fact, violative of the Talent Agencies Act, respondents' attempt to enforce these
28  contracts through a court action constituted a new and separate violation of the
    law within the one-year limitations period.

                              2

1   written agreements whereby Bash and BNB agreed to render services to
2   Baker as her personal manager. The agreements recite that respondents
3   were not rendering services as talent agents within the meaning of the
4   Labor Code. In consideration of the rendition of these services, Baker
5   was to pay BNB a 15 per cent commission on all gross monies received by
6   her during the term of each agreement. There were written agreements
7   executed in 1983 and 1987, the terms of which are substantially similar.
8   In 1991 the parties entered into an oral agreement at a commission rate
9   of 10 per cent on "an as needed basis." Baker purported to terminate
10  this final agreement on December 13, 1994.

11      Early in this relationship Bash and BNB negotiated an endorsement
12  contract for Baker with Soft Sheen Products, a manufacturer of hair care
13  products for African-American women, as documented by undisputed
14  correspondence emanating from Bash. They also negotiated renewal
15  contracts through 1993. As a result of these negotiations Baker became
16  "The Soft Sheen Girl," i.e., the spokesperson for this company. Bash and
17  BNB received a commission from monies earned by Baker from this work. No
18  licensed talent agent participated in these transactions.

19      Baker secured a number of major television engagements during the
20  period of her representation by Bash and BNB, as documented by undisputed
21  correspondence, including appearances on The Songwriters Hall of Fame
22  Awards Show in May of 1989, The National Literacy Honors Show in February
23  of 1990, The Detroit Car Show Special in January of 1991 and 1992, the
24  Earth Voice '92 Concert in May of 1992, the Essence Awards Show in April
25  of 1993, a Frank Sinatra special entitled "Duets" in October of 1994, the
26  Disney American Teachers Awards Show in November of 1994, the Christmas
27  in Washington Show in December of 1994, and the Soul Train Awards Show in
28  March of 1995. Bash and BNB were responsible for all business

3

1 negotiations in connection with these appearances.

2     At a certain point in her career, Baker, like many other concert
3 performers, was eager to convert her career from concert tours to
4 television and films. She testified at the hearing in this matter that
5 Bash promised to "shake the bushes" to get her movie offers. One such
6 opportunity she claimed Bash tried to solicit was an HBO movie in
7 November of 1990. Correspondence was received documenting discussions
8 between Bash and the producer of that film. Bash purportedly sought
9 production teams to develop television pilots for Baker.

10     BNB also assisted in securing major concert appearances by Baker
11 during the period of these agreements, including, inter alia, an
12 appearance with the Boston Pops Orchestra in July of 1994, and a
13 lucrative appearance at the Universal Amphitheatre in December of 1994.

14     Though they did not come to fruition, BNB also actively negotiated
15 on Baker's behalf for concert appearances in Japan, England, at the
16 Montreux Jazz Festival, and in Germany, Denmark, Holland and elsewhere
17 between 1989 and 1994. Detailed correspondence traces BNB's efforts in
18 this regard. In a letter dated September 27, 1989 to a French concert
19 promoter, Bash (on BNB letterhead) stated, "I am Anita Baker's manager,
20 and I wonder if you might be interested in presenting her in concert in
21 Paris during June of 1990." Bash wrote similar letters to English and
22 Dutch promoters. He admitted during his testimony that he had
23 longstanding relationships with European concert promoters and initiated
24 contacts with these promoters on Baker's behalf for the purpose of
25 securing employment for her.

26     Baker appears to have increasingly grown restless under Bash and
27 BNB's tight control of her career. This particularly seems to be the
28 case with respect to her film and television ambitions. Though the

4

1  testimony is in conflict, it appears that Bash and BNB'S took pains to
2  discourage Baker from retaining the services of established licensed
3  talent agents such as the William Morris Agency, on the theory that they
4  could do anything that a regular talent agent could do to help her
5  career.

6       Except for the period between June of 1992 and December of 1993,
7  when Baker was represented by Creative Artists Agency for purposes of
8  securing television and film work, she had no licensed representation
9  during this eleven year period.  The Hearing Officer takes official
10  notice that Associated Booking Corporation, the organization that handled
11  a number of concert bookings for Baker, was not licensed as a talent
12  agent in California during this period.[2]  There is no evidence that Bash
13  and BNB acted in "conjunction" with a licensed talent agent within the
14  meaning of Labor Code §1700.44(d).

15       Bash testified at the hearing that he is the sole owner of BNB.  He
16  claimed that as an artist manager he primarily "guides" his clients
17  careers, assisting them in finding proper professional help.  He has
18  represented Neil Diamond, Herb Alpert, Lou Rawls, and other noted musical
19  artists and performers during a long and apparently distinguished career.
20  He insisted that while he responds to and sometimes negotiates the terms
21  of offers, he never solicits offers for his clients.  In the case of
22  Baker, for example, he insisted that he served solely as a "conduit" for
23  employment offers that passed through his office.

24       To accept Bash's testimony one would have to assume that a major
25  musical artist went without any talent agent representation for a period
26  of almost eleven years (excluding the period of time Baker was

27

28      [2]    The  records of the Labor Commissioner reflect that Associated Booking
Corporation was licensed in California between 1961 and 1982, but not thereafter.

5

1   represented by Creative Artists Agency) during which time the artist

2   received numerous major television and live concert engagements.  Such a

3   proposition not only defies logic, it flies in the face of common

4   industry practice and experience.

5        Moreover, it is manifest from the record, including voluminous

6   correspondence between Bash and third parties, that Bash was actively

7   engaged in promoting Baker's employment opportunities.  It will not do to

8   argue, as respondents argue, that Bash and BNB did not initiate contacts

9   with music, television, and film producers.  For one thing, as noted, the

10  evidence is to the contrary with respect to several of the transactions

11  involved.  This evidence more than meets the minimal standard described

12  in <u>Waisbren v. Peppercorn Productions, Inc.</u> (1995), 41 Cal. App. 4th 246,

13  255-260.  Secondly, and as Baker points out, even negotiations that

14  "exploit" employment offers emanating from the outside constitute

15  solicitation within the meaning of the Talent Agency Act (see, e.g.,

16  discussion in <u>Hall v. X Management, Inc.</u>, T.A.C. 19-90 at pp. 29-30).

17  Here there can be no question based on the pages and pages of back and

18  forth correspondence received in evidence at the hearing that Bash and

19  BNB actively "exploited" offers to the extent they did not initiate them.

20       Respondents also argue that many of the television shows in which

21  Baker appeared were merely "promotional," so that she received lesser

22  amounts of compensation, and that most of the European solicitations by

23  Bash resulted in no employment for Baker.  These arguments are not well

24  taken.  The crucial element is the act of solicitation, even where the

25  solicitation results in either insufficient remuneration or no

26  remuneration for the artist.

27       Bash and BNB additionally argue that the express language of the

28  written agreements providing that they were not acting as talent agents

6

should be given substantial weight. But it is the actual conduct of the parties, not their self-serving exculpatory contractual provisions that are at the forefront of the inquiry in a case of this nature. See Buchwald v. Superior Court (1967) 254 Cal. App.3d 347, 355. Any other rule would permit circumvention of the law based on careful draftsmanship. The key, therefore, is not how respondents defined their relationship with Baker but how they actually performed it.

As mentioned hereinabove, respondents initially challenged the jurisdiction of the Labor Commissioner in prehearing proceedings, claiming that the petition was untimely under Section 1700.44(c) of the Labor Code. That challenge was rejected on the ground that the filing of the Complaint in the underlying Superior Court action on July 25, 1995 was an attempt within the one-year statute of limitations of Section 1700.44(c) to enforce the aforementioned contracts entered into by the parties. Respondents renewed this challenge at the time of the hearing. A ruling must again issue in petitioner's favor on this point inasmuch as the allegations of the Complaint, specifically the allegations of Paragraphs 7, 8, 9, 10, and 15 thereof, make it evident that respondents are seeking to enforce all contracts entered into between the parties. The filing of this Complaint effectively started the one-year statute of limitations running again.

CONCLUSIONS OF LAW

1. Petitioner is an "artist" within the meaning of Labor Code §1700.44(a). The Labor Commissioner has jurisdiction to determine this controversy pursuant to Labor Code §1700.44(a).

2. Respondents violated Labor Code §1700.5, in that they, and each of them, engaged in and carried on the occupation of a talent agency without first procuring a license therefor from the Labor Commissioner. The

7

1  various aforementioned agreements between respondents and petitioner are

2  accordingly void _ab initio_ and are unenforceable for all purposes.

3  (Waisbren v. Peppercorn Productions, Inc., supra, 41 Cal. App. 4th 246;

4  Buchwald v. Superior Court, supra, 254 Cal. App. 2d 347.)

5  3.   Petitioner has made no showing that respondents received any

6  commissions or other monies pursuant to the aforementioned agreements

7  during the one-year period prior to May, 1996, the date the Petition was

8  filed with the Labor Commissioner.  She is accordingly entitled to no

9  monetary recovery.

DETERMINATION

11  The written agreements entered into between the parties in 1983 and

12  1987, and the oral agreement entered into between them in 1991, are each

13  void and unenforceable for all purposes.  Having made no showing that

14  respondents received compensation pursuant to these agreements during the

15  one-year limitations period prescribed by Labor Code §1700.44(c),

16  petitioner shall have no monetary recovery.

17  DATED:   December **23**, 1996                _Thomas S. Kerrigan_

18                                                       Thomas S. Kerrigan
                                                        Special Hearing Officer

20  The above Determination is adopted by the Labor Commissioner

21  in its entirety.

23  DATED:  _December 27, 1996_            _Roberta E. Mendonca_

24                                                       Roberta Mendonca
                                                        State Labor Commissioner

8

# Exhibit O

1    DIVISION OF LABOR STANDARDS ENFORCEMENT
     Department of Industrial Relations
2    State of California
     BY: DAVID L. GURLEY (Bar No. 194298)
3    455 Golden Gate Ave., 9th Floor
     San Francisco, CA  94102
4    Telephone: (415) 703-4863

     Attorney for the Labor Commissioner
5

6                    BEFORE THE LABOR COMMISSIONER

7                    OF THE STATE OF CALIFORNIA

8

9

10   MARTHA ROBI,                        )    Case No. TAC 29-00
                                         )
11                       Petitioners,    )
     vs.                                 )    DETERMINATION OF
                                         )    CONTROVERSY
12                                       )
                                         )
13   HOWARD B. WOLF,                     )
                                         )
14                       Respondents.    )
                                         )
15                                       )
     _____)

16                           INTRODUCTION

17          The above-captioned petition was filed on September 1,

18   2000, by MARTHA ROBI, (hereinafter "Robi" or "Petitioner"),

19   alleging that HOWARD B. WOLF, (hereinafter "Wolf" or "Respondent"),

20   booked performances on behalf of the petitioner's husband without

21   a talent agency license, thereby acting as an unlicensed talent

22   agent in violation of Labor Code §1700.5[1].   Petitioner seeks a

23   determination voiding *ab initio* several written and one oral

24   management agreement between the parties.

25

26   _____
          [1]  All statutory citations will refer to the California Labor Code unless
27   otherwise specified.
                                     1

1
2          Respondent filed his answer with this agency on October
3     3, 2000, asserting laches, statute of limitations, and release as
4     his affirmative defenses.   A hearing was scheduled before the
5     undersigned   attorney,   specially   designated   by   the   Labor
      Commissioner to hear this matter.   After several continuances, the
6     hearing commenced on August 14, 2001, in Los Angeles, California.
7     Petitioner was represented by Allen Hyman; respondent appeared
8     through his attorney Terran T. Steinhart.   Due consideration having
9     been given to the testimony, documentary evidence, arguments
10    presented, and briefs submitted, the Labor Commissioner adopts the
11    following determination of controversy.

12

13                            FINDINGS OF FACT

14          1.    Petitioner's husband, Paul Robi was an original
15    member of the performing group, "The Platters".   "The Platters"
16    established a string of #1 hits including, "Only You" and "The
17    Great Pretender" and performed internationally throughout the 50's,
18    60's.   Several original members interchanged, but Paul Robi legally
19    retained the group's commercial name and continued to perform as
20    "The Platters" throughout the 70's and 80's.

21          2.    In 1983 Paul Robi met Howard Wolf at the Tropicana
22    Hotel and Casino in Las Vegas, Nevada.   On May 4, 1983, Paul Robi
23    and Wolf signed an agreement, whereby Wolf would produce a
24    nostalgia show utilizing "The Platters", called "Golden Memories on
25    Tour".   Wolf's responsibilities for the tour, pursuant to the terms
26    of the agreement included, "negotiating on behalf of the show, and
27    coordinating the functions that go into the presentation of the

                                    2

1 show."  Soon thereafter, Wolf sought to exclusively manage Robi's
2 career as a performing artist.

3        3.     On November 18, 1983, Paul Robi and Howard Wolf
4 signed a one-year agreement whereby Wolf agreed to personally
5 manage Robi's career in exchange for 10% of Robi's gross
6 compensation.  The agreement provided that Wolf would advise and
7 counsel, *inter alia*, any and all matters pertaining to public
8 relations; the adoption of proper formats for presentation; and
9 other general practices in the entertainment industry.  Notably, a
10 provision informing Robi that Howard could not act as a talent
11 agent or seek or obtain employment for Robi was also included.  At
12 the expiration of the one-year agreement, Robi and Wolf agreed to
13 continue the relationship and executed ostensibly the same
14 agreement in both 1984 and 1985.

15        4.     On July 28, 1986, Paul Robi and Wolf appeared
16 to terminate the agreement by executing a mutual release from
17 liability.  The release provided in pertinent part:

18
19       "I hereby release you from any further liability or
        obligation to perform services under the aforesaid
20      Personal Management agreement and I release you from any
        obligation or claim to obligations for services rendered
21      or required to be rendered under that agreement in the
        past.  In doing so I waive all claims against you, known
22      or unknown..."
23

24        5.     The testimony conflicted as to why the parties
25 executed the release and whether the release truly manifested the
26 parties intent.   The petitioner argued the release was a sham
27 designed to protect the assets of the relationship from Wolf's

                             3

1  pending bankruptcy petition and further argued the parties
2  continued to function as they always had.   The petitioner
3  established through documentary and testimonial evidence, that
4  irrespective of the mutual release, Wolf continued to act as Robi's
5  personal manager via an oral agreement under the same terms.  Robi,
6  supplied deposit statements evidencing the collection of
7  commissions by Wolf for performances completed after the mutual
8  release was executed by the parties.  In short, it was clear the
9  parties acted under the terms of an oral agreement for continued
10 representation and the mutual release, prepared by Wolf, was not
11 the true intent of the parties.

12        6.   In support of Robi's allegation that Wolf acted as
13 a talent agency by procuring work, Robi introduced several
14 "Agreements".   The "Agreements", admittedly prepared by Wolf,
15 contained all of the material terms between the artist [Robi], and
16 the purchaser of talent [venue], including compensation and
17 perquisites.  Wolf unconvincingly argued that the petitioner would
18 procure the engagements herself on behalf of her husband, and then
19 phone in the information to Wolf who would simply fill in the terms
20 on his preprinted agreement forms.   This testimony was not
21 credible.   In sum, it was Wolf who negotiated the terms of the
22 deals and it was Wolf who procured these engagements on Robi's
23 behalf.

24        7.   On February 25, 1988, Paul Robi, unequivocally
25 terminated the relationship with Howard Wolf.  In 1989 Paul Robi
26 passed away and control of the estate passed to the petitioner.
27 Throughout the latter part of Paul Robi's life and thereafter, the

                                4

1  petitioner was engaged in several lawsuits, litigating the right to
2  control "The Platters" name.  In 1990, the petitioner prevailed in
3  one federal lawsuit and was awarded $3,510,000.00.  As a result of
4  petitioner's victory in the federal action, the respondent filed
5  two state court actions against the petitioner in 1996 and 1998,
6  seeking 10% of the $3,510,000.00 award and 10% of all gross income
7  for the sale of a Platters' recording.  The second state action is
8  stayed   pending   this   Labor   Commissioner's   Determination   of
9  Controversy.

10

11                          CONCLUSIONS OF LAW

12        .   1.   Labor Code §1700.4(b) includes "musical artists" in
13  the definition of "artist" and petitioner is therefore an "artist"
14  within the meaning of §1700.4(b).

15           2.   The primary issue is whether based on the evidence
16  presented at this hearing, did the respondent operate as a "talent
17  agency" within the meaning of §1700.40(a).  Labor Code §1700.40(a)
18  defines "talent agency" as, "a person or corporation who engages in
19  the occupation of procuring, offering, promising, or attempting to
20  procure employment or engagements for an artist or artists."

21           3.   Labor Code section 1700.5 provides that "no person
22  shall engage in or carry on the occupation of a talent agency
23  without   first   procuring   a   license   therefor   from   the   Labor
24  Commissioner."   There   was   some   testimony   that   the   respondent
25  obtained a talent agency license, but did not act as petitioner's
26  talent agency.  The express relationship between Robi and Wolf was
27  a personal management agreement.   Therefore, whether respondent

                                    5

1   obtained a talent agency license is irrelevant for this proceeding.
2   A manager may not switch hats.   If the manager embarks on a
3   personal management relationship with a client, and subsequently
4   obtains a talent agency license, the possession of a talent agency
5   license will not insulate a manager acting as an agent for his
6   client from liability.   Any person obtaining employment for an
7   artist will be subject to all of the state's talent agency
8   requirements.

9           4.   In Waisbren v. Peppercorn Production, Inc (1995) 41
10  Cal.App.4th 246, the court held that any single act of procuring
11  employment subjects the agent to the Talent Agencies Act's
12  licensing requirements, thereby upholding the Labor Commissioner's
13  long standing interpretation that a license is required for any
14  procurement activities, no matter how incidental such activities
15  are to the agent's business as a whole.   Applying Waisbren, it is
16  clear respondent acted in the capacity of a talent agency within
17  the meaning of §1700.4(a).

18          5.   Respondent argued the petitioner did not meet her
19  burden of proof.   The burden of proof is found at Evidence Code
20  §115 which states, "[e]xcept as otherwise provided by law, the
21  burden of proof requires proof by preponderance of the evidence."
22  Further, McCoy v. Board of Retirement of the County of Los Angeles
23  Employees Retirement Association (1986) 183 Cal.App.3d 1044 at 1051
24  states, "the party asserting the affirmative at an administrative
25  hearing has the burden of proof, including both the initial burden
26  of going forward and the burden of persuasion by preponderance of

27

6

1    the evidence (cite omitted).   "Preponderance of the evidence"
2    standard of proof requires the trier of fact to believe that the
3    existence of a fact is more probable than its nonexistence.   In re
4    Michael G. 74 Cal.Rptr.2d 642, 63 Cal.App.4th 700.

5         6.     Here, the petitioner has established by a
6    preponderance of the evidence the respondent procured employment
7    reflected by the petitioner's credible testimony, and supported by
8    several "Agreements" between Robi and the purchaser of the
9    performance, negotiated and completed by the respondent.   The
10   defense proffered by respondent that all of these "Agreements" were
11   actually procured by the petitioner was not supported by the
12   evidence.   The evidence presented satisfies the minimal standard
13   described in Waisbren.

14        7.    Finally, the respondent argues that the petition
15   should be dismissed because the statute of limitations for a
16   violation of the Act had run.   Labor Code §1700.44(c) provides that
17   "no action or proceeding shall be brought pursuant to [the Talent
18   Agencies Act] with respect to any violation which is alleged to
19   have occurred more than one year prior to the commencement of this
20   action or proceeding.

21        8.    Petitioner alleges violations that occurred between
22   1983 and 1988.   The petition was filed on September 1, 2000.   The
23   question arises whether the management agreements can be voided.
24   They can.   The recent California Supreme Court case of Styne v.
25   Stevens 26 Cal.4th 42, held, "that statutes of limitations do not
26   apply to defenses..... Under well-established authority, a defense

27

7

1    may be raised at any time, even if the matter alleged would be

2    barred by a statute of limitations if asserted as the basis for

3    affirmative relief. The rule applies in particular to contract

4    actions. One sued on a contract may urge defenses that render the

5    contract unenforceable, even if the same matters, alleged as

6    grounds for restitution after rescission, would be untimely. Styne,

7    supra at p. 51; 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, §

8    423, p. 532.

9         9.    We thus conclude, §1700.44(c) does not bar the

10   petitioner from asserting illegality of the contracts in defense of

11   respondent's superior court action for breach of contract.

12        10.   The aforementioned 1983, 1984, 1985 and subsequent

13   oral agreements between the parties are hereby void *ab initio* and

14   are unenforceable for all purposes.  Waisbren v. Peppercorn Inc.,

15   supra, 41 Cal.App. 4th 246; Buchwald v. Superior Court, supra, 254

16   Cal.App.2d 347.  Moreover, a release from liability for a voided

17   contract also has no bearing.

18

19

20                              ORDER

21        For the above-stated reasons, IT IS HEREBY ORDERED that

22   the 1983, 1984, 1985, and subsequent oral contracts between

23   petitioner MARTHA ROBI and HOWARD B. WOLF, are unlawful and void *ab*

24   *initio*.    Respondent has no enforceable rights under those

25   contracts.

26

27

                                8

Dated: March 21, 2002

DAVID L. GURLEY
Attorney for the Labor Commissioner

ADOPTED AS THE DETERMINATION OF THE LABOR COMMISSIONER:

Dated: March 21, 2002

ARTHUR S. LUJAN
State Labor Commissioner

9

## DECLARATION OF SERVICE BY OVERNIGHT COURIER

Case Name:   **Siegel, Rick v. Julie Su**

No.:   2:17-cv-07203 CAS (SSx)

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter; my business address is: 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550.

On November 30, 2017, I served the attached **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF CALIFORNIA LABOR COMMISSIONER JULIE SU'S MOTION FOR JUDGMENT ON THE PLEADINGS (FED. R. CIV. P. 12(C))** by placing a true copy thereof enclosed in a sealed envelope with the **GOLDEN STATE OVERNIGHT**, addressed as follows:

Rick Siegel
22971 Darien Street
Woodland Hills, CA 91364

*Pro per*

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on November 30, 2017, at Sacramento, California.

| Tursun Bier | */s/ Tursun Bier* |
|:---:|:---:|
| Declarant | Signature |

SA2017109057
12896255.docx