Rick Siegel
22647 Ventura Boulevard, Suite 451
Woodland Hills CA 91364
323.864.7474 phone
rick@marathonentco.com
Acting pro per

FILED

2017 DEC 29  PM 1:56

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
LOS ANGELES

---

**RICK SIEGEL**, an individual,

                    Plaintiff,

          vs.

**JULIA SU**, in her official capacity as the
California State Labor Commissioner

                    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.   2:17-cv-07203 CAS (SSx)

**OPPOSITION TO DEFENDANT'S
MOTION FOR JUDGMENT ON THE
PLEADINGS**

Date:            February 12, 2018
Time:            10AM
Courtroom:       8D
Judge:           Hon. Christina A. Snyder
Trial Date:      None Set
Action Filed:    September 29, 2017

---

1

## TABLE OF CONTENTS

INTRODUCTION                                                         Pg. 2

STATEMENT OF FACTS                                                   Pg. 3

I.      THE TAA IS ANTIQUATED AND DEFENDANT'S
        ENFORCEMENT IS INDEFENSIBLE                                  Pg. 2

II.     AS ENFORCED, THE TAA HAVE NO RATIONAL
        RESEMBLANCE TO ITS STATED MISSION, PROTECTING
        MORE THAN REGULATING AGENTS                                  Pg. 7

III.    THE TAA DOES NOT STAUTORILY PROHIBIT THOSE
        WITHOUT A TALENT AGENCY LICENSE FROM PROCURING  Pg. 11

LEGAL STANDARD                                                       Pg. 11

ARGUMENT                                                             Pg. 12

I.      DEFENDANT CLAIMS TAA IS NOT UNCONSTITUTIONALLY
        VAGUE, BUT CANNOT POINT TO THE NEEDED
        STATUTORY EVIDENCE                                           Pg. 12

        A. Legal Standard For Vagueness Claims                       Pg. 13

        B. The Act as Written Does Not Clarify Who Or What
           Is Regulated                                              Pg. 13

        C.  The TAA Is, In Fact, Standardless                        Pg. 18

        D. Claiming The TAA Has Clear Notice Of Consequences
           Violators Face Is Past Disingenuous, It Is Shameful       Pg. 19

           1.  The TAA Has No Notice Of Penalty, Fine, Felony
               Misdemeanor or Remedy                                 Pg. 19

           2.  TAA Enforcement Is Founded Upon Faulty Precedents     Pg. 21

        E. Defendant's Claims Of Issue Preclusion Is Meritless       Pg. 24

II.    **AS IT MAKES CA.-BASED ARTISTS AND MANAGERS USE IN-STATE LICENSEES TO DO BUSINESS OUTSIDE THE STATE, THE TAA BURDENS INTERSTATE COMMERCE AND THUS, IS UNCONSTITUTIONAL**    Pg. 27

III.    **CONCLUSION**    Pg. 30

## FEDERAL CASES

Balistreri v. Pacifica Police Dept., 901 F2d 696, 699 (1990)      Pg. 11

BMW of America v. Gore, 517 U.S. 559, 574 (1995)      Pg. 21

Cahill v. Lib. Mut. Ins. Co., (1996, 9th Cir.) 80 F.3d 336      Pg. 11

Conley v. Gibson, 355 US 41 (1957)      Pg. 11

Desertrain v. City of Los Angeles, 754 F 3d 1147      Pg. 18

De La Cruz v. Tormey, 582 F2d 45, 48 (1978)      Pg. 11

FCC v. Fox Television Stations, Inc., 132 S. Ct      Pg. 13, 15, 17

Goldfarb v. Va. State Bar, 421 U.S. 773 (1975)      Pg. 28

Grayned v. City of Rockford, 408 U.S. 104 (1972)      Pg. 7, 13, 18

Healy v. Beer Instit., 491 U.S. 324 (1989)      Pg. 28

Heitt v. United States, 415 F.2d 664      Pg. 15-16

Human Life of Wash. Inc. v. Brumsickle, 624 F.3d 990 (2010)      Pg. 16

Muskrat v. United States, 219 U. S. 346 (1911)      Pg. 11

Pacific Bell LLC v. Public Utilities Commission, 140 4th 718, 736 (2006)      Pg. 7

Pest Committee v. Miller, 626 F3d 1097      Pg. 18

Poe v. Ullman, 367 U. S. 497 (1961)      Pg. 11

Preston v. Ferrer, 552 U.S. 346 (2008)      Pg. 27

Sam Francis Foundation v. Christies, 784 F.3d 1320 (2015)      Pg. 28-30

U.S. v. Evans, 333 U.S. 483, 495 (1948)      Pg. 19

U.S. v Williams, 553 U.S. 285 (2012)      Pg. 13, 19

Valley Bank of Nev. v. Plus Sys., Inc., 914 F.2d 1186 (1990)      Pg. 29

## CALIFORNIA STATE CASES

Agricultural Lab. Relations Bd. v. Superior Court, 16 Cal.3d 392 (1976)      Pg. 20

Albaugh v. Moss Constr. Co., 125 Cal. App. 2d 126 (1954)                    Pg. 23-24

Beverly v. Anderson 76 Cal.App.4th 480 (1999)                               Pg. 4-5

Buchwald v. Superior Court, 254 Cal. App. 2d 347 (1967)             Pg. 2-3, 10, 20, 24

CA Mfrs. Assn. v. Public Utilities Com. 24 Cal.3d 836 (1979)               Pg. 4-5

Central Delta Water Agency v.
         State Water Resources Control Bd. 17 Cal.App.4th 621 (1993)        Pg. 4-5

Dyna-Med. v. Fair Emp. & Housing Comm., 43 Cal. 3d 1385 (1987)             Pg. 20

Gatti v. Highland Park Builders Inc., 27 Cal 2d 687, 689 (1947)            Pg. 23, 24, 25

Hall v. Bureau of Employment Agencies 64 Cal.App.3d 482 (1976)            Pg. 20-21

Human Life of Washington Inc v. Brumsickle, 624 F 3d 990 (2010)           Pg. 15

Loving & Evans v. Blick, 33 Cal. 2d 603 (1949)                            Pg. 23, 24, 25

Lucido v. Superior Court (1990) 51 Cal.3d 335 (1990)                      Pg. 25

Marathon v. Blasi, 42 Cal. 4th 974 (2008)                    Pg 5, 6, 10, 12, 13, 15, 20, 21

Montana v. United States, 400 U.S. 147 (1979)                            Pg 25

Murray v. Alaska Airlines, 50 Cal 4th 860 (2010)                         Pg. 25

Pacific Bell LLC v. Public Utilities Comm., 140 Cal. App. 4th 718 (2006)   Pg. 6

Rich v. State Board of Optometry (1965) 235 Cal.App.2d 591, 607          Pg. 4-5

Severance v. Knight-Counihan Co., 29 Cal.2d 561 (1947)                   Pg.23, 24, 25

Smith v. Bach, 183 Cal. 259 (1920)                                       Pg.23, 24, 25

Wachs v. Curry, 13 Cal. App. 4th 616 (1993)                             Pg. 20-21

Waisbren v. Peppercorn Prods, Inc., 41 Cal. App. 4th 246, 261 (1995)          Pg. 21-22

Wood v. Krepps, 168 Cal. 382 (1914)          Pg. 22-23, 24, 25


## NJ STATE CASES

State v. Fair Lawn Service Center, 120 A.3d 233 (NJ 1956)          Pg. 20


## CALIFORNIA STATE STATUTES

CA Labor Code
      § 1700.4 (a)          Pg. 13, 14
      § 1700.25          Pg. 3, 8
      § 1700.30          Pg. 14, 21
      § 1700.31          Pg. 3
      § 1700.33          Pg. 14
      § 1700.34          Pg. 14
      § 1700.35          Pg. 3, 8, 14
      § 1700.38          Pg. 14
      § 1700.39          Pg. 4, 8, 14
      § 1700.40          Pg. 14-15

CA Business & Professions Code (BPC)
      § 1714          Pg. 15
      § 7030          Pg. 23-24
      § 7031          Pg. 23-24

CA Civil Code
      §§ 1550, 1596, 1598, 1599, 1608, 1667, 3513          Pg. 21
      § 3523          Pg. 22
      § 3530          Pg. 21


## TALENT AGENCIES ACT CASES

Creative Artists Group v. O'Dell (TAC 26-99)          Pg. 5

Gittleman v Karolat, TAC 24-02          Pg. 6

Hyperion v. Toltec, TAC 1999-07          Pg. 9-10

<u>Manera v. Stamelman</u>, TAC 32-96                          Pg. 9

<u>Marathon Entertainment v. Rosa Blasi</u>, TAC 15-03       Pg. 4, 17

<u>Robi v. Wolf</u>, TAC (2000-29)                            Pg. 28

<u>Wesley Snipes v. Robinson</u> (TAC 36-96)               Pg. 5

## <u>SECOND RESTATEMENT OF JUDGMENTS</u>

§ 26(1)(d)                               Pg. 24
§28                                    Pg. 25
§ 28 (5)                                 Pg. 25
§ 28 (5) (i)                            Pg. 25-26

## <u>LAW REVIEW ARTICLES</u>

*Preclusion as to Issues of Law*: *The Legal System's Interest*
      Geoffrey C. Hazard Jr., Yale Law Faculty Scholarship Series     Pg. 24

Unforeseeable Preclusion and the Second Restatement,
      Cornell Law Review, Vol. 77, Issue 4                  Pg. 25-26

## <u>CALIFORNIA STATE REPORTS</u>

Opinion Letters of Labor Commission                  Pg. 10

## <u>PUBLICATIONS</u>

*William Morris Endeavor's Purchase of IMG Will Have*
      *Electrifying Effect on Sports Business*, Forbes          Pg. 8 Fn 4

*"Talent agents get into film fundraising,"* L.A. Times       Pg. 8, Fn, 3, 5

*The Truth About Packaging Fees*, FilmEscape.com         Pg. 8

"Packaging Prime Time," TVWEEK.com              Pg. 9, Fn. 5

"TV's Dirty Secret," Hollywood Reporter             Pg. 9

**INTRODUCTION**

As opposing counsel noted in the Labor Commissioner's Motion For Judgement on the Pleadings (MJP), the parties have had multiple conversations over the last few months.

Recognizing the Plaintiff (Siegel) is an authority of the Talent Agencies Act (TAA, Act), the Deputy Attorney General (DAG) wondered about day-to-day realities. He asked, for instance, why personal managers just don't get talent agency licenses? Was it, as many think, that managers did not want to be limited by a ten percent commission limit?

"No," he was told, "The Act has no percentage limit for compensation. The choice not to get licensed is so managers can get paid anything at all." Managers work <u>with</u> agents, not compete with them; a manager wanting an agent-less client is an outlier. A license would eliminate that synergy: each artists' guild (SAG-AFTRA, EQUITY, DGA and WGA, via their by-laws, limit <u>cumulative</u> talent agency compensation to 10% (ten percent). As the standard talent agency compensation is 10%, once the licensed agency gets paid, there is no money left to pay the 'licensed manager.'

"Why," DAG asked, "doesn't the management community lobby the Legislature?"

"Simple. There is nothing for the Legislature to do. We cannot ask for the penalty provision to be removed or modified, as there is none. We cannot ask it to remove the clause expressly stating only talent agency licensees can procure for an artist, or that expressly bans non-licensees from engaging in procurement activities, as no such statute exist.

The other licensing schemes that do bar non-licensees from engaging in an activity have written statutes expressly doing so. The TAA does not. Why, then, is the TAA enforced like licensing schemes that have express verbiage that the TAA does not? Every rule of statutory construction informs the Labor Commissioner (Defendant, LC) not to? Why is it enforced infinitely more severe – and infinite is the appropriate word because the difference between *no consequence* for engaging in a defined activity of a licensed occupation like the Accountancy, Psychology and the Landscape Architects Act – than *any remedy*, especially one that voids one's contractual rights, as the LC currently enforces the TAA.

The most discussed topic of the DAG's pre-motion discussions; ow the foundational precedent that all subsequent TAA cases rely upon to get their authority to disgorge or void a found violator's contract, 1967's <u>Buchwald v. Superior Court</u>, is bad law; misstating four

State Supreme Court holdings where that Court took its authority to void a violator's contract.

Buchwald contradicts four higher court precedents; all of them holding that without a penalty provision, adjudicators have no authority to void or otherwise infringe on a party's contractual rights. Defendant's principal brief begins by saying Plaintiff's action as that this is a constitutional challenge. While there are constitutional issues – violating the Dormant Commerce clause and the facial and as applied vagueness of the Act relevant to procurement, but first and foremost this Court is being asked to consider the statutory construction and misinterpretation issues.

The legitimacy of the Plaintiff's claims is undeniable. The Dormant Commerce clause claim mirrors a 2015 2015 Ninth Circuit case where a statute was found invalid pro se. The vagueness claim aligns with every legal tenet and precedent save those related to the TAA, including the four CA Supreme Court matters Buchwald purports to follow. As such, Plaintiff asks the Court to reject the Defendant's Motion.

## STATEMENT OF FACTS

### I.     The TAA Is Antiquated And Defendant's Enforcement Is Indefensible

The Legislature History shows the Act was enacted for moral, safety and fraud concerns, Among those detailed requirements:

§ 1700.25: After receiving "payment of funds on behalf of an artist," to disburse the monies "to the artist within 30 days after receipt." Repeating for emphasis: the TAA allows agents to hold the clients' revenues for a full month after receiving the clients' monies.

§ 1700.31: Talent agents are barred from knowingly issuing contracts "containing any term or condition, which, if complied with, would be in violation of law." A rule, of course, that pertains to every contract in every circumstance.

§ 1700.35. No talent agency shall knowingly permit, among other people of "bad character," any gamblers … to frequent, or be employed in, the place of business of the talent agency." Talent agencies not only represent professional poker players, they represent poker organizations. Plaintiff is unaware of the Defendant ever getting petitioned about a controversy related to talent agencies and gamblers.

**OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS**

§ 1700.39. "No talent agency shall divide fees with an employer, an agent or other employee of an employer." The biggest source of revenue for the major agencies is packaging, where they receive a percentage of the license fee and the profits directly from the studio and/or network. Plaintiff is unaware of the Defendant ever getting petitioned to oversee a controversy related to talent agencies and packaging, which usually results in the agency making more money than their client who actually does the work.

As Plaintiff writes in his Motion for Summary Judgment (MSJ) Pgs. 3-5, nowhere in the TAA's legislative history does it show the State was ever concerned about improper persons procuring work for an artist. At no time has the State discussed enacting statutes where potential talent agents must prove a level of training, competency or apprenticeship; the legislative history shows no concern unlicensed people may get artists meaningful employment with a third party.[1] There was never discussion to limit who were going to help artists get meaningful employment with a third party to talent agents: the State of California has never worried about an unlicensed person helping someone make millions of dollars on a long-running series or movie. But for some reason the LC has, and courts have, as lawfully obliged, have followed.

If, as the Defendant stubbornly claims, "Like other licensing statutes, the TAA prohibits unlicensed work," where is the statute saying that? Why, in the TAA does just listing the defining activities enough to create that prohibition, when all other licensing schemes feel the need to expressly state it statutorily? Does every other licensing scheme suffer from surplusage? Why, too, are there no controversies about unlicensed persons engaging in the defined activities of the Geologists, Psychologists, Landscape Architects and Accountancy, whose licensing schemes mirror the TAA in statutory language?

Defendant claims that because during the 1978 passage of the Talent Agencies Act, the Legislature raised and then rejected the idea of establishing a licensing scheme for personal managers, personal managers by default become subject to TAA regulation. (MJP, Pg 3, ln 26 –Pg 4, Ln. 1). Such thinking is opposite to CA. Law:

> "The rejection by the Legislature of a specific provision
> contained in an act as originally introduced is most persuasive to

---

[1] There were discussions by the CA Entertainment Comm., made up of artists, personal managers, talent agents and Defendant, but it made no such recommendations for the Legislature to affirm.

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

the conclusion that the act should not be construed to include the omitted provision." <u>Rich v. State Board of Optometry</u> (1965) 235 Cal.App.2d 591, 607; accord <u>California Mfrs. Assn. v. Public Utilities Com.</u> (1979) 24 Cal.3d 836, 845-846.) Similarly, '[t]he fact that the Legislature chose to omit a provision from the final version of a statute which was included in an earlier version constitutes strong evidence that the act as adopted should not be construed to incorporate the original provision.' <u>Central Delta Water Agency v. State Water Resources Control Bd.</u> (1993) 17 Cal.App.4th 621, 634."

<u>Beverly v. Anderson</u> (1999) 76 Cal.App.4th 480, 485-486.

It defies logic, and the law, to think that because the Legislature had decided not to regulate an occupation, that occupation then by default becomes regulated by a licensing scheme of a different occupation.

Defendant states that, "<u>Marathon v. Blasi</u>, 42 Cal 4th 974 reflects a typical dispute between an artist and a personal manager." MJP, Pg. 5, Lns. 8-15. Typical, yes, in that it shows the arbitrary, illogical, inconsistent and wrongful nature of TAA enforcement.

In <u>Marathon v. Blasi</u> (TAC-15-03) the Defendant ruled Marathon had violated the Act because "Siegel took the lead on many of the submissions he made on behalf of petitioner Blasi *before* discussing it with Mr. Kelly. Respondents made submissions on roles they thought petitioner Blasi was right for and sent out demo tapes of petitioner Blasi to some casting directors without the request of Bresler-Kelly..." <u>Id., pg 7, lines 3-8.</u>

But in <u>Wesley Snipes v. Robinson</u> (TAC 36-96) and <u>Creative Artists Group v. Jennifer O'Dell</u> (TAC 26-99), the Defendant determined the "requirements of the [Safe Harbor] statute cannot be construed to call for a game of 'Mother May I?' every time [a personal] manager takes some action during a long-term relationship … To find otherwise would be to ignore the realities of the day to day life in the [entertainment] industry."

Per <u>Snipes</u> and <u>O'Dell</u>, the TAA is not to be construed as to demand the personal manager waits for the agent's permission each and every time. Yet in <u>Marathon</u>, it was.

And per the Defendant, sending out submissions of pictures and resumes is lawful. Quoting the Labor Commissioner in defending a suit brought by the National Conference of Personal Managers, "Personal managers do not need a license to "send [] out resumes,

5

photographs, videotapes, or written materials for an artist." Exhibit 1: Pg. 28 of Appellee Principal Brief in National Conference of Personal Managers (NCOPM) v. Julia Su et al.

The Defendant also found Siegel violated the Act because he worked with Blasi's publicist to arrange three talk show appearances, THE LATE, LATE SHOW WITH CRAIG KILBORN, POLITICALLY INCORRECT and RENDEZ-VIEW, without involving the artist's talent agent. But in Gittleman v Karolat, TAC 24-02, decided just weeks before, the Labor Commissioner determined that a "talent agency license is not required for the procurement of a guest appearance on a talk show provided the appearance does not involve the rendition of artistic services." (Id., pg. 27.)

To summarize: (1) Siegel/Marathon was found to have violated the Act for activities that is not to be, per Snipes and O'Dell, the TAA is not to be construed as a violation because the actions were not first approved by the agent, and (2), Per the LC, Plaintiff's actions, both related to getting his client publicity opportunities and sending out sales materials, were lawful without need to involve an agent.

As sending the picture and resume is legal, and resumes have the name and phone number of the agent as well, is it unlawful for the manager to receive a response? Does it make sense, in the real world, for a manager to tell the casting director they must make another call, to the agent, and then hope that call is made and the client does not lose the opportunity? Isn't this exactly what the Labor Commissioner meant by saying the statute "cannot be construed to call for a game of 'Mother May I?'"

Siegel/Marathon was not accused of or found to have concealed conflicts of interests or send Blasi to houses of ill-repute under the guise of providing 'employment opportunities.' Working to get a client national exposure or working to get the quality of auditions Blasi wants her representatives to obtain is not "exploiting" the artist, it is working in her best interest. Marathon in no way was violating the foundational goals/missions of the TAA, but when it turned to a court to file a breach of contract action, Blasi petitioned the Labor Commissioner resulting in the above, inexplicable results.

How could Siegel/Marathon or any citizen look at the TAA as written and think that one needed a license to procure meaningful work for their client? Has anyone ever thought

they needed the related license before maintaining an outdoor area, keeping financial records or using psychological principles to affect another's behavior?

Should the existing precedents be enough? It has been proffered that the long-accepted enforcement is enough, but that is not the standard courts are to adhere. It must be on the page, in the statutes: "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." Pacific Bell LLC v. Public Utilities Commission, 140 4th 718, 736 (2006) quoting Grayned v. City of Rockford (1972) 408 U.S. 104, 108. The law, not the enforcement.

## II.    AS ENFORCED, THE TAA HAS NO RATIONALE RESEMBLANCE TO ITS STATE MISSION, PROTECTING MORE THAN REGULATING AGENTS

Quoting introduction of Defendant's brief:

> The "paramount goal" of the TAA "is to protect artists, and particularly young artists, from exploitation by unscrupulous promoters who offer them a 'foot in the door,' only then to take a disproportionate share of earnings or to arrange unsuitable professional engagements. To curb such abuses, the TAA requires licensed 'talent agencies' and 'agents' to safeguard artists' physical safety and financial interests. The Labor Commissioner oversees talent agencies to ensure that they are complying with the TAA's detailed requirements."
> MJP, Pg. 1, lns. 11-16.

> "From an early time, the Legislature was concerned that those representing aspiring actors might take advantage of them, whether by concealing conflicts of interests when agents split fees with the venues where they booked their clients, or by sending clients to houses of ill-repute under the guise of providing 'employment opportunities.' ... Exploitation of artists by their representatives has remained the Act's central concern ... to the present day." Id, Pg. 3, lns.1-9.

Exactly. The Act's legislative mission, unchanged for over a century, is to protect artists' safety, financial interests and most important, so they are not lured into unsuitable employment by employers masquerading as talent agents.

Defendant did not and cannot point to anything in the 104-year legislative record showing the State's legislature has ever been concerned of an improper person becoming an artist's procurement representative. There is no evidence the Legislature ever considered requiring proof of sales or negotiation training, a test of competency or getting tenured after an apprenticeship. While the LC and the courts have followed the decree that the Act's purpose is to keep improper persons from representing artists, here is no legislative history to buttress that assertion. It's simply a decades-old fable that is accepted as the reality.

California's official website has a library of two hundred and fifty-eight (258) TAA determinations from August 18, 1971 through May 8, 2013.[2]

The chart includes the date of issue of the determination, the parties, and the issues that the Defendant was asked to consider. In that 43-year period of time, not a single petitioner alleged that they were lured into unsuitable employment from an employer who had pretended to be a talent agent. There are no cases of an artist being lured into an unsafe environ. There has not been a legitimate government interest of this set of laws in more than a half-century. In addition, the Act is antique in some of its archaic requirements:

§ 1700.25: After receiving "payment of funds on behalf of an artist," to disburse the monies "to the artist within 30 days after receipt." Repeating for emphasis: the TAA allows agents to hold all of the clients' revenues for a full month after receiving the clients' monies, meaning artists may not get paid for six weeks after they have done the work. Such delays are not considered acceptable by modern standards.

§ 1700.35. No talent agency shall knowingly permit, among other people of "bad character," any gamblers … to frequent, or be employed in, the place of business of the talent agency." Talent agencies not only represent professional poker players, they represent poker organizations. Plaintiff is unaware of the Defendant ever getting involved in a controversy related to talent agencies and gamblers.

§ 1700.39, "No talent agency shall divide fees with an employer, an agent or other employee of an employer," is the one statute that mirrors the century-old mission of the licensing scheme, putting a conflict of interest barrier up; making sure the representative

---

[2] http://www.dir.ca.gov/dlse/DLSE-TACs.htm.

**OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS**

only serves the artist. However, in today's world, there is no bright line between employer and employment counselor. The Defendant has not acted as agencies become film financiers[3] and owning sports leagues while representing some of its athletes and teams.[4]

Plaintiff found only two of the 248 controversies where this seminal issue was at the fore. Each of them involve the concept of 'packaging,' which "is the fee that agencies get for finding all the creative auspices for a TV show and attaching them to the series before selling. In other words, it's what they get paid for packaging a TV show with writers, directors, actors and shopping the show to studios. The studio will then pay the agency an upfront package fee, along with a percentage (usually 10%) of the profits." [5]

"Agencies link actors, directors and writers from their client list and present ready-made projects to a studio or a network. The packaging fees from those films and TV shows are the lifeblood of the agencies, sustaining them through work shortages and other periods of volatility." L.A. Times Article Supra.

"The bulk of a talent agency's TV revenues come from packaging fees rather than straight commissions off of clients."[6]

"In many cases, the total payments to the agency are more than what the agency's client — on whose back it leveraged the package — makes on the show. Let me say that again: The agency can make more than its client."[7]

In <u>Manera v. Stamelman</u>, TAC 32-96, the Defendant found the personal manager's "efforts to secure a 2% profit participation contained in the 'deal memo' with Sony violated §1700.39. However, <u>Hyperion v. Toltec</u>, TAC 1999-07 speaks to how the Defendant "has

---

[3] *Talent agents get into Film Fundraising,* L.A. Times article by Clair Hoffman,

http://articles.latimes.com/2006/ nov/03/business/fi-agents30, November 3, 2006

[4] https://www.forbes.com/sites/darrenheitner/2013/12/18/william-morris-endeavors-purchase-of-img-worldwide-will-have-electrifying-effect-on-sports-business/#66b37e9f71bc;
http://www.latimes.com/entertainment/envelope/cotown/la-et-ct-business-ufc-wme-img-20160711-snap-story.html.)

[5] *The Truth About Packaging Fees,* FilmEscape.com, August 15, 2015 article; Charlie Sierra.

[6] http://www.tvweek.com/in-depth/2003/07/packaging-prime-time.

[7] https://www.hollywoodreporter.com/news/gavin-polone-tvs-dirty-secret-783941

historically taken the position that 'packaging arrangements' are exempt from state regulation, and that the Labor Commissioner lacks jurisdiction."

Its rationale is taken from an October 30, 1998 Opinion Letter of the Defendant,[8] where it explains, "A 'package' agreement, or 'packaging agreement' as the term is customarily understood in the television and motion picture industries is more analogous to selling an idea or a concept … the concept of packaging is s 'pitch' that must be sold prior to any procurement of employment.

"A traditional packaging agreement also includes putting together the talent and production for the project. It is then sold to a producer in this completed 'packaged' form." Id., Pg. 16, ln. 26 – Pg. 17, ln. 17.

This explanation is a concocted, tortured way to allow agencies to package despite the law against it and showing a complete lack of understanding of how show business works. This waiver/exception, which as noted above, changes the potential of earnings for an agency from a percentage of what the artist makes to allowing them to "make more than its" client who is doing the actual labor, undermines one of the stated rationales for creating the Talent Agencies Act in the first place.

Defendant wrongly states that a producer is the eventual buyer of a package. In reality, it is a studio or network and a producer is most likely one of the package's elements. It is unthinkable for there to no employment intrinsic to a package: attaching a writer, actor, or director requires paying the artist for their involvement and labors. Furthermore, agencies rarely are offered package agreements on a project without a script, so a script purchase is an element of the transaction. If there is no script, no producer, no writer either to have written or is obligated to provide writing services, it is simply a talent deal – and there is never a packaging guarantee to such transactions.

The TAA is supposed to protect the artist. By twisting the elements of what packaging is to allow agencies to package, as the Defendant does now, the TAA does just the opposite: it protects talent agencies' interests over artists.

---

[8] DLSE Website has Opinion Letters from 1983-2016 (http://www.dir.ca.gov/dlse/OpinionLetters-byDate.htm) but for whatever reason, the 10.30.1998 letter is not included.

10

### III. The TAA Does Not Statutorily Prohibit Those Without A Talent Agency License From Procuring

Yes, the TAA requires one to obtain a license before engaging in the occupation of talent agent. And yes, courts since Buchwald v. Superior Court, 254 Cal. App. 2d 347 (1967) have unanimously found that "it is the act of procuring (or soliciting), not the title of one's business, that qualifies one as a talent agency." Marathon, 42 Cal. 4th at 986.

Those facts do not change this real-world fact: unlike all statutory schemes that prohibit unlicensed persons from engaging in a defining activity of a regulated occupation, the TAA has no statute that expressly reserves procurement to licensees, or conversely, prohibits non-licensees from engaging in the defined activity. The TAA as written mirrors the licensing schemes, like the Psychology and Accountancy Acts, where it is not unlawful to engage in the occupation's defining activities, but to hold oneself out as a licensee. These facts should lead courts to enforce the TAA like the latter Acts and rather than enforcing an unwritten prohibition.

### LEGAL STANDARD

The traditional function of a motion on the pleadings is to test the legal sufficiency of the claims stated in the complaint. The court is to (1) construe the complaint in the light most favorable to the plaintiff; (2) accept well-pleaded factual allegations as true; and (3) determine whether plaintiff can prove any set of facts to support a claim that would merit relief. Cahill v. Lib. Mut. Ins. Co., (1996, 9th Cir.) 80 F.3d 336, 337-338. **"Unless the answer is unequivocally "no," the motion must be denied."** Conley v. Gibson, (1957) 355 US 41, 45-46, 78 S.Ct. 99, 102; De La Cruz v. Tormey, 582 F2d 45, 48 (1978, 9th Cir.).

Dismissal is proper only when there is either a "lack of cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory. " Balistreri v. Pacifica Police Dept.,, 901 F2d 696, 699 (1990, 9th Cir). Per Rule 8 of the Federal Rules of Civil Procedure, a complaint shall not be dismissed for failure to state a claim as long as it puts the defendant on notice of the gravamen of the plaintiff's complaint and includes the "short and plain statement of the claim showing that the pleader is entitled to relief." The U.S. Supreme Court set out the pleading requirement decades ago in Conley v. Gibson, 355 U.S. 41 (1957).

Conley holds, "[T]he accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Federal courts have applied that standard for 50 years to refuse to dismiss complaints containing the barest of allegations.

This matter meets the conditions necessary for it to be justiciable by a Federal Court: (1) The parties are not seeking an advisory opinion; Plaintiff is seeking declarative and injunctive relief; (2) There is an actual controversy between the parties (Muskrat v. United States, 219 U. S. 346 (1911)); and (3) The question is neither unripe nor moot Poe v. Ullman, 367 U. S. 497 (1961); DeFunis v. Odegaard, 416 U. S. 312 (1974).

## ARGUMENT

## I.   DEFENDANT CLAIMS TAA IS NOT UNCONSTITUTIONALLY VAGUE, BUT CANNOT POINT TO THE NEEDED STATUTORY EVIDENCE

The Defendant claims that because: (1) the TAA "prohibits unlicensed persons from 'procuring employment' for artists," (2) a reasonable person knows the dictionary definition of the word 'procure', and (3) there are multiple court cases that have assumed the Act gives the Labor Commissioner the right to void contracts, the TAA is not standardless and should be found constitutional.

Defendant knows these claims are disingenuous. She knows, for example the TAA has no statutory prohibition of any activity. If asked the question, "Is the defining activity of licensing scheme axiomatically the sole dominion of licensees," the Labor Commissioner would answer, "Of course not. There must be an expressed, written prohibition inside the statutes." And she knows the TAA has no statute either limiting procurement for artists to licensees or prohibiting non-licensees from engaging in that activity.

Defendant knows Plaintiff is not saying the plain meaning of procurement is obtuse, but there is vagueness as to which activities are illicit. It is something, "the Labor Commissioner has struggled over time to better delineate which actions involve mere general assistance to an artist's career and which stray across the line to illicit procurement," (Marathon at 989), because the TAA does not further delineate what activities are involved with procurement.

Plaintiff knows there may be nothing more difficult than upending long-standing legal precedent. If Galileo had to convince a bunch of lawyers, there'd be no globes today," having to fight thousands of years of 'settled science' of the world being flat. In the legal world, that would be so well-settled that it would be impossible to change that truth. But just as we recognize 'two wrongs don't make a right,' 50 years of TAA wrongs is unacceptable.

### A. Legal Standard For Vagueness Claims

"[I]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined," Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). Laws, as written must provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." Id. ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.")

"[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." FCC v. Fox Television Stations, Inc.  567 U.S. ___, p. 2 (2012).

A statute cannot be "so standardless that [they] authorize or encourage seriously discriminatory enforcement." United States v. Williams, U.S. 553 U.S. 285, 303 (2012). The TAA's lack of a penalty provision is reflexively standardless; without guidelines, it requires arbitrary enforcement; creating remedies is a legislative, not judicial function.

### B.  As Written, The Act Does Not Clarify What Is Prohibited

If the TAA has a statute that expressly states what actions are prohibited and which are allowed, why does the Defendant continually only lead Court to the statute that lists the defining activities of a talent agent? How can Defendant feign there is clarity without a statute specifically noting what activity[ies] are the exclusive domain of licensees, or what activities non-licensees are prohibited from engaging in?

In arguing the clarity of who is subject to the TAA, Defendant notes the CA. Supreme Court holds that the TAA "regulates conduct, not labels; it is the action of *procuring* (or

13

soliciting), not the title of one's business, that qualifies as a talent agency," <u>Marathon</u> 42 Cal. 4th at 986, **and** the Act does not regulate the "**advice, direction, coordination, and oversight with respect to an artist's caree**r or personal or financial affairs." See MJP, Pg. 9, Lns. 18-23; emphasis added. But like procuring, advice and direction are statutorily defined activities.

CA. Civ.Code § 1700.4 (a) lists three defining activities: **procuring, counseling and directing**: Talent agency is defined as "a person or corporation who engages in the **occupation of procuring,** offering, promising, or attempting to procure employment or engagements for an artist or artists, except that the activities of procuring, offering, or promising to procure recording contracts for an artist or artists shall not of itself subject a person or corporation to regulation and licensing under this chapter. Talent agencies may, in addition, **counsel or direct artists in the development of their professional careers."**

There is no accompanying probationary provision to procurement, no allowance provision for counseling and directing: the judicial enforcement is based on the Defendant's interpretation. With no further delineation, how would anyone know they cannot engage in one of them but can engage in the other two. As no reasonable person can answer this question simply by reading the Act as written, it does not pass constitutional scrutiny.

Had the Legislature wanted to bar unlicensed individuals from procuring employment for an artist, the logical action, and one that would clearly have passed the constitutional bar of clarity, was to have codified verbiage that said just that: "Only licensees can procure or effort to procure employment for an artist. It is a violation of the act to engage in those activities without the requisite license." The Legislature did not do that.

Had the Legislature wanted to regulate conduct, and not labels, why did they put an occupational label on it versus clearly regulating the activity of procurement; or call it the Talent Representatives Act? After all, attorneys, personal managers, publicists and producers all get involved in the procurement process and as enforced, only licensees can procure. Plaintiff argues the reason is the Legislature only wanted to regulate talent agents.

Or at minimum, the Act could specifically speak to the conduct of procurement in the way it did relating to the sale of an agency (§ 1700.30), places where artists can be sent to work (§ 1700.33), where and how it can procure work for minors (§§ 1700.34, 1700.36),

who can visit the agency (§ 1700.35), secure employment where there are labor issues (§ 1700.38), who they can share fees with (1700.39), and prohibiting agents from collecting fees to work for the artist or referring an artist to a service entity that they have a financial interest in (§ 1700.40).

"Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'" FCC v. Fox Television Stations, Inc., 132 S. Ct. at 2317. Unlike with the above statutes, the TAA does not expressly speak to procurement being regulated and thus does not satisfy the bar of FCC.

As the TAA does not elucidate on what is meant by procurement in 1700.4 (a), it is also a constitutional fail. Heitt v. United States, 415 F.2d 664 (1969) found a licensing scheme "designed to solicit business in connection with the procurement thereof" was unconstitutionally vague; not because the term 'solicit' was unclear, but because the term was "nowhere further defined." Id. at 670.

> … [A]s we have pointed out § 1714 defines all information about foreign divorces designed to solicit business in procuring a divorce as non-mailable matter, without limitation as to whether the addressee has requested the information, regardless of its truth or falsity, and regardless of the relationship between the parties. In the case at bar, in fact, the information was sent in response to inquiries. We can easily see, if the statute can apply to the case at bar (and from the wording of the statute we cannot say that it does not), that an attorney writing to a client of long standing to discuss a question regarding a foreign divorce, even one that the parties had already contemplated in a face-to-face meeting, could realistically be uncertain whether he was violating the statute. The trial court was concerned that such businesses as airlines and hotels might unwittingly violate § 1714 by advertising or service to customers. These may be reasonable interpretations of the statute as it is written.
> …
> "In short, because the meaning of "solicitation" is not clear, anyone who sends foreign divorce information through the mails to another with whom he has a business relationship cannot be certain whether his conduct is legal or not. As a

**OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS**

1   statute affecting speech, § 1714 fails to measure up to a strict
    standard of specificity." Id. at 671.

2

3       Marathon found the terms procuring and soliciting synonymous ("it is the act of

4   procuring (or soliciting), not the title of one's business, that qualifies one as a talent agency."

5   42 Cal. 4th at 986). And like Heitt, Marathon noted that the TAA "contains no definition" of

6   the term, "and the Labor Commissioner has struggled over time to better delineate which

7   actions involve mere general assistance to an artist's career and which stray across the line to

8   illicit procurement." Id. Following Heitt, with no further delineation of what procurement

9   entails, the TAA, too, fails to measure up to a strict standard of specificity.

10      Defendant wants this Court to follow Human Life of Washington Inc v. Brumsickle,

11  624 F 3d 990 (2010) that because a reasonable person knows the "ordinary, common

    meaning" (Id. at 1021) of the term "mass communication," the statute is not vague.

12  However, Human Life ruled that way only after a full analysis revealed the only

13  communication not covered by what was entailed in the statute defining the term "political

14  advertising" was a telemarketing campaign. As the telemarketing "campaign clearly falls

15  within the ordinary meaning of 'mass communication and that there was no reason to believe

16  that the scope of that term will be overly vague in the vast majority of its intended

17  applications.'" Id.

18      The case at bar is much more complex: rather than one relevant element that Human

19  Life had to analyze, 'procurement' has a litany of elements.

20      Lining up the procurers/sales teams is clearly part of the procurement process – can a

21  personal manager find their artist client a licensed agency to act as the sales team, or must

22  the agent find the personal manager for the artist? The TAA does not say.

23      Can the unlicensed personal manager create the sales materials? It is uniformly

24  accepted that personal managers, not agents, work with the artist to build the right demo reel,

25  choose the right headshots, hone the spec script, etc.; but is it lawful? The TAA does not say.

26      Can the unlicensed personal manager send out a client/artist's picture and resume to a

27  potential buyer? As noted earlier, The Labor Commissioner has been definitive on this issue:

    **"Personal managers do not need a license to "send [] out resumes, photographs,**

28

videotapes, or written materials for an artist." Exhibit 1: Pg. 28 of <u>Appellee's Principal</u> <u>Brief in National Conference of Personal Managers (NCOPM) v. Julia Su et al.</u>

**For decades, the sending out of the above sales materials violated the Act. (See, for instance, <u>Blasi v. Marathon</u>, TAC 2003-15, <u>pg 7, lines 3-8.</u>) This material change in the law moots Defendant's claim of issue preclusion.**

Knowing personal managers can lawfully submit only adds to the confusion. If they follow up the submission with a phone call, is that a violation? The TAA does not say.

If the person who receives the lawful submission then calls the personal manager and the manager takes the call, have they violated the Act? The TAA does not say.

If the person who receives the lawful submission then calls the personal manager, and that is lawful, and offers the artist a job; is that a violation? The TAA does not say.

What if the person who receives the lawfully submission calls the personal manager, and that is lawful, and offers the artist a job, and that is lawful; if the manager asks for more money than what is offered, does that violate the Act? The TAA does not say.

What if the personal manager sends nothing out but gets a cold call asking about their client's availability? If the manager answers, have they violated the Act? The TAA does not say. If that unexpected caller asking about the client's availability then offers the client a job, with zero solicitation on the part of personal manager, is that a violation of the Act? The TAA does not say. If all of that is legal but the personal manager than asks the buyer to provide transportation, does that violate the Act? The TAA does not say.

If a personal manager gets a call about a client who has a reoccurring role on a series because the series is interested in booking the client for the twentieth time and called the manager because the agent had not returned the buyer's call, does that violate the Act? The TAA does not say.

If any part of the above is unlawful, but the personal manager receives a late-night phone call asking if the client is available to report for work for a 7:00AM call the next day and they buyer had already tried to reach the licensed agent but the agency had closed, can the personal manager accept the offer or must the manager refuse to take the offer and have the client lose the job? Or does the manager need to give up the privacy of his client and give the buyer a way to contact the artist directly, and if that job ends up being the pilot for

FRIENDS, does the manager have to agree not to commission that ten years of work or otherwise violate the Act? The TAA does not say.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required," FCC Supra at 2317, thus reaffirming the constitutional mandate "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Grayned 408 U.S. at 108.

In Desertrain v. City of Los Angeles, 754 F 3d 1147, the Ninth Circuit noted that a statute outlawing people sleeping in their cars was unconstitutionally vague because, like the unanswerable questions above, the City statute left too many open questions, "making it impossible for citizens to know how to keep their conduct within the pale. ... Because [the statute] fails to draw a clear line between innocent and criminal conduct, it is void for vagueness." Id. at 1156.

In the MJP (Pg 12, lines 22-28), Defendant writes that the "generalized distribution of information" is lawful, but not "for the purpose of obtaining a specific engagement for the artist." Is this another change in the law without statutory direction? If Defendant is unsure of the circumstances sales materials can be sent out, how can anyone else know how to "act accordingly," as Grayned states is necessary for the statute to be constitutional. The question is rhetorical; they cannot. As it is impossible to read the Act and know where the line is to act accordingly, the Act does not meet the standard needed for constitutionality.

## C.    The TAA Is, In Fact, Standardless

Defendant introduces its sufficient legal standards section with an incomplete cite from Pest Committee v. Miller, 626 F3d 1097, 1111: 'The TAA also 'provides explicit standards for those who apply it.'"

Here is the cite in full: "To determine whether a statute is unconstitutionally vague as applied, a two-part test is used: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it. [Citations omitted.] Objections to vagueness ... rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." Id.

Plaintiff assumes Defendant chose to edit out the latter part because no one, reasonable or otherwise, can find a statute codifying any risk to any conduct discussed therein as no such statute exists.

While the Act bars agencies from working with gamblers, there is no notice of any risk for doing so. While it bars an agency from being sold without first obtaining permission from the Labor Commissioner, there is no notice of any risk for doing so. While it bars sending artists to jobs where there is labor unrest, there is no notice of any risk of doing so. While the TAA requires its licensed agencies to post the Act in a conspicuous place, there is no notice of any risk for not doing so. The TAA bars an agency from collecting fees from the buyer, but there is no notice of any risk for doing so.

The TAA does not have a statute barring non-licensees from engaging in any of the three defining activities of a talent agent – directing, counseling or procuring – and there is no notice of any risk for engaging in this – or any other – activity.

"What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." U.S. v Williams Supra at 306. Without any statutes providing the needed clarification as to what is and is not prohibited, and without any penalty provisions, the TAA is, despite Defendant's protestations, standardless.

**D.    Claiming The TAA Has Clear Notice Of Consequences Violators Face Is Past Disingenuous, It Is Shameful**

    **1.    The TAA Has No Notice of Penalty, Fine, Felony, Misdemeanor or Remedy**

This suit alleges that Californian citizens are being wrongfully and unconstitutionally compromised because of the vague nature and arbitrary enforcement of the Talent Agencies Act. One would expect that the State – here, specifically, the Labor Commissioner and the Attorney General's office – would be invested in making sure our laws were constitutional and fair. At a minimum, wouldn't one expect that as Defendants, they would not do anything in their court papers that others might look at askance?

Why would those empowered to protect Californians when they have been damaged edit cites to change their meaning in an effort to keep an unjust status quo?

**OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS**

It is undebatable that "Clear notice" is when there is clarity inside of a statute as to who and what is being regulated, and what the penalty/fine/remedy/consequence is for violating the regulation.

"The [Talent Agencies] Act is silent – completely silent – on the subject of the proper remedy for illegal procurement." (Marathon Supra at 985.) Period, end of story.

Defining [violations of law] and fixing penalties are legislative, not judicial, functions. U.S. v Evans, 333 U.S. 483, 486. Creating remedies for unlawful behavior is "a task outside the bounds of judicial interpretation." Id. at 495.

"An administrative agency cannot by its own regulations create a remedy which the Legislature has withheld. 'Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations.'" Dyna-Med, Inc. v. Fair Empl. & Housing Comm., 43 Cal. 3d 1385, (1987) 1388. `It is fundamental an administrative agency may not usurp the legislative function, no matter now altruistic its motives are.' Agricultural Lab. Relations Bd. v. Superior Court, 16 Cal.3d 392, 419 (1976)." Defendant knows all this.

The Defendant's claim that there is constitutional clarity as to the consequences unlicensed representatives face despite the TAA having no penalty provision is in disharmony with every – every – related legal tenet and precedent outside of how courts rule about the TAA after Buchwald. Defendant knows this; too; if any matter outside TAA cases came to a contradictory conclusion, that case would have been cited in her motion.

"Where a statute fails to provide a penalty it has been uniformly held that it is beyond the power of the court to prescribe a penalty." State v. Fair Lawn Service Center, 120 A.3d 233, 236 (NJ 1956).

With no penalty provision, and creating penalties being a legislative, not judiciary function, the Labor Commissioner is meting out penalties without judicial authority. This Court are obliged to end this policy.

The Defendant claims that these prohibitions only matter in "statutes that prescribe a criminal penalty." (MJP Pg. 15, lns. 8-10.) Defendant knows, too, this is untrue: "Statutes, regardless whether criminal or civil in nature, must be sufficiently clear as to provide adequate notice of the prohibited conduct as well as to establish a standard of conduct which

20

can be uniformly interpreted by the judiciary and administrative agencies." Wachs v. Curry, 13 Cal. App. 4th 616, 628 citing Hall v. Bureau of Employment Agencies 64 Cal.App.3d 482, 491 (1976). (Curry was the then-Acting Labor Commissioner.)

As the Supreme Court unequivocally stated: while the "strict constitutional safeguards afforded to criminal defendants are not applicable to civil cases … the basic protection against 'judgments without notice' afforded by the Due Process clause [citation] is implicated by civil penalties." BMW of America v. Gore, 517 U.S. 559, 574 (1995).

Defendant challenged Plaintiff to find authority that limits the effect of the relevant Civil Code sections (§§ 1550, 1596, 1598, 1599, 1608, 1608, 1667, 3513). But there is no applicability here. These statutes only become relevant as to the potential voiding of a contract once there is a finding of unlawfulness.

The verbiage of § 1599 is clear: "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." The statute is only applicable once there has been a finding of unlawfulness, to determine whether the unlawfulness can and should be separated out from a contract or should the entire contract be voided. Claiming Civil Code § 1599, on its own, can be the needed notice without itself is the epitome of vagueness: how would a reasonable person reading the Labor Code licensing scheme know to read the Civil Codes in full to learn of their risk of remedy? Even if they read § 1599, how would one know that there does not need a finding of unlawfulness first?

### 2.     TAA Enforcement Is Founded Upon Faulty Precedents

Defendant leans on Waisbren v. Peppercorn Prods, Inc., 41 Cal. App. 4th 246, 261 (1995). Waisbren leans on the Legislature choosing to eliminate the Act's criminal sanctions in 1982 and how a Legislative Commission started simultaneously recommended that there is no need to re-impose criminal sanctions "in part because the existing remedy of contract voidness was sufficient." Per Waisbren, the Legislature then following the recommendation and 'approv[ing] the remedy of declaring agreements void if they violate the Act. Thus, an

agreement that violates the licensing agreement is illegal and unenforceable despite the lack of criminal sanctions.'" MJP, Pg. 15, lines 24-28.

Only, as Defendant knows, the criminal sanction had nothing to do with procurement, there was no existing remedy, and no 'remedy to declare agreements void' was ever codified.

The repeal of 1982 was the penalty provision of Civil Code § 1700.30. Until then, it was a misdemeanor "punishable by fine of not less than one hundred dollars ($100) nor more than five hundred dollars ($500), or imprisonment for not more than 60 days, or both" should one "sell, transfer or give away any interest in or the right to participate in the profits of the talent agency without the written consent of the Labor Commissioner." Id. Relatedly, the main holding of Waisbren, where one TAA violation resulted in the full voidance of the violator's contractual rights, was mooted by Marathon.

If there was an existing remedy for unlicensed, what is the statute number? The Legislature never put in a voidance statute into the Act for that or any other action. As stated in Civ. Code § 3523, "For every wrong, there is a remedy." Thus, with no notice of a remedy, there is no wrong. Put another way, as stated in CA Civil Code § 3530: "That which does not appear to exist is to be regarded as if it does not exist."

Defendant argues that, "It is clear what the consequences are for violating the TAA," pointing to "the general rule," "that a contract made in violation of statutory law is void." MJP, Pg 14, Lns. 19-24.

The CA Supreme Court first referred to this 'general rule' in Wood v. Krepps, 168 Cal. 382, 386 (1914): "when the object of the statute or ordinance in requiring a license for the privilege of carrying on a certain business is to prevent improper persons from engaging in that particular business ... the imposition of the penalty amounts to a prohibition against doing the business without a license and a contract made by an unlicensed person in violation of the statute or ordinance is void." With no penalty imposition, TAA contracts are not to be voided.

The parties in Wood faced a very analogous situation as the instant matter; a licensing scheme that had not imposed a penalty, did not void the contractual rights of an unlicensed pawnbroker. "The ordinance does not declare that a contract made by any one in the conduct of the various businesses for which licenses are provided to be procured under the

ordinances, shall, if a license is not obtained, be invalid; nor is there any provision therein indicating in the slightest that this failure was intended to affect in any degree the right of contract." Id.

Smith v. Bach, 183 Cal. 259, 262 (1920) further elucidated on the rule: "The imposition by statute of a penalty implies a prohibition of the act to which the penalty is attached, and a contract founded upon such act is void." The TAA has no penalty statute and thus does not have, per Smith, the authority to void a contract.

Loving & Evans v. Blick, 33 Cal. 2d 603, 608-09 (1949) found that, "it has been repeatedly declared in this state that 'a contract made contrary to the terms of a law designed for the protection of the public and prescribing a penalty for the violation thereof is illegal and void, and no action may be brought to enforce such contract.'"

Gatti v. Highland Park Builders Inc., 27 Cal 2d 687, 689 (1947) further clarifies, "a contract made contrary to the terms of a law designed for the protection of the public and prescribing a penalty for the violation thereof is illegal and void, and no action may be brought to enforce such contract." The TAA does not prescribe a penalty, therefor there is no prohibition to enforcing the parties' contracts.

"If the statute does not provide expressly that its violation will deprive the parties to sue on the contract and the denial of the relief is wholly out of proportion to the requirements of public policy or appropriate individual punishment, the right to recover will not be denied." Severance v. Knight-Counihan Co., 29 Cal.2d 561, 572 (1947). As the TAA has no statute expressly providing that its violation deprives parties the right to sue on the contract, per Severance, that right is not to be denied.

Albaugh v. Moss Constr. Co., 125 Cal. App. 2d 126, 131-32 (1954) is a Contractors Act dispute. That Act expressly prohibits non-licensees from engaging in the activities of a contractor and expressly prohibits compensation for unlicensed work:

> "Section 7030 makes it a misdemeanor for any person who acts in the capacity of a contractor without a license. Section 7031 provides that 'No person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action in any court of this State for the collection of compensation for the performance of any act or contract for which a license is required by this chapter

23

> without alleging and proving that he was a duly licensed
> contractor at all times during the performance of such act or
> contract. ... In order to be entitled to prevail in a legal
> action, a contractor must allege and prove that he was
> licensed at all times during the performance of his contract.
> (Bus. & Prof. Code, 7031)."

The TAA has no such statutes and therefor no such prohibition. To rule otherwise would make §§ 7030 and 7031 superfluous.

When Defendant finds an unlicensed representative has unlawfully procured, the determinations unerringly cite the same precedent to find the authority to void the contract:

> "Since the clear object of the Act is to prevent improper persons from
> becoming [talent agents] a contract between [the agent] and an artist is void.
> See Wood v. Krepps, 168 Cal. 382, 386, Loving & Evans v. Blick, 33 Cal. 2d
> 603; Albaugh v. Moss Construction, 125 Cal. App. 2d 126, 131-132. Contracts
> otherwise violative of the Act are void (see Severance v Knight-Counihan, 29
> Cal. 2d 561, 568; Smith v. Bach, 183 Cal. 259, 262)."
> Buchwald v. Superior Court, 254 Cal. App. 2d 347, 351.

Buchwald cites cases that unequivocally state contracts can only be judicially invalidated when there is statutory authority supplied in the form of a penalty provision, only for whatever reason, created a wrongful precedent that made a penalty statute unneeded.

### E.    Defendant's Claims Of Issue Preclusion Is Meritless

Issue Preclusion, even when the same parties are litigating the same issues as was argued in a past court case, is not an absolute:

> "There are exceptions to the rule. These are defined in
> Restatement (Second) of Judgments § 26(1)(d): 'The
> judgment in the first action was plainly inconsistent with the
> fair and equitable implementation of a statutory or
> constitutional scheme, or it is the sense of the scheme that the
> plaintiff should be permitted to split his claim. ...  [T]he first
> decision involve[s] an issue of law.'"

*Preclusion as to Issues of Law: The Legal System's Interest*, Geoffrey C. Hazard Jr., Yale Law Faculty Scholarship Series, Pg. 83-84.

http://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?article=3297&context=fss_papers.

The fact that <u>Buchwald</u> is plainly inconsistent with the five upper court holdings of <u>Wood</u>, <u>Smith</u>, <u>Loving</u>, <u>Gatti</u> and <u>Severance</u> gives reason for re-litigation so the scheme's implementation will be fair and equitable.

> "As formulated in Restatement (Second) of Judgments §
> 28, in relitigation between the same parties an exception to the
> rule of preclusion operates when "[t]he issue is one of law and
> (a) the two actions involve claims that are substantially
> unrelated, or (b) a new determination is warranted in order to
> take account of an intervening change in the applicable legal
> context or otherwise to avoid inequitable administration of the
> laws." ' This exception is expressly limited to issues of law."

> "The issue is one of law and treating it as conclusively
> determined would inappropriately foreclose opportunity for
> obtaining reconsideration of the legal rule upon which it was
> based.' 'Again, this exception reflects the broader institutional
> concerns of the legal system-equality and stability between the
> individual litigants may be sacrificed in order to preserve the
> equality and stability of the legal system as a whole. <u>Id</u>.

This action satisfies both exceptions (a) and (b) to the preclusion rule. The actions are completely unrelated; only the legal issues regarding the righteousness or wrongfulness of the regulation of the Talent Agencies Act and the parties remain the same. As the Labor Commissioner no longer finds a personal manager's sending out of sales materials a TAA violation, is an intervening change in the applicable legal context. The knowledge that the precedent the Defendant uses for its authority to void violators' contracts is an anomaly, contradicting with all federal and state authorities, including the four State Supreme Court cases the precedent/<u>Buchwald</u> itself relies on.

Section 28(5) of the Second Restatement states that issue preclusion is not applicable if "[t]here is a clear and convincing need for a new determination of the issue... because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action."

Comment i of Section 28(5) adds: "preclusion should not operate to foreclose redetermination of an issue if it was unforeseeable when the first action was litigated that the issue would arise in the context of the second action, and if that lack of foreseeability may

have contributed to the losing party's failure to litigate the issue fully." *Unforeseeable Preclusion and the Second Restatement*, Robert Ziff, Cornell Law Review Vol. 77, Issue 4; Pg. 906, FN 7.

As nothing in the Act changed as written, it was impossible to foresee that the Labor Commissioner was going to change the enforcement. As this change was not made public, it contributed to Plaintiff's inability to litigate the issue fully.

A litigant is subject to issue preclusion and is collaterally estopped from challenging a prior, fully adjudicated judgment when these conditions are in place: (a) a "right, question or faction distinctly put in issue and directly determined in a subsequent suit between the same parties," (b) the precise claim was presented and previously resolved, (c) the factual and legal content in with the issues of a case have not materially changed." <u>Montana v. United States</u>, 400 U.S. 147 (1979). As this precise claim was not presented, and the factual and legal content have materially changed, Plaintiff is not subject to issue preclusion.

In addition: "Even assuming all the threshold requirements are satisfied . . . [w]e have repeatedly looked to the public policies underlying the doctrine before concluding that collateral estoppel should be applied in a particular setting." <u>Murray v. Alaska Airlines</u>, 50 Cal 4th 860, 882 (2010) <u>Lucido v. Superior Court</u> (1990) 51 Cal.3d 335, 342-343.)

"Application of collateral estoppel depends not only on whether the strict requirements for estoppel have been satisfied, but also on whether the core public policies underlying it—preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation—support its invocation." <u>Murray</u> Supra at 873.

There is a core public policy that must be examined: should artists who choose not to pay for the benefit of the labor of those they hire to represent them be able to take advantage of the wrongful interpretation and enforcement of the Defendant? There is only one answer to this question: no. As such, if only because Issue Preclusion incorporates discretion, Defendant's claim should be denied. More important, it should be denied because of the broader institutional concerns of the legal system; to preserve the equality and stability of the legal system as a whole.

**OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS**

## II.   AS IT MAKES CA.-BASED ARTISTS AND MANAGERS TO USE IN-STATE LICENSEES TO DO BUSINESS OUTSIDE THE STATE, THE TAA BURDENS INTERSTATE COMMERCE AND THUS IS UNCONSTITUTIONAL

As Defendant states (MJP, Pg 16, lines 6-10), this issue is new. The facts related to this claim are also new. This issue was not ripe in the original suit as there was no relevant interstate commerce. Plaintiff was litigating whether he had wrongly been affected by past actions that were all related to California-based employment. As such, Plaintiff would not have had standing to raise this argument/claim. As such, Defendant's claim preclusion claim regarding the Dormant Commerce clause is meritless.

Again, it is mindboggling that those who have been asked to protect the rights of Californians – all Californians – would effort to avoid having to fully defend the statute's appropriateness instead of having a court fully consider the righteousness of its enforcement.

"Interstate Commerce refers to the purchase, sale or exchange of commodities, transportation of people, money or goods, and navigation of waters between different states." https://definitions.uslegal.com/i/interstate-commerce/

Thus, when a California-based artist is engaged to work in any other state, it is interstate commerce. Virtually every working artist will at times travel for a film, television series or live performances; working for entities that are based in New York, Delaware, Nevada, Florida or other domiciles. As such, the Defendant's protestation that, 'there is nothing 'inherently national' about the talent agent business, which is an integral element in creating one of America's biggest export – entertainment content -- is simply ludicrous.

Only one TAA controversy reached the U.S. Supreme Court, Preston v. Ferrer, 552 U.S. 346 (2008), a case about a Florida Judge who made a deal in Nevada to work in Texas for a Delaware Corporation. The TAA is only about matters of local concern? Really? As entertainment is carried through airwaves and bought throughout the 50 states, the industry intrinsically relies on interstate commerce.

Defendant has also chosen not to address the specific claim being made: that when a CA-based artist gets work out-of-state from out-of-state agent is involved, ass enforced, the artist and manager must also involve a licensed agent.

Should a regional agent know of a project in the Poconos or a County Fair in the Ozarks or some other area that no California-based agent covers, if the artist and/or personal

27

manager do not involve a licensee, the Defendant finds it a violation of the Act. (See, for example, <u>Robi v. Wolf</u>, TAC 2000-29.) The personal manager and/or the artist must cover this extra cost despite the licensed agent providing no labor, expertise or needed facilitation. In short, no benefit past taking away the risk of violation; the agent is in no place to provide anything more than 'protection.'

As Defendant stated, Plaintiff "must plausibly argue that any incidental burdens on interstate commerce caused by the TAA are clearly excessive in relation to the putative local benefits." MJP, Pg. 21, Lines 5-9. Here, the only beneficiary is the licensed agent. The CA agent would not have the time to properly cover the regional buyer and know their needs; they would not have the local knowledge to understand how to best negotiate. Anita Baker and her manager chose to hire the best specialist in urban music, domiciled in New York. To abide by the Act, Ms. Baker and her manager would also have to cut a licensed agent in or used an inferior representative. Again, this is to the benefit of the California agent and no one else. The TAA is supposed to regulate California's talent agencies, not protect them. If California does not have as good an agency as elsewhere, making the artist and manager add another layer of costs or demanding that an out-of-state agency get an in-state license though its outside the boundaries of California is protectionist.

Defendant cites <u>Goldfarb v. Va. State Bar</u>, 421 U.S. 773, 792 (1975), where the U.S. Supreme Court recognized states' "compelling interest in the practice of professions within their boundaries." Yet, as noted above, a Montana or Missouri agent booking a Missoula or Meridian wedding party must abide by California rules, though these places are thousands of miles away from California's boundaries. This is a clear unconstitutional burden.

Defendant writes that in <u>Sam Francis Foundation v. Christies</u>, 784 F.3d 1320, 1323-24 (2015), a statute was invalidated because it "facially regulates a commercial transaction that takes place wholly outside of the State's borders." Half-true: the Ninth Circuit found California's Resale Royalty Act violated the dormant Commerce Clause because that Act "require[d] the payment of royalties to the artist after a sale of fine art whenever 'the seller resides in California or the sale takes place in California" and thus regulates sales that take place outside California. "

> "Those sales have no necessary connection with the state
> other than the residency of the seller. For example, if a

28

California resident has a part-time apartment in New York, buys a sculpture in New York from a North Dakota artist to furnish her apartment, and later sells the sculpture to a friend in New York, the Act requires the payment of a royalty to the North Dakota artist—even if the sculpture, the artist, and the buyer never traveled to, or had any connection with, California. We easily conclude that the royalty requirement, as applied to out-of-state sales by California residents, violates the dormant Commerce Clause."

"The Supreme Court has held that "our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following proposition[ ]: . the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State. {Healy v. Beer Instit., 491 U.S. 324, 336 (1989)."

Sam Francis Supra.

… "Direct regulation occurs when a state law directly affects transactions that take place entirely outside of the state's borders. Such a statute is invalid per se."

Id. at 1124, citing Valley Bank of Nev. v. Plus Sys., Inc., 914 F.2d 1186, 1189–90 (9th Cir.1990)."

"Under Healy, the Act's clause regulating out-of-state art sales where "the seller resides in California," Cal. Civ.Code § 986(a), and no other connection to California need exist, violates the dormant Commerce Clause as an impermissible regulation of wholly out-of-state conduct." Id. at 1125.

This mirrors what happens when out-of-state agents get a California resident work outside California. The only' connection is that there is a CA resident involved, but the agent's procurement and the artist's labor is being done out-of-state.  Thus, just as with Sam Francis, the TAA is invalid per se because of its "impermissible regulation of wholly out-of-state conduct."

In Sam Francis, the Court left the 5% seller commissions on in-state sales in place. It determined there was "grammatical separability," where the out-of-state sales could be extracted and the "revised provision has a reduced scope … but it is complete, has coherent functionality, and does not conflict with any of the Act's other provisions." The TAA has

29

no such language, so severance for in-state procurement is not available.

Here again, Plaintiff is confounded by the Defendant Labor Commissioner and the Attorney General's office serving as her counsel. As they inserted the controlling case law into their motion, they know the Act is inarguably violative of the dormant Commerce Clause because of its impermissible regulation of wholly out-of-state conduct. Yet still they effort to keep this wrongful enforcement in place, despite knowing it wrongfully and unconstitutionally compromises personal managers, attorneys, publicists and other unlicensed professionals/representatives.

## III.    CONCLUSION

If you prick a personal manager, do we not bleed? If you poison a personal manager, do we not die? We are like you in the rest, and the law we receive should resemble you in that. As the TAA as it pertains to procurement is vague on its face and how enforced, and it is violative of the Dormant Commerce clause, this Court should affirm the Plaintiff's claims through declarative relief and through injunction bar the Defendant from enforcing the Act until and unless the California Legislature properly amends it.


Dated December 29, 2017          Respectfully Submitted,

                                 Rick Siegel, serving pro per

**OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS**

1  Rick Siegel
   22647 Ventura Boulevard, Suite 451
2  Woodland Hills CA 91364
   323.864.7474  phone
3  rick@marathonentco.com
   Acting pro per

4

5

6  **RICK SIEGEL**, an individual,            )   CASE NO.   2:17-cv-07203
                                              )
7                        Plaintiff,           )   **PLAINTIFF'S REQUEST FOR**
                                              )   **JUDICIAL NOTICE PURSUANT TO**
8          vs.                                )   **FEDERAL RULES OF EVIDENCE**
                                              )   **RULE 201**
9  **JULIA SU**, in her official capacity as the )
   California State Labor Commissioner        )   **[filed concurrently with Opposition To**
10                       Defendant.           )   **Defendant's Motion For Judgment On**
                                              )   **The Pleadings**
11                                            )
                                              )
12 _____        )
                                              )
13                                            )
                                              )
14                                            )
                                              )
15

16         In support of Plaintiff's Opposition to Defendant's Motion For Judgment On The

17 Pleadings, Plaintiff Rick Siegel requests that the court take judicial notice of the following

18 document pursuant to Rule 201.

19         Under 201, facts appropriate for judicial notice are those "not subject to reasonable

20 dispute in either (1) generally known within the territorial jurisdiction of the trial court or (2)

21 capable of accurate and ready determination by resort to sources whose accuracy cannot

22 reasonable be questioned."

23         (1) Page 29 from a brief Defendant submitted using the same counsel as Defendant has

24             in this matter, explaining how the Defendant enforces the submission of sales

25             materials by an unlicensed talent representative in a Talent Agency Controversy.

26 Dated: 1/29/17                      _____

27                                     Rick Siegel serving Pro Per

28
                    REQUEST FOR JUDICIAL NOTICE          Exhibit 1
                                    1

15-56388

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

**NATIONAL CONFERENCE OF PERSONAL MANAGERS, INC.,**

Plaintiff-Appellant,

v.

**EDMUND G. BROWN, JR., et al.,**

Defendants-Appellees.

On Appeal from the United States District Court
for the Central District of California

No. 2:12-cv-09620-DDP-RZ
The Honorable Dean D. Pregerson, District Judge

## APPELLEES' ANSWERING BRIEF

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
MARC A. LEFORESTIER
Supervising Deputy Attorney
General

JOHN W. KILLEEN
Deputy Attorney General
State Bar No. 258395
1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 445-1968
 Fax: (916) 324-8835
 Email: John.Killeen@doj.ca.gov
*Attorneys for California Governor
Edmund G. Brown, Jr., and California
Labor Commissioner Julie A. Su*

artist. Conversely, if the unlicensed person fails to book the artist for an engagement, he or she has not "procured employment" for the artist. This meaning would be "clear enough to the reasonable person." *Pickup*, 740 F.3d at 1234.

Like the plaintiffs in *Pickup*, NCOPM "argue[s] that it cannot ascertain where the line is between what is prohibited and what is permitted—for example," it "wonder[s] whether the mere dissemination of information" would constitute unlawful procurement. *Pickup*, 740 F.3d at 1234; *see* AOB at 5 ("sending out resumes, photos, videotapes, or written materials promoting a . . . client"), 26-27 (same), 27 ("creat[ing] marketing materials").

The examples NCOPM cites, *standing alone*, clearly do not constitute the "procurement" of "employment" because no employment or engagement has been obtained for the artist. Personal managers do not need a license to "send[] out resumes, photographs, videotapes, or written materials for an artist." AOB at 27-28. Nor do personal managers need a license to provide "other services for which artists often contract, such as personal and career management (i.e. advice, direction, coordination, and oversight with respect to an artist's career or personal or financial affairs)." *Styne v. Stevens*, 26 P.3d 343, 349 (Cal. 2001).

28

requirement—which is indistinguishable from other professional licensing

requirements—clearly exceeds its local benefits.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request that the Court

affirm the judgment of the district court.

Dated:  May 25, 2016         Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
MARC A. LEFORESTIER
Supervising Deputy Attorney General

*/s/ John W. Killeen*

JOHN W. KILLEEN
Deputy Attorney General
*Attorneys for California Governor*
*Edmund G. Brown, Jr., and California*
*Labor Commissioner Julie A. Su*

SA2015105081
12278978.doc